# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BELINDA MATA,                    )
    Plaintiff,                   )
                                 )
v.                               )        CASE NO. B-04-092
                                 )
CAMERON COUNTY HEALTH            )
DEPARTMENT, CAMERON COUNTY,      )
    Defendant.                   )

## DECLARATION UNDER PENALTY OF PERJURY

STATE OF TEXAS        )
COUNTY OF CAMERON      )

    "I declare under penalty of perjury under the laws of the United States of America that the

attached are true and correct copies of Pages 11, 18, 22, 23, 30, 32, 38, 39, 40, 41, 42, 43, 45, 46,

71, 72. 107, 108, 114, 153, and Exhibits1 and 3 of the Yvette Salinas Deposition taken in this case

on April 4, 2005."

    "I declare under penalty of perjury that the foregoing is true and correct."

Executed on June 10, 2005.

                       Richard O. Burst
                       Attorney in Charge
                       For Cameron County

09:42  1          A.   At Cameron County Department of Health and

09:42  2     Human Services, located at 1122 Morgan Boulevard in

09:43  3     Harlingen.

09:43  4          Q.   All right, and what is your title there?

09:43  5          A.   Health administrator.

09:43  6          Q.   And what is your residential address and

09:43  7     telephone number?

09:43  8          A.   5800 North 23rd Lane in McAllen, Texas.  And my

09:43  9     phone number is 956-630-6625.

09:43 10          Q.   And how long have you worked for Cameron

09:43 11     County?

09:43 12          A.   Since 1990.

09:43 13          Q.   And what titles have you held with Cameron

09:43 14     County?

09:43 15          A.   I have been the WIC coordinator, the WIC

09:43 16     director, the interim health administrator, and the

09:43 17     health administrator.

09:43 18          Q.   Do you have any relatives working for Cameron

09:43 19     County?

09:44 20          A.   No, not to my knowledge.

09:44 21          Q.   Okay.  At any time since, say, 1989, have you

09:44 22     had any relatives that worked for Cameron County?

09:44 23          A.   No, not that I know of.

09:44 24          Q.   Are you aware of any relatives assisting you

09:44 25     with your -- did you apply for the director position

09:52  1    satisfaction with your job?

09:52  2    A.  I approached Remy and told him that I had

09:52  3    applied for this job and they had offered me the

09:53  4    position, but I needed to know where I stood with

09:53  5    Cameron County because if there was any dissatisfaction

09:53  6    with my work, then it would a good opportunity for me

09:53  7    to move on since the pay was comparable.

09:53  8        So Remy didn't get to me -- back to me in

09:53  9    an appropriate timeframe, and I had a meeting with the

09:53 10    county health authority and the county judge around the

09:53 11    same time.  So I went ahead and I asked him that

09:53 12    question, and he told me that, yes, Remy had mentioned

09:53 13    it to him and that he had instructed Remy to tell me

09:53 14    that, yes, he was happy with my work and that he was

09:53 15    surprised that Remy did not relay that message to me.

09:53 16    Q.  Can you tell the ladies and gentlemen of the

09:53 17    jury who Remy is?

09:53 18    A.  Remy Garza?

09:53 19    Q.  Yes.

09:53 20    A.  I'm not sure what his title is, but he's

09:53 21    possibly the chief administrative assistant to the

09:54 22    county judge.

09:54 23    Q.  Okay.  And who is actually responsible for your

09:54 24    review?

09:54 25    A.  The commissioners court.

09:58   1       Q.   Are you eligible to be promoted to a higher

09:58   2   position than you hold today with Cameron County?

09:58   3       A.   I do not believe so.

09:58   4       Q.   Are you eligible for any raises?

09:58   5       A.   I do not believe so.

09:58   6       Q.   What about cost of living adjustments?

09:58   7       A.   When the county employees get a salary

09:58   8   increase, I do too.

09:58   9       Q.   Why do you think you're not eligible for any

09:58  10   raise or promotion?

09:58  11       A.   I am at the highest level that I can be as a

09:58  12   department head who works for the commissioners court.

09:58  13       Q.   And it's your testimony you have not received

09:58  14   any raises since you have held this position?

09:58  15       A.   I received the raises that are approved by the

09:59  16   commissioners court and given to the county employees.

09:59  17       Q.   Have you been satisfied with those raises to

09:59  18   this point in time?

09:59  19       A.   Yes.

09:59  20       Q.   Do you consider yourself a loyal employee of

09:59  21   Cameron County?

09:59  22       A.   Yes.

09:59  23       Q.   What is your understanding of the duty that an

09:59  24   employee owes to its employer in terms of loyalty?

09:59  25       A.   In terms of loyalty?

09:59 1    Q.   Yes.

09:59 2    A.   I need to perform the duties -- I need to

10:00 3    perform the duties as outlined, whether they are county

10:00 4    policies, state policies, and I need to have a

10:00 5    commitment to the county.

10:00 6    Q.   Do you believe it's also important not to cast

10:00 7    the county as your employer in a bad light publicly?

10:00 8    A.   Can you repeat that?

10:00 9    Q.   Do you believe it's important for a person in

10:00 10   your position not to cast the county, which is your

10:00 11   employer, in a bad light publicly?

10:00 12   A.   Yes, I do.

10:00 13   Q.   Do you believe it's important to protect the

10:00 14   public's image of your employer, which is the county?

10:00 15   A.   To a point, yes, I do.

10:01 16   Q.   Would you be reluctant to say or do anything

10:01 17   that you thought would hurt the reputation of the

10:01 18   county?

10:01 19   A.   No.

10:01 20   Q.   Have you ever done so?

10:01 21   A.   I don't recall.

10:01 22   Q.   Okay, so your testimony is that you wouldn't be

10:01 23   reluctant to cast the county in a bad light, but you

10:01 24   don't recall ever having done so personally; is that

10:01 25   correct?

10:12 1    terminated because of the expired vaccine and her

10:12 2    involvement in that.

10:12 3        Q.   Okay.   Do I take it that you mean in your

10:12 4    answer or imply in your answer that she wasn't

10:12 5    terminated for her involvement in the expired vaccine?

10:12 6        A.   Can you repeat that?

10:13 7        Q.   Let me just ask a different question

10:13 8    altogether.   Was Ms. Mata terminated for her

10:13 9    involvement in reporting the expired vaccine?

10:13 10       A.   I did not terminate her for that reason.

10:13 11       Q.   Was that part of it?

10:13 12       A.   No.

10:13 13       Q.   What reason did you terminate her for, then, if

10:13 14   it wasn't for reporting the expired vaccine?

10:13 15       A.   She was terminated -- I make the decision

10:13 16   whether to terminate or not, and Esmer Guajardo, her

10:13 17   immediate supervisor, approached me and told me that

10:13 18   this was the third instance that she did not follow the

10:13 19   procedure for reporting an intended absence or lateness

10:13 20   or what have you, and that a note had been left on the

10:13 21   door for all the staff to see whenever they got to

10:14 22   work, and her recommendation was to go ahead and to

10:14 23   terminate.

10:14 24       Q.   Okay.   But it's correct that at the time that

10:14 25   you terminated Belinda Mata, you were aware that she

10:15  1    about the vaccine and that she may feel that she may

10:15  2    have been terminated because of that.

10:15  3        Q.  All right.  Is there any merit in your mind to

10:16  4    her contention that that was part of the reason she was

10:16  5    terminated?

10:16  6        A.  No.

10:16  7               MR. BURST:  Object -- answer.

10:16  8        A.  No.

10:16  9        Q.  And why is that?

10:16 10        A.  I'm the only one in the department that

10:16 11    terminates.  So I have to have real clear in my mind

10:16 12    why someone is being terminated.  And I know that she

10:16 13    was terminated because she failed to report her

10:16 14    absence, as Ms. Guajardo had previously instructed her

10:16 15    to do.

10:16 16        Q.  Have you ever regretted a decision that you

10:16 17    made in your capacity as director?

10:16 18        A.  Yes.

10:16 19        Q.  Let's talk about some regrettable decisions.

10:16 20        A.  Okay.

10:16 21        Q.  Tell me some examples.

10:17 22        A.  There was one employee that was terminated, and

10:17 23    I later rehired him, and I regretted terminating him to

10:17 24    begin with because I did not feel that possibly he was

10:17 25    given an opportunity to work.

10:24 1      Q.   Had you made any determinations about her

10:25 2  performance being lacking at the time she was

3  terminated?

10:25 4      A.   No.

10:25 5      Q.   Let me show you an exhibit that I would like to

10:25 6  mark as Deposition Exhibit No. 1.

10:25 7           (Salinas Exhibit No. 1 was marked)

10:25 8      Q.   I'm just going to hand you a page from the

10:25 9  policy manual, and directing your attention to one of

10:25 10  the reasons for disciplining an employee.

10:26 11     A.   Uh-huh.

10:26 12     Q.   Does that page appear familiar to you?

10:26 13     A.   Yes, it does.

10:26 14     Q.   What is it?

10:26 15     A.   Well, it looks like a policy from the personnel

10:26 16  manual.

10:26 17     Q.   The one that applied to Ms. Mata while she was

10:26 18  an employee of yours?

10:26 19     A.   Yes.

10:26 20     Q.   Does the policy specifically address being

10:26 21  absent?

10:26 22     A.   Absent without leave?

10:26 23     Q.   Yes.  Can you read that provision?

10:26 24     A.   "Absence without leave, including failure to

10:26 25  notify supervisor of sick leave and repeated tardiness

10:26 1    or early departure."

10:26 2        Q.   Is that the provision that Ms. Mata violated?

10:27 3        A.   I believe so.

10:27 4        Q.   You terminated Ms. Mata, correct?

10:27 5        A.   Yes.

10:27 6        Q.   And you believe that it was because of

10:27 7    violation of that policy?

10:27 8        A.   I believe that I terminated her because she

10:27 9    failed to report her absence to her supervisor.

10:27 10       Q.   You were present for her deposition where a

10:27 11   note was admitted as an exhibit that she left notifying

10:28 12   her supervisor of her coming in late, correct?

10:28 13       A.   Yes.

10:28 14       Q.   You don't dispute that she did leave a note for

10:28 15   her supervisor, correct?

10:28 16       A.   Correct.

10:28 17       Q.   And that note was notification of when she

10:28 18   would be coming in, correct?

10:28 19       A.   It was notification, correct.

10:28 20       Q.   Wouldn't it be a fair statement to say that you

10:28 21   did not have to terminate Ms. Mata on June 4th for

10:28 22   violating that policy if you had decided that her note

10:29 23   did provide notification that she would be coming in

10:29 24   late?

10:29 25       A.   That was a long question.

10:29  1      Q.   It was a short question.  I just said it very

10:29  2   slowly.  Let me restate it.  Let me rephrase it.

10:29  3           Do you believe you could have, within your

10:29  4   discretion, exercised any lesser means to get your

10:29  5   point across about being absent besides terminating

10:29  6   Ms. Mata?

10:29  7      A.   Yes, that option was available to me.

10:29  8      Q.   And it would not have violated any policy for

10:29  9   you to have exercised some discretion over a lesser

10:29 10   means of discipline than termination, correct?

10:29 11      A.   No, it would not have violated any policy.

10:30 12      Q.   And you don't always utilize termination, which

10:30 13   is the ultimate form of discipline, when there's a

10:30 14   violation of a policy, do you?

10:30 15      A.   No, I do not.

10:30 16      Q.   In fact, more often than not, you would tend, I

10:30 17   would presume, not to exercise the ultimate form of

10:30 18   discipline, which is termination, when there's a policy

10:30 19   violation, right?

10:30 20      A.   There's many times I do not use termination.

10:30 21      Q.   And looking at that policy today, do you

10:30 22   believe you could have determined that her note was the

10:30 23   very sort of notification of being out that that policy

10:30 24   discusses?

10:30 25      A.   I do not feel that she fulfilled the

10:30  1   obligations of notifying her supervisor.

10:30  2       Q.  But you admit that she made an effort, don't

10:31  3   you?

10:31  4       A.  I believe she made an effort.

10:31  5       Q.  And you admit that what she wrote in the note

10:31  6   would have been identical to what she could have told

10:31  7   her supervisor, correct?

10:31  8       A.  No, I do not believe that.

10:31  9       Q.  What would you have thought she would have told

10:31 10   her supervisor that would have been different?

10:31 11       A.  I believe that there would have been a

10:31 12   conversation and an understanding between the two, and

10:31 13   that would have been different.

10:31 14       Q.  But oftentimes employees can't reach and talk

10:31 15   to supervisors before they are actually late or absent;

10:31 16   isn't that right?

10:31 17       A.  I do not know.

10:31 18       Q.  You don't have any idea whether there are

10:31 19   circumstances that prevent your employees from reaching

10:31 20   their supervisors before they are absent?

10:31 21       A.  We have a policy that they are to report to

10:31 22   their immediate supervisor, and there are instances

10:31 23   where someone could be hospitalized, unable to talk.

10:32 24   So, yes, there are instances.

10:32 25       Q.  Why did you feel it was appropriate, if we

10:32 1  assume you weren't holding anything against Ms. Mata,

10:32 2  as the petition alleges, to utilize the most extreme

10:32 3  form of discipline in the case of her leaving a note

10:32 4  saying she will be in later?

10:32 5      A.  I do not believe that Ms. Mata at that point

10:32 6  could follow the procedure of reporting absences,

10:32 7  tardiness.

10:32 8      Q.  Was this simply a decision you made because she

10:33 9  technically -- in your mind, she technically did not

10:33 10 comply with the request?

10:33 11     A.  Can you repeat that?

10:33 12     Q.  You said that in your mind you did not think

10:33 13 she could follow the specific procedures given to her

10:33 14 for notification about coming in late?

10:33 15     A.  Uh-huh.

10:33 16     Q.  That's why you terminated her, because you

10:33 17 didn't think she could follow the procedures; is that

10:33 18 right?

10:33 19     A.  That's correct.

10:33 20     Q.  But her -- she is not employed -- let me put it

10:33 21 a different way.  She was working on a very important

10:33 22 project up to the day she was terminated, correct?

10:33 23     A.  Yes.

10:33 24     Q.  In fact, she had just finished it the day she

10:33 25 was terminated, correct?

10:33  1        A.   Yes.

10:33  2        Q.   She finished your expectations of what she was

10:34  3   to do on a very important project, right?

10:34  4        A.   Yes.

10:34  5        Q.   All right.   You testified earlier that her

10:34  6   performance was not the issue, her job performance was

10:34  7   not the issue.   It was her ability to comply with

10:34  8   instructions about coming in late that was the issue

10:34  9   that led to her termination, right?

10:34 10        A.   Yes.

10:34 11        Q.   Did you not think that the value of her

10:34 12   employment and her ability to work on the project that

10:34 13   she had been working on outweighed Esmer's request that

10:34 14   she use a cell phone to call Esmer to notify her as

10:34 15   opposed to any other means of notifying her?

10:34 16        A.   No, I did not.

10:34 17        Q.   Why did you not think that was far more

10:35 18   important, that her employment was far more important

10:35 19   than the specific means she used to notify Esmer of

10:35 20   when she would be in?

10:35 21        A.   I could have someone inventory the vaccines.

10:35 22   That could -- that job duty could be done by somebody

10:35 23   else.   What would be difficult was to continue to

10:35 24   employ somebody who was not following reporting

10:35 25   procedures, and I could not have other employees follow

10:37  1    got a phone call -- or maybe she didn't even show up

10:37  2    until 1:00.  So she -- my understanding was that she

10:37  3    had a problem with maintaining a schedule and notifying

10:37  4    her supervisor of what her intentions were.

10:37  5        Q.  So you believe that her termination was

10:37  6    justified when you terminated her, and you believe --

10:37  7    you actually said it was overdue, I believe, earlier in

10:37  8    your deposition?

10:37  9        A.  Yes.

10:37 10        Q.  When do you think she should have been

10:37 11    terminated?

10:37 12        A.  In the first two weeks, I did write a

10:37 13    termination letter because she had not reported to

10:37 14    work.  Esmer wasn't at the office yet, and one of the

10:37 15    employees came and told me she had not reported to

10:37 16    work, so we thought that she had just stopped working.

10:38 17    So I set up that termination letter.

10:38 18            So then Esmer came in, and we talked about

10:38 19    it.  And Esmer felt that she wanted to work with

10:38 20    Belinda Mata because it was difficult to find an LVN.

10:38 21    So she wanted to work with her and make sure that this

10:38 22    type of activity did not continue to happen.  At that

10:38 23    point, I felt like, "Well, she has only been here for a

10:38 24    little while.  It has already happened.  So it will

10:38 25    probably happen again."

10:38 1        Q.   Have you had training on laws that are relevant

10:38 2   to the employer-employee relationship?

10:38 3        A.   Some.

10:38 4        Q.   What kind of training?

10:38 5        A.   I remember years ago I attended one in McAllen.

10:38 6        Q.   For the county?

10:38 7        A.   When I was working for the county.

10:38 8        Q.   Cameron County?

10:38 9        A.   That was, my best guess, maybe eight years ago.

10:39 10       Q.   That's the last one?

10:39 11       A.   No.   And then I know that the human resources

10:39 12  director has provided some training.   I know that -- I

10:39 13  work closely with some of the staff in trying to

10:39 14  research some of the employee questions.

10:39 15       Q.   Laws?   What do you mean by "questions"?

10:39 16       A.   Questions like break time, what is considered

10:39 17  at-work time, and so --

10:39 18       Q.   And how many employees do you have under your

10:39 19  control?

10:39 20       A.   We probably have -- my best guess is maybe 250.

10:39 21       Q.   And you're in charge of hiring -- or you're in

10:39 22  charge of firing all of them?

10:39 23       A.   Yes.

10:39 24       Q.   Those terminations.   And that has been true

10:39 25  since you took this position in '98?

11:21  1    A.  Yes.

11:21  2    Q.  So is it fair to say that if financial

11:21  3  impositions had occurred, sanctions had occurred, it

11:21  4  would have been your fault?

11:21  5    A.  Not my fault.  It would have been my

11:21  6  responsibility.

11:21  7    Q.  And you viewed it that way?

11:21  8    A.  Yes.

11:22  9    Q.  Who hired Ms. Mata?

11:22 10    A.  I hire all the employees within the department.

11:22 11    Q.  And what was the title that you were filling

11:22 12  when you hired Ms. Mata?

11:22 13    A.  I believe it was a communicable disease LVN.

11:22 14    Q.  Could it have been immunizations program

11:22 15  supervisor?

11:22 16    A.  It could have been.

11:22 17        (Salinas Exhibit No. 2 was marked)

11:22 18    Q.  That item that's marked as Deposition Exhibit

11:22 19  No. 2 purports to be a memo authored by Belinda Mata.

11:22 20  Have you ever seen that document before?

11:23 21    A.  I may have.

11:23 22    Q.  Okay.  As far as her title is concerned, are

11:23 23  you aware of anyone who took issue with how she

11:23 24  described her title in that document?

11:23 25    A.  No.



11:23  1        Q.   Do you believe she's correct in how she titles

11:23  2   her position?

11:23  3        A.   I would have to see the job description in the

11:23  4   paperwork to see if she's correct.

11:23  5        Q.   Do you have any idea what the duties of that

11:23  6   job position are?

11:23  7        A.   Immunization program supervisor?

11:23  8        Q.   Yes.

11:23  9        A.   I know what it was intended to be.

11:23 10        Q.   Okay.  What was that?

11:24 11        A.   The immunization program supervisor was to

11:24 12   oversee the immunization grant, including the staffing

11:24 13   and anything to do with the immunization program,

11:24 14   whether it was the contract, compliance or outreach or

11:24 15   staffing or interviewing.

11:24 16        Q.   Okay.  And what was Esmer's title?

11:24 17        A.   Assistant health administrator.

11:24 18        Q.   Okay.  And that's who Belinda Mata reported to?

11:24 19        A.   Administratively, yes.

11:24 20        Q.   Okay.  Is there some other means of reporting?

11:24 21        A.   Esmer is not a nurse.  So Belinda Mata would

11:24 22   have had to go to Ms. San Pedro for medical, nursing,

11:24 23   immunization-related questions.

11:24 24        Q.   Okay.  Did Belinda Mata have discretion to

11:25 25   decide how to handle the expired immunizations?

12:10  1   Belinda Mata who commits the offense again could be

12:11  2   deemed not to be able to comply with a certain request

12:11  3   or instruction?  Couldn't you always say that about an

12:11  4   employee who garners another infraction?

12:11  5       A.  Yes.

12:11  6       Q.  All right.  So it's kind of assumed, is it not,

12:11  7   in this policy that the people who garner a demotion or

12:11  8   a suspension have already offended or repeatedly

12:11  9   offended a policy such as to receive a reprimand,

12:11 10   right?

12:11 11       A.  I don't recall demoting.  I have suspended.  I

12:11 12   don't know that we have had an employee that has had

12:11 13   this type of problem in the short amount of time of

12:12 14   employment, which was a critical factor.

12:12 15       Q.  So back to my question about why you didn't

12:12 16   demote or suspend her.  It's merely because she had

12:12 17   garnered another perceived infraction, right?

12:12 18           MR. BURST:  Object as asked and answered.

12:12 19       Q.  More specifically, I should say, it's because

12:12 20   you didn't think she was capable of following that

12:12 21   instruction?

12:12 22       A.  I did not think she was capable of following

12:12 23   the reporting procedure.

12:12 24       Q.  Why did you not think she was?

12:12 25       A.  Because this was the third time in the short

12:12  1    amount of time that she had been there.

12:12  2    Q.  Did she tell you that she disagreed with that

12:12  3    instruction and was never going to follow it, that she

12:13  4    was simply going to leave a note whenever the situation

12:13  5    arose?

12:13  6    A.  She did not tell me anything like that.

12:13  7    Q.  I didn't think she did.  Did she tell you that

12:13  8    she didn't understand that you perceived the difference

12:13  9    between a call and a note?

12:13  10   A.  She did not tell me anything like that.

12:13  11   Q.  Well, then, why do you think she wasn't capable

12:13  12   of understanding it?

12:13  13   A.  Because it was the third time.

12:13  14   Q.  It wasn't the third time she left a note

12:13  15   instead of making a call, was it?

12:13  16   A.  It was the third time that she did not contact

12:13  17   her supervisor.  There was documentation in the file

12:14  18   that indicated that they had an understanding.  So it

12:14  19   did not appear that she was going to follow her

12:14  20   supervisor's direction.

12:14  21   Q.  Okay.  Do you think that having stopped by

12:14  22   there and taken the time to write out a note and

12:14  23   conspicuously placed it such that it was found by an

12:14  24   employee she intentionally violated any agreement that

12:14  25   she had with Esmer, if according to you she had?  I'm

12:21 1    department whether she was there in the office that

12:21 2    morning or not?

12:21 3        A.   It made a difference to the department in the

12:21 4    sense that she had left the note on the door telling

12:22 5    everybody that she was not following the process and

12:22 6    that perhaps we would start getting future notes on the

12:22 7    door from the staff, as well.  So that was a problem

12:22 8    for me.

12:22 9        Q.   Did Esmer have the authority to dictate to

12:22 10   Belinda how the notification of being out should be

12:22 11   communicated?

12:22 12       A.   Yes.

12:22 13       Q.   So where the policy says notify, you're saying

12:22 14   that Esmer can get more specific and tell Belinda Mata

12:22 15   that notification has to be given in a certain way?

12:22 16       A.   The communication process can be dictated by

12:22 17   Esmer, yes.

12:22 18       Q.   Can Esmer say, "You have to call" -- just an

12:23 19   example, "You have to call between 8:00 and 8:10 on my

12:23 20   cell phone"?

12:23 21       A.   I do not --

12:23 22       Q.   "Or the notice is invalid"?

12:23 23       A.   I don't think that between 8:00 to 8:10 on her

12:23 24   cell phone would be very reasonable when the county

12:23 25   policy allows up to 9:00, or one hour.

BRYANT & STINGLEY, INC.
RECEIVED

5/16/05
DATE

### ERRATA SHEET/SIGNATURE PAGE

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 9 | 18 | Pedra to Pedro | misspelled |
| 9 | 23 | Valentino to Tolentino | misspelled |
| 16 | 15 | Remy to Remi | misspelled |
| 88 | 3 | add "not" between "did" and "have" I understood the question to mean "did not" and answered as if "did not" | |
| 146 | 21 | Letty to Lety | misspelled |

I, YVETTE SALINAS, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above.

YVETTE SALINAS

THE STATE OF TEXAS

COUNTY OF *Cameron*

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the __13__ day of _May_, 2005.



MARTHA CAÑAS
Notary Public
State of Texas
Comm. Exp. 11-12-2006

Notary Public in and for
The State of Texas

TR-3472
DDB-5/18/05

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BELINDA MATA                ) (
    Plaintiff            ) (
                      ) (
VS.                         ) (   CASE NO. B-04-092
                      ) (
CAMERON COUNTY HEALTH       ) (
DEPARTMENT, THE COUNTY OF   ) (
CAMERON                     ) (
    Defendants           ) (


## REPORTER'S CERTIFICATE

        I, MAUREEN STINGLEY, Certified Court
Reporter, certify that the witness, YVETTE SALINAS, was
duly sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
APRIL 4, 2005; that the deposition was reported by me
in stenograph and was subsequently transcribed under my
supervision.

        I FURTHER CERTIFY that I am not a
relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
counsel, nor am I financially interested in the action.

        WITNESS MY HAND on this the 15th day of
_April_ , 2005.


                              _Maureen Stingley by RSR_
                              MAUREEN STINGLEY, CSR NO. 691
                              Expiration Date: 12/31/06
                              Bryant & Stingley, Inc.
                              Firm Registration No. 41
                              2010 East Harrison
                              Harlingen, Texas 78550

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

## 12.01 REASONS FOR DISCIPLINARY ACTION

Disciplinary action may be taken against an employee for various reasons, which include but are not limited to the following examples:

- Insubordination, i.e., willful disregard of a job assignment;

- Absence without leave, including failure to notify a supervisor of sick leave and repeated tardiness or early departure;

- Endangering the safety of other persons through negligent or willful acts, e.g., horseplay, reckless use of County vehicles or equipment, etc.;

- Unauthorized use or misuse of public funds or property, i.e., theft; misuse of vehicles, equipment, etc.;

- Conviction of a felony;

- Conviction of official misconduct or oppression;

- Falsification of documents or records;

- Unauthorized use of official information or unauthorized disclosure of confidential information;

- Unauthorized or abusive use of official authority;

- Violation of on the job safety rules;

- Violation of the the County's Sexual Harassment Policy;

- Violation of the County's Drug and Alcohol Abuse Policy;

- Incompetence or neglect of duty;

- Disruptive behavior which impairs the performance of others; e.g., fighting and sexual harassment, etc.;

- Violation of the requirements of these personnel policies;

- Other misconduct which may render an employee liable for disciplinary action.

40



Salinas

EXHIBIT NO. 1

BRYANT-STINGLEY

To the greatest extent practical, the County uses the following progressive discipline system. The County, however, is not obligated to use all of the steps defined below. Additionally, the County may begin the disciplinary process at any level, up to and including discharge, based upon the severity of the infraction.

.    Verbal Warnings with records of each warning maintained by the supervisor and filed in the employee's personnel file;

.    Written Reprimands to the employee which the supervisor must, in all cases, transmit through the department head to the employee's personnel file;

.    Demotion;

.    Suspension from duty without pay for up to thirty (30) days; or

.    Separation by involuntary dismissal.

Except in the case of verbal warning, disciplinary action is accomplished or preceded by written notice to the employee involved.  A notice to an employee would include a description of the reason for the action, and except in the case of dismissal states the likely consequences of further unsatisfactory performance or conduct.  Written notice of disciplinary action is always included in the employee's personnel file.

Disciplinary action does not automatically or permanently disqualify an employee from consideration for future promotion, pay increases, commendations, or other beneficial personnel action.

12.03 SUSPENSION FOLLOWING INDICTMENT

If a Department Head determines that suspension is in the best interests of the County and the public, the department head may suspend without pay an employee indicted for a felony, or accused by information of official misconduct or oppression, until the indictment or information is dismissed or tried and, if tried, until the trial and appeal (if any) are completed.  Under no circumstances, will a Department Head suspend an employee with pay.



Salinas
EXHIBIT NO. 3
BRYANT-STINGLEY

4 1