# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BELINDA MATA,              )
    Plaintiff,            )
                  )
v.                         )          CASE NO. B-04-092
                  )
CAMERON COUNTY HEALTH      )
DEPARTMENT, CAMERON COUNTY,)
    Defendant.            )

## DECLARATION UNDER PENALTY OF PERJURY

STATE OF TEXAS          )
COUNTY OF CAMERON    )

      "I declare under penalty of perjury under the laws of the United States of America that the

attached are true and correct copies of Pages 20, 21, 46, 47, 48, 49, 50, 71, 72, 73, 74, 75, 96, 97,

131, 132, 133, and Exhibits 9 and 11 of the Belinda Mata Deposition taken in this case on

December 8, 2004."

      "I declare under penalty of perjury that the foregoing is true and correct."

Executed on June 10, 2005.

                        Richard O. Burst
                        Attorney in Charge
                        For Cameron County

| | | |
|---|---|---|
| | 1 | A. Okay. |
| 11:29 | 2 | Q. Do you have copies of any -- |
| 11:29 | 3 | A. I don't believe I have any W-4s. |
| 11:29 | 4 | Q. Okay. Do you have copies of check stubs from |
| 11:29 | 5 | your employment? |
| 11:29 | 6 | A. Copies of check stubs? |
| 11:29 | 7 | Q. Now, we're talking for 2004. |
| 11:29 | 8 | A. 2004? I may have a couple around the house, but |
| 11:29 | 9 | I don't have copies of them. I had thrown away several, |
| 11:29 | 10 | so I can look to see what I have. |
| 11:29 | 11 | Q. All right. Thank you. |
| 11:30 | 12 | Was your first day of employment with the |
| 11:30 | 13 | county -- our records indicate it's April 5th, 2002. Is |
| 11:30 | 14 | that correct? |
| 11:30 | 15 | A. I think so. To the best of my knowledge, yes, |
| 11:30 | 16 | sir. |
| 11:30 | 17 | Q. Okay. I have -- if I have the county |
| 11:30 | 18 | paperwork -- and I may show you some of it here in a |
| 11:30 | 19 | little bit. But, if the county paperwork indicates in |
| 11:30 | 20 | writing your first day was April 5th, 2002, you don't |
| 11:30 | 21 | have any reason to disagree with that, do you? |
| 11:30 | 22 | A. No, sir. |
| 11:30 | 23 | Q. Okay. And do you agree that your date of |
| 11:30 | 24 | termination from the Cameron County Health Department |
| 11:30 | 25 | was June 4th, 2002? |

| | | |
|---|---|---|
| 11:30 | 1 | A.  Yes, sir. |
| 11:30 | 2 | Q.  You agree with that? |
| 11:31 | 3 | A.  Yes, sir. |
| 11:31 | 4 | Q.  Okay.  You have indicated that there is a prior |
| 11:31 | 5 | settlement in this case; is that correct? |
| 11:31 | 6 | MR. JOE:  Well, I may have responded to an |
| 11:31 | 7 | interrogatory or question on the subject with |
| 11:31 | 8 | information to the effect that there was a prior |
| 11:31 | 9 | settlement not in this case, because this case did not |
| 11:31 | 10 | exist at the time. |
| | 11 | MR. BURST:  Okay. |
| 11:31 | 12 | MR. JOE:  But there is a prior settlement |
| 11:31 | 13 | with an attorney over some issues that had to do with |
| 11:31 | 14 | the claims asserted in this case but no prior settlement |
| 11:31 | 15 | in this case. |
| 11:31 | 16 | MR. BURST:  I understand. |
| 11:31 | 17 | Q.  Have you received a sum of money from some |
| 11:31 | 18 | attorneys, as a result of your termination from Cameron |
| 11:31 | 19 | County Health Department? |
| 11:31 | 20 | MR. JOE:  Object to the form of that |
| 11:31 | 21 | question.  The attorneys -- I may go ahead -- |
| 11:31 | 22 | MR. BURST:  Go ahead and state your |
| 11:32 | 23 | objection.  I mean, what is your objection so I can |
| 11:32 | 24 | rephrase the question? |
| 11:32 | 25 | MR. JOE:  Okay.  Those attorneys did not |

12:09   1    don't know exactly what the immunization program is with

2    the county health department?

12:09   3        A.   For Cameron County Health, not that -- no, sir.

12:09   4        Q.   Okay.   Was part of your job to inventory the

12:09   5    vaccines on hand?

12:09   6        A.   I believe so, sir.

12:09   7        Q.   Well, did you do that while -- during those two

12:09   8    months you were there?

12:09   9        A.   Yes, sir.

12:10   10       Q.   Okay.   Did you discover anything unusual, as a

12:10   11   result of that inventory?

12:10   12       A.   Yes, sir.

12:10   13       Q.   And what was that?

12:10   14       A.   I discovered expired vaccines or immunizations.

12:10   15       Q.   And where were they located?

12:10   16       A.   Some were upstairs.   Some were downstairs.

12:10   17       Q.   Okay.   What's the significance of upstairs or

12:10   18   downstairs?   Please explain to the jury.

12:10   19       A.   I don't know.   Some -- some of them were -- they

12:10   20   have storage rooms, or they had storage rooms upstairs.

21       Q.   Okay.

12:10   22       A.   Supply rooms.

12:10   23       Q.   The ones that were downstairs, where were they

12:10   24   physically located?

12:10   25       A.   In a refrigerator and some file cabinet or wall

12:11  1    cabinet.

12:11  2        Q.  Did you tell anybody about the expired vaccine?

12:11  3        A.  Yes, sir.

12:11  4        Q.  Who did you tell?

12:11  5        A.  Ms. Guajardo.

12:11  6        Q.  Okay.  Is she the first person you told?

12:11  7        A.  Probably she was the first person I reported it

12:11  8    to.

12:11  9        Q.  Okay.  And then, in turn, did you ever have an

12:11  10   opportunity to talk to Yvette Salinas concerning the

12:11  11   expired vaccine?

12:11  12       A.  I don't remember speaking to her.  Well, excuse

12:11  13   me.  Ask the question again, please.

12:11  14       Q.  Yes.  Did you -- did you speak to Yvette Salinas

12:11  15   about the expired vaccine?

12:11  16       A.  I don't remember speaking to her personally

12:11  17   about that.

12:11  18       Q.  Okay.  And what did your immediate supervisor

12:11  19   tell you to do about the expired vaccine?

12:11  20       A.  To figure it out.

12:11  21       Q.  Okay, to figure it out.  Okay.  Did she tell you

12:12  22   to contact the -- okay.  Do you understand what the

12:12  23   Texas Department of Health -- what that agency is?

12:12  24       A.  Texas Department of Health?

12:12  25       Q.  Yes.

12:12   1       A.   More or less.

12:12   2       Q.   All right.  Well, did she tell you to contact

12:12   3   the TDH, the Texas Department of Health, concerning what

12:12   4   to do with the vaccine?

12:12   5       A.   No, sir.

12:12   6       Q.   Did anybody at the health department tell you to

12:12   7   contact them with regard to that?

12:12   8       A.   No, sir.

12:12   9       Q.   Have you ever given a written statement where

12:12   10  you said you were told to contact the Texas Department

12:12   11  of Health after you found the vaccine?

12:12   12      A.   Told by who?

12:12   13      Q.   Have you ever given a written statement that you

12:12   14  were told to contact the Texas Department of Health?

12:12   15      A.   No, sir.

12:12   16      Q.   Okay.

12:13   17           MR. JOE:  Can we take a quick rest room

12:13   18  break while you read that?

12:13   19           MR. BURST:  Sure.

12:21   20           (Brief recess taken)

12:21   21      Q.   We're back on the record now.  Okay?

12:22   22      A.   Yes, sir.

12:22   23      Q.   All right.  You've -- as far as -- let me start

12:22   24  again and ask you, did Yvette Salinas tell you to get

12:22   25  ahold of the Texas Department of Health to find out what

12:22   1   to do with the expired vaccine?

12:22   2       A.   I don't remember, sir.

12:22   3       Q.   Okay.   Did your immediate supervisor tell you to

12:22   4   get ahold of the Texas Department of Health to see what

12:22   5   to do with the expired vaccine?

12:22   6       A.   Not that I can recall, sir.

12:22   7       Q.   Okay.   Do you -- did either of your immediate

12:22   8   supervisors -- were they nurses?

12:22   9       A.   No, sir.

12:22   10       Q.   Okay.   And so what -- did they tell you to take

12:22   11   care of the vaccine -- the expired vaccines, find out

12:23   12   what to do?   What did they tell you?   Give me -- tell me

12:23   13   in your own words.

12:23   14       A.   To the best of my recollection, sir, I remember

12:23   15   being told to figure it out, to -- that they weren't --

12:23   16   well, I believe it was Ms. Guajardo who told me she was

12:23   17   not sure, that the vaccines had been there for years.   I

12:23   18   asked for a policy or some procedure to follow in order

12:23   19   to dispose of them properly.   She said that she wasn't a

12:23   20   nurse and for me to figure it out.

12:23   21       Q.   Okay.

12:23   22       A.   That's basically what I can remember.

12:23   23       Q.   All right.   And, in fact, you told the TDS that

24   you were told to take care of it; is that correct?

12:23   25       A.   Who is TDS?

12:23  1        Q.  I'm sorry.  Texas Department of -- I withdraw

12:23  2     the question.  You told the Texas Department of Health

12:23  3     that you were told to take care of the -- of the expired

12:24  4     vaccines?

12:24  5        A.  That I can remember, yes, sir.

12:24  6        Q.  Okay.  Did you contact the Texas Department of

12:24  7     Health concerning the expired vaccines?

12:24  8        A.  Yes, sir.

12:24  9        Q.  And did they give you instructions on what to do

12:24  10    with them?

12:24  11       A.  We came up with instructions.

12:24  12       Q.  Well, who's "we"?

12:24  13       A.  As far as Texas Department of Health, are you

12:24  14    talking about Austin?

12:24  15       Q.  Yes.

12:24  16       A.  Yes, sir.

12:24  17       Q.  Okay.  They're the ones that told you how to

12:24  18    handle the expired vaccines?

12:24  19       A.  Yes.

12:24  20       Q.  And did you, in fact, handle them as they told

12:24  21    you to handle them?

12:24  22       A.  To the best of my recollection, yes, sir.

12:24  23       Q.  Okay.  I'm going to hand you what's been marked

12:25  24    as Mata 5.  It's not Bates stamped, but I want to ask

12:25  25    you, is that the form that was provided, or is that the

13:03  1      Q.  Okay.  I'm going to hand you what's been marked

13:04  2   as Mata Exhibit No. 9.

13:04  3              Is that your signature at the bottom of the

13:04  4   form?

13:04  5      A.  Yes, sir.

13:04  6      Q.  Okay.  And do you remember that discussion with

13:04  7   your supervisor, Esmeralda?

13:04  8      A.  With who?

13:04  9      Q.  With your supervisor.  Sorry.

13:04  10     A.  Yes, sir.

13:04  11     Q.  Okay.  Did you read this form before you signed

13:05  12  it?

13:05  13     A.  Yes, sir.

13:05  14     Q.  Did you agree with it?

13:05  15     A.  Yes, sir.

13:05  16     Q.  Did she -- were you provided the cell phone and

13:05  17  personal phones in order to contact your supervisor if

13:05  18  you were -- had the need to be late or absent?

13:05  19     A.  Yes, sir.

13:05  20     Q.  Subsequently, on April 23rd did you fail to

13:05  21  report for work?

13:05  22     A.  I don't remember, sir.

13:06  23     Q.  Did you receive a verbal warning for failure to

13:06  24  report to work subsequently on -- subsequent to April

13:06  25  18th?



13:06   1       A.   I don't remember that, sir.

13:06   2       Q.   I'll hand you what's been marked as Exhibit --

13:06   3   Mata Exhibit 10.  Please -- are you familiar with the

13:06   4   conversation that's related in that exhibit?  Let me

13:06   5   withdraw that question.  When you finish reading it,

13:07   6   I'll ask you another question.  You finished?

13:07   7       A.   Yes, sir.

13:07   8       Q.   Did you have a conversation with Esmeralda

13:07   9   Guajardo and with Martha Canas present on April 24th,

13:07  10   2002?

13:07  11       A.   I don't remember.

13:07  12       Q.   Do you recall having a conversation subsequent

13:07  13   to April 18th for being absent?

13:07  14       A.   After April 18th?

13:07  15       Q.   Yes.

13:07  16       A.   Yes, sir.

13:07  17       Q.   Okay.  So there were -- do you recall, then,

13:07  18   that there were two occasions where you were counseled

13:07  19   about being either tardy or absent?

13:08  20       A.   No, sir.

13:08  21       Q.   You only recall one?

13:08  22       A.   From what I can see, I -- I only remember one

13:08  23   right now because the -- because of the dates.

13:08  24            The second form, Exhibit No. 10, is dated

13:08  25   before I signed Exhibit No. 9.

13:08    1        Q.  I understand that.  But were you absent or did

13:08    2   you report for work late on April 16th, 2002?

13:08    3        A.  I don't remember.  I would have to look at my

13:08    4   time sheets.

13:08    5        Q.  Did you sign the -- okay.  Look at Exhibit

13:08    6   No. 9.  You signed that.  You said you agreed to the

13:08    7   content of that, did you not?

13:08    8        A.  Oh, Exhibit No. 9, yes.

13:08    9        Q.  Okay.  And does it state that on April 16th,

13:08    10   2002, you did not appear for work or report your

         11   absence?

13:09    12        A.  That's what it states.

13:09    13        Q.  Okay.  And did you agree with that when you

13:09    14   signed it?

13:09    15        A.  Yes, sir.

13:09    16        Q.  Okay.  Then on Exhibit No. 10, I believe it is,

13:09    17   the next exhibit --

13:09    18        A.  Uh-huh.

13:09    19        Q.  -- states under "Follow-up" -- states on April

13:09    20   24th they met with you, and it was about the incident on

13:09    21   April 23rd where you did not appear for work.

13:09    22              Do you recall a meeting with them at that

13:09    23   time?

13:09    24        A.  No, sir.

13:09    25        Q.  Do you deny that that happened?

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

13:09  1     A.  I don't remember about April 23rd.  As I stated,

13:09  2  Exhibit No. 9 is dated after April 23rd, so I don't -- I

13:09  3  didn't sign Exhibit No. 10, so I don't -- I never saw

13:09  4  this.  I don't remember this.

13:09  5          MR. BURST:  I'll object as nonresponsive.

13:09  6     Q.  Do you remember meeting with Esmeralda Guajardo

13:10  7  on April 24th concerning an April 23rd absence?

13:10  8     A.  I don't remember that.

13:10  9     Q.  Do you deny that it happened?

13:10  10    A.  No.  I said, "I don't remember that."

13:10  11    Q.  Okay.  It could have happened; you just don't

13:10  12  remember?  Is that your testimony?

13:10  13    A.  It could have been for April 16th, because it

13:10  14  was signed after April 23rd.

13:10  15          MR. BURST:  Object as not responsive.

13:11  16    Q.  I'm going to hand you what's been marked as

13:11  17  Exhibit No. 11.  Do you recognize that note?

13:11  18    A.  Yes, sir.

13:11  19    Q.  Did you leave that note on the front door at the

13:11  20  Texas -- at the Cameron County Health Department?

13:11  21    A.  Yes, sir.

13:11  22    Q.  And is the date correct?  Let me strike that and

23  withdraw.

13:11  24          On June 4th, 2002, did you leave that note

13:11  25  on the front door of the Cameron County --

13:11   1      A.   Yes.

13:11   2      Q.   Okay.  Did you call your supervisor,

13:11   3  Ms. Guajardo, in advance to let her know you were going

13:11   4  to be late or absent?

13:11   5      A.   No, sir.  I left -- that's why I left this note.

13:12   6      Q.   And then when she sat down with you, and on the

13:12   7  report you signed, Exhibit No. 9, did she provide you

13:12   8  with your cell phone and her personal phones so you

13:12   9  could call her?

13:12   10     A.   Yes, sir.

13:12   11     Q.   Did you try to call her?

13:12   12     A.   Not that day, no, sir.

13:12   13     Q.   Okay.  You had explicit instruction to do -- to

13:12   14  call her if you were going to be late or absent, did you

13:12   15  not?

13:12   16     A.   I had instructions.

13:12   17     Q.   And you disobeyed those instructions, did you

13:12   18  not?

13:12   19     A.   By leaving this note, yes, I did.

13:12   20     Q.   Okay.  You filed this lawsuit claiming that you

13:13   21  made a verbal or written report or complaint of a

13:13   22  concern.  Do you understand that?

13:13   23     A.   Yes.

13:13   24     Q.   Do you understand that?

13:13   25     A.   Yes.

13:42   1      A.   No, sir.

13:42   2      Q.   When you left that note on the door, couldn't

13:42   3   you as easily just called Ms. Guajardo like she

13:42   4   instructed you to do in writing?

13:42   5      A.   I don't -- I don't remember why I didn't call

13:42   6   her, but I was right by the building at that hour, so I

13:42   7   left her the note.

13:42   8      Q.   Okay.   Pretty much, you felt you could do what

13:42   9   you wanted to do with regard to tardiness and absences;

13:42   10   is that correct?

13:42   11      A.   No, sir, I didn't say that.

13:42   12      Q.   What is it you feel you could do?

13:42   13      A.   I did the best that I could do, sir, at the

13:43   14   time.

13:43   15      Q.   While you were employed with the Cameron County

13:43   16   Health Department were you assigned a cell phone?

13:43   17      A.   Yes, sir.

13:43   18      Q.   Did you have that the entire two months you were

13:43   19   there?

13:43   20      A.   I don't remember, sir.

13:43   21      Q.   Do you remember when you got it?

13:44   22      A.   No, sir.

23      Q.   You don't?

24      A.   No.

13:44   25      Q.   So was there any reason you could not use that

13:44  1  cell phone to call when you were going to be tardy or

13:44  2  late?

13:44  3      A.  I don't know.  No, sir.

13:44  4      Q.  Okay.  On the letter that you received advising

13:44  5  that you were employed, it told you on that letter that

13:44  6  you would be working 8:00 to 5:00; is that correct?

13:44  7      A.  I believe so, sir.

13:44  8      Q.  Okay.  You've identified what you consider two

13:46  9  reports which were of public concern.  Are there any

13:46  10  other reports you made while at the Cameron County

13:46  11  Health Department that you consider were of public

13:46  12  concern?

13:46  13      A.  Not that I can remember.

13:47  14          MR. BURST:  Let me -- if we can, let's go

13:47  15  off the record briefly and let me talk to my clients,

13:47  16  and I'll probably pass the witness after that.

13:47  17          MR. JOE:  All right.

13:54  18              (Brief recess taken)

13:54  19          MR. BURST:  At this time I'll pass the

       20  witness.

13:54  21          MR. JOE:  I do have some questions.  These

13:54  22  subject areas I'm going into are for purposes of this

13:54  23  deposition and not in lieu of or in substitution of the

13:54  24  right to ask my client witnesses in the same -- I mean,

13:55  25  questions on the same subjects at the time of trial.

### BELINDA MATA - ERRATA SHEET

Reasons for changes: (1)  Clarify the record
                     (2)  Conform to the facts
                     (3)  Correct transcription errors.

PAGE LINE   CHANGE FROM/CHANGE TO                          REASON

No Changes

BRYANT & STINGLEY, INC.
RECEIVED
2/14/05 DATE

TR-3472
DDB-1/27/05

ORIGINAL

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

## SIGNATURE OF BELINDA MATA

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on DECEMBER 8, 2004, except as to any corrections I have listed on Page 131 herein.

_____
BELINDA MATA

THE STATE OF TEXAS

COUNTY OF HIDALGO

            SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the _11th_ day of _February_, 2005.

_____
Notary Public in and for
The State of Texas

My commission expires:
_August 10, 2008_

STACEY LEE LOPEZ
Notary Public, State of Texas
My Commission Expires
August 10, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
BELINDA MATA              ) (
        Plaintiff         ) (
                          ) (
VS.                       ) (   CASE NO. B-04-092
                          ) (
CAMERON COUNTY HEALTH     ) (
DEPARTMENT, THE COUNTY OF ) (
CAMERON                   ) (
        Defendants        ) (
```

REPORTER'S CERTIFICATE

I, LINDA LOCKLEAR, Certified Court Reporter, certify that the witness, BELINDA MATA, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on DECEMBER 8, 2004; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this __28TH__ day of __December__ , 2004.

LINDA LOCKLEAR, Texas CSR 6326
Expiration Date: 12-31-04
Bryant & Stingley, Inc.
4900 North 10th, Building A, Suite 3
McAllen, Texas  78504
Firm Registration No. 41
(956) 618-2366

## CAMERON COUNTY
## WARNING NOTICE

Belinda Mata _____    April 18, 2002__
    (NAME                                            (DATE)

1.  (X)  Unreported Absence          10.  ( )  Reporting Under the
                                               Influence of Alcohol

2.  ( )  Tardiness                   11.  ( )  Violation of Rules

3.  ( )  Drinking on Duty            12.  ( )  Defective Improper
                                               Work

4.  ( )  Insubordination             13.  ( )  Carelessness

5.  ( )  Dishonesty                  14.  ( )  Destruction of
                                               Property

6.  ( )  Failure to Obey Orders      15.  ( )  Other

7.  ( ) Fighting on Premises

8.  ( )  Leaving Without Permission

9.  ( )  Improper Conduct

**EXHIBIT NO. 9**
Mata
LL 12/8/04
BRYANT & STINGLEY, INC.

**REMARKS:**          (Set forth all facts in detail)
On April 16, 2002, Ms. Mata did not appear at work and did not report her absence until
approximately 9:30 a.m.  As per Ms. Mata, her intentions were not to abandon her work
responsibilities without notice; however, she did attempt to call me on the cell phone and
did leave a message prior to her medication affecting her ability to stay awake. Ms. Mata
was then not able to report to work until she awoke at approximately 9:30 a.m.

**GOAL:**
As this incident occurred within Ms. Mata's first month of employment with the Health
Department, she was not familiar with the telephone numbers in order to contact a Health
Department employee. During the conference with her on April 18, 2002, I provided Ms.
Mata my cellular numbers of both my work and personal phones. I reminded Ms. Mata of
the need to telephone me to notify me of any intended absence or tardiness. If necessary,
I informed Ms. Mata she could also contact me the night before and let me know about
the possibility of her absence/tardiness. Ms. Mata apologized for the confusion and stated
she understands the policy and procedure if she does need to call in.

_Esmeralda Carral_
Signature of Assistant Health Administrator

I have read this Report:    _B Mata  4/25/02_
                            Signature of Employee

The above has been noted and is made a part of the above employee's record, as of this date.

000092

6/5/00

Cris,

I'll be in at
10:00 Please let
them know.

Thank Belinda

Mata
EXHIBIT NO. 11
LL 1/8/04
BRYANT & STINGLEY, INC.

000025