United States District Court
Southern District of Texas
FILED

JUN 3 0 2005

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| BELINDA MATA, | § |
| **Plaintiff,** | § |
| | § |
| Vs. | § |
| | § CIVIL ACTION NO. B-04--092 |
| CAMERON COUNTY HEALTH | § |
| DEPARTMENT, THE COUNTY | § |
| OF CAMERON, | § |
| | § |
| **Defendant.** | § |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Belinda Mata, hereinafter the "Plaintiff," responding to the Motion for Summary Judgment of CAMERON COUNTY HEALTH DEPARTMENT, THE COUNTY OF CAMERON, hereinafter referred to as "Defendant," and requests this Court Deny Defendant's Motion, showing unto the Court the following:

## I. SUMMARY OF THE ARGUMENTS AND PROCEDURAL BACKGROUND

1.    The Parties have responded to written discovery and have completed the two necessary depositions in this case that establish beyond doubt that genuine issues if

material fact exist and that no element of the Plaintiff's burden of proof at trial cannot be established as a matter of law. The Defendant's Motion and this Response have been timely filed with this Court.

2.      The Plaintiff was hired by the Defendant as the Immunizations Program Supervisor. Shortly after beginning her employment, the Plaintiff discovered that the Defendant unknowingly had accumulated scores and scores, if not hundreds of expired vials of vaccinations, in odd lots strewn about the building, which no one at the County Department of Health had realized. An uncovering of neglect such this had not happened before and it is undisputed that the Department had no existing procedure for addressing the matter. Yvette Salinas, the Department's Director, and the person who ultimately fired the Plaintiff, testified that the ruination and waste of these vaccines was: a) unknown to her and the Department, b) amongst the most embarrassing incidents to occur during her tenure, c) a breach of the contract the County has with the State of Texas, and d) ultimately her own the responsibility, as the Director.

3.      The Director also testified about her feelings toward the Plaintiff before she fired her. As will be enumerated, the Director testified that she held a number of negative perceptions about the Plaintiff, although she testified she had never addressed them with the Plaintiff. (These were never addressed because her employment had been determined to be short lived.) The Plaintiff agrees these perceptions existed and contends that the root cause of them was fallout from the manner in which she handled the expired

vaccinations, and specifically the Plaintiff's undertaking involvement with the Texas Health Department's Austin, Texas representatives. The Plaintiff contends that her action in this regard wore thin and agitated the patience and usual tolerance of Director, and turned her against the Plaintiff. The admissions of the Director's feelings about the Plaintiff, including her unfounded personal assumption that the Plaintiff, because of her nurse's license, would have been looking for a higher paying job anyway, all suggest the Director stretched to rationalize her decision, and her admissions belie the Director's credibility on the motivation for termination.

4.     In a letter to the State about remedying the waste problem and what the County has been able to do and not do, the Defendant incredibly omits mention of the Plaintiff even before she is fired, saying no one has been able to address the problem, (when that was the full time assignment of the Plaintiff, suggesting the County had written off the Plaintiff as an employee before a reason could be asserted. For weeks the Plaintiff only worked on inventorying the problem with the State; she was fired the same afternoon she completed the ongoing task, as far as she could, and there had not been mention to her of what she would be working on as her next assignment, which is very telling. A factfinder must judge the parties' *bona fides*. Texas precedent holds that when the movant's credibility is likely to be the dispositve factor, summary judgment should not be granted.

5.    It is agreed that Plaintiff's termination was supposedly decided for the reason that Plaintiff left a written note saying she would be coming in late, rather than calling in to say the same thing.  However, it is asserted that an ulterior motivation caused the decision. The Director, a long-term employee, could recall no other instance when this hyper-technical distinction has been the basis for a termination, or even discipline.  It is undisputed that this lateness caused no harm to work.  Although this reason *could* be a legally defensible justification for one's termination, it also could also be a mere pretext as is alleged here, and the summary judgment evidence will establish a genuine issue of material fact exists as to the pretextual nature of the termination.

6.    With respect to the argument that an action under 42 USC Section 1983 cannot be maintained because the Director was not a "policy maker" for Cameron County, Texas, the U.S Supreme Court's precedent establishes that such action as this can indeed be maintained when an authorized decision maker such as the Director, deprives another of a Constitutional right, using authority to terminate and apply policy, as was the custom of the County.  An individual can be placed in the shoes of a board, commission or other governing body with respect to certain decisions, for which an action can be maintained. (Indeed, the critical last sentence of the Defendant's cited *Pembaur* holding was conveniently omitted that says as much.)

7.    With respect to the argument that the Plaintiff's speech was not protected under the First Amendment because it did "not rise to the level of public concern," one

could scarcely envision subject matter more germane to the interest if the public at large, as opposed to a private interest, than the County's gross negligence in maintaining vaccinations and its embarrassingly poor administration of a contract with the State of Texas, for which there was an uncontested breach. The argument that the speech was part of the Plaintiff's job and therefore not protected is: a) an oversimplified conclusion of the law; b) subject to testimony that exists establishing that the Plaintiff reported to the State out of concern as a citizen, (and this must be taken as true for summary judgment purposes); and, c) is negated in any event by the fact that remedial efforts were undefined (because this had never happened before) and the Plaintiff testified she was given discretion in how to handle the situation, (so liaising with the TDH in Austin was not an assignment) and that in actuality, the steps the Plaintiff took bred contempt from her supervisors.

8)    Plaintiff is not urging a Sabine Pilot or Whistleblower Act claim. Plaintiff has not sought such relief and therefore no ruling against Plaintiff for such relief is appropriate, rather, that part of Defendant's Motion should be denied as moot.

## II.    STANDARD OF REVIEW

9.    The nonmovant's burden in resisting a motion for summary judgment is well-established, but has been further delineated by the Texas and federal courts in discrimination cases. In sum, summary judgment is not proper in a pretext termination

case when an employer's credibility regarding its reasons for the termination is likely a dispositive factor. This wrongful termination case presents first and foremost the issue of what, in truth and fact, motivated the Plaintiff's termination. Deposition testimony establishes that Director Yvette Salinas terminated the Plaintiff. In her deposition, Director Salinas does not admit to holding an impermissible private motive in terminating the Plaintiff, (Defendants rarely do) however numerous admissions that were obtained from the Director related to her feelings about the Plaintiff, as well as her feelings about the facts and circumstances leading to the termination, suggest that the Director was not forthright about her motivations. These admissions and suspect circumstances are what Federal Courts have referred to as either a "smoking gun," or when less direct, a "cloud of smoke" upon which an inference can be based.

10.     The issue of a legitimate credibility gap exists. A jury could infer from evidence already gathered that the Director is willing to swear, untruthfully, to innocuous motivations. In its Motion, the Defendant urges this Court to take as true the nondiscriminatory reason it proffers for the Plaintiff's termination. However, in considering a motion for summary judgment, the evidence favorable to the non-movant must be taken as true when evidence conflicts. The Defendant's Director's credibility is the material issue in the ultimate question of whether the motivation for the termination, and by clear state and federal precedent, her willingness to swear to an innocent motivation does not resolve the question of her own credibility, and the Plaintiff should be permitted to proceed to trial with evidence of a pretextual termination. State authority, Texas *Division-Tranter, Inc. v.*

*Carrozza,* 876 S.W.2d 312, 313 (Tex. 1994)  Federal authority, *Jalal v. Columbia,* 4 F. Supp.

2d 244, (1998); *Price Waterhouse v. Hopkins,* 490 U.S. 228, (1988).


### III.  EVIDENCE, ARGUMENTS AND AUTHORITIES

**A.    As a New Employee the Plaintiff Engaged in Protected Activity in a Matter that was Highly Embarrassing to the County**

It is undisputed the Plaintiff was the first to discover the systematic vaccinations

problem and, as set forth in subsequent paragraphs below, went to the State (Judi Chase

in Austin) without instruction from the County Health Department.   The matter was highly

sensitive:


Salinas dep. P. 131

```
 7        Q.  Is it possible in your mind that as of the
 8    summer of 2002 the county could get bad press
 9    publication over having all these expired immunizations
10    and vaccines in its possession?
11        A.  I think that's possible.
12        Q.  And that fingers could be pointed as to whose
13    fault that was?
14        A.  I think that's very possible.
15        Q.  And that taxpayers could have been upset about
16    the apparent wasting away of valuable medicines that
17    had to be purchased?
18        A.  I think that's possible.
19        Q.  And that someone could lose their job over it?
20        A.  I guess that's a possibility.
```

21    Q.  And that at the very least, there would be some

22    extreme embarrassment even if none of those things did

23    come to happen, come to pass?

24    A.  Repeat that one.  "At the very least"?

25    Q.  At the very least, if there wasn't publication [132]

1    and an inquiry or someone losing their job, there would

2    still be some extreme embarrassment over the fact that

3    this happened?

4    A.  Yes.

The matter was most certainly the type of subject that is considered speech of "public concern." Expired vaccinations, possibly unsafe, but undisputedly wasted and in violation of a contract with the State of Texas, borne at tax-payers expense, is subject matter classically fitting the "public concern" description, and Defendant has clearly not established the contrary as a matter of law.

Even the Defendant itself concedes in testimony a proper description of what the lawsuit is about, negating the sincerity of its Motion:

Salinas dep. P. 27:

1    Q.  Okay.  What is your understanding of Ms. Mata's

2    lawsuit?

3    A.  That it's not a whistle blower's lawsuit, but

4    it is a lawsuit of public health concern.

The lawsuit of course seeks relief fro wrongful termination of employment on these grounds.

### B.  Asserting a Nondiscriminatory Reason for Termination Does Not Dispose of Allegations of Pretext

The lawsuit claims that writing a note instead of placing a call about coming in late, was a mere pretense for a termination that the Defendant wanted to effectuate for ulterior and illegal reasons, and that this hyper-technicality itself would not have led to Plaintiff's termination absent such.  In its Motion, the Defendant urges this Court to take as true the nondiscriminatory reason it proffers for the Plaintiff's termination.  However, in considering a motion for summary judgment, the evidence favorable to the non-movant must be taken as true when evidence conflicts.  The Defendant's Director's credibility is the material issue in the ultimate question of whether the motivation for the termination, and by clear state and federal precedent, her willingness to swear to an innocent motivation does not resolve the question of her own credibility, and the Plaintiff should be permitted to proceed to trial with evidence of a pretextual termination.

A Defendant's affidavits and testimony concluding that a plaintiff was fired for merely a legitimate nondiscriminatory reason that a establish a fact issue exists but, but does not resolve that question.  For summary judgment purposes, a plaintiff need only "point to sufficient evidence to reasonably support a finding that she was harmed by an

employer's illegal discrimination." *Jalal v. Columbia,* 4 F. Supp. 2d 244, (1998); *Price Waterhouse v. Hopkins,* 490 U.S. 228, (1988).


### C.   Evidence Exists that could Reasonably Support an Inference of Retaliation By the Director

As was discovered in the Director's deposition, the Defendant County has used its counsel to navigate the termination of the Plaintiff since the time she was still an employee.

Salinas dep. P. 59-60:

```
20      A.  Because she was working on the vaccine and she

        21   was the one that had initially reported that to me.

        22      Q.  Initially reported what to you?

        23      A.  That the vaccines were expired, that there were

        24   a lot of vaccines that were expired.  I wanted to make

        25   sure that I did not give the appearance that I was [60]

        1    terminating her because of that.
```

The Director consulted with legal counsel believing that terminating the Plaintiff might "violate her rights."

Salinas dep. P. 58-9:

```
15      Q.  Why would you need to consult legal counsel in

        16   that circumstance?
```

```
17        A.   Because I had a situation that we were very --
18   we were trying to be very strict with time reporting as
19   we were trying -- we have had problems in the past.  So
20   we needed to work with our employees that could follow
21   our procedures, but at the same time I did have that
22   situation where the vaccines had not been shipped to
23    the state within the appropriate timeframe.
```

## Salinas dep. P. 60:

```
4        Q.   You thought you might be violating her rights?
5        A.   Yes.
6        Q.   By firing her?
7        A.   Yes.
```

**The Plaintiff performed her job well, and this is undisputed.**

## Salinas dep. P. 37:

```
23      Q.  Did anyone ever recommend that she be
   24       disciplined or terminated for poor performance?
   25          A.  No.
```

## Salinas dep. P. 38:

```
1       Q.  Had you made any determinations about her
   2        performance being lacking at the time she was
   3        terminated?
   4           A.  No.
```

Director Salinas considers herself a loyal employee and will not intentionally discredit the County:

## Salinas dep. P. 23

```
Q.  Do you believe it's important for a person in
        10   your position not to cast the county, which is your
        11   employer, in a bad light publicly?
        12       A.  Yes, I do.
```

## Salinas dep. P. 22:

```
20      Q.  Do you consider yourself a loyal employee of
        21   Cameron County?
        22       A.  Yes.
```

The Director is exceptionally adept managing perceptions where she is involved. Director Salinas had even, sometime prior to or around this termination, privately approached Judge Hinojosa and Commissioners to feel out job security and see if her job performance was an issue with anyone:

## Salinas dep. P. 16-17:

```
14      A.  I spoke to the county judge and the health
        15   authority and Remy Garza and told them I had been
        16   offered this position.
        17       Q.  And what was your purpose for telling them that
```

```
18    you had been offered another position?

19        A.  I wanted to make sure that they were happy with

20    my work.

21        Q.  And were they?

22        A.  Yes.

23        Q.  Did they offer you any different terms or

24    incentives to stay?

25        A.  No.    [17]


 1        Q.  What did they say to you?

 2        A.  That -- the county judge told me he would

 3    prefer for me to stay.

 4        Q.  Is this Gilbert Hinojosa?

 5        A.  Yes.

 6        Q.  Why did he say he would prefer for you to stay?

 7        A.  He said he didn't have any problems with my

 8    work.

 9        Q.  And when was this?

10        A.  It was probably two or three years ago.
```

The Plaintiff contends that the reporting relationship she undertook with the State
caused resentment, and in direct contrast to Defendant's Motion, Plaintiff was not asked to
go to Austin, the State Department of Health:

Salinas dep. P. 63:

```
Q.   She had gone a step higher than what you had

 3    chosen to direct her towards.  She had gone above the

 4    department of health to the department of health's
```

5    **supervisors, which is the state department of health.**

6        A.   Uh-huh.

7        Q.   And she had done so without being specifically

8    asked to do that, correct?

9        A.   Possibly the regional office asked her to do

10   that.

11       Q.   Well, you didn't ask her to do that, right?

12       A.   No, I asked her to contact the regional office.

13       Q.   And if the regional office didn't ask her, then

14   you would have no reason to dispute that she chose to

15·  do that on her own, correct?

16       **A.   I don't know how she ended up there.**

17       **Q.   You don't know.  But you did find out at some**

18   **point?**

19       A.   At some point, yes, I did, but --


Resentment was partially due to a difference in opinion between the State and
County Department instructions on what fields of information were to be revealed on
wasted vaccines:

Salinas dep. P. 79-80:


16       Q.   Didn't you send her back a number of times to

17   revise the spreadsheets?

18       A.   I don't think it was a number of times.  I know

19   one time I did.

20       Q.   What were you sending her back to do?

21       A.   I was -- I had asked her -- Esmer had come into

```
22    my office and said that Belinda was getting ready to

23    finalize the Excel form, that it was completed, but

24    that it was possible she was sending information that

25    was not being asked.
```

### Continuing...

```
19        Q.  But you don't have any reason to dispute that

20    in an understanding between Belinda Mata and Judi Chase

21    she did the spreadsheet exactly as those two had

22    discussed, do you?  You can't dispute that?

23        A.  I don't know what her conversation was with --

24        Q.  Because you didn't insist on being in the

25    middle of those conversations, did you?   [80]
```

```
1        A.  No, but we did have an understanding of what

2    the Excel spreadsheet was going to look like.

3        Q.  And she had all the communication -- Belinda

4    Mata had all the communication with the state, correct?

5        A.  Yes.
```

Despite good performance, in her deposition the Director was pressed to reveal her true feelings about the Plaintiff, and though there may have been more than was admitted to, what was revealed id very telling, and gives rise to the inference that the Director became inalterably jaded because of the reporting to the State:

Salinas dep. P. 119:

```
15        A.  I thought she treated me flippant.  I thought

          16    she was disrespectful at times.
```

17    Q.  Okay.  Was this when she was doing the report?

18    A.  Yes.

19    Q.  In what ways did you think she was

20    disrespectful?

21    A.  Sometimes she would -- when she would talk, she

22    sounded annoyed and agitated when I was asking her how

23    she was coming along with the project.  When I asked

24    her how soon could she be finished on the project,

25    because I needed to know if I could get her more [119]

1    assistance, she sounded like I was asking her to finish

2    it too quickly.

3        So from her demeanor and her tone of

4    voice, she -- and sometimes even the way she walked,

5    the way she grabbed something and turned around and her

6    hair flipped, you know, flew in the air because she was

7    so quick and stomped out, and, I mean, there were times

8    when she was disrespectful.

 

**Incredibly, and most revealing after two years, the Director's indelible impression of the Plaintiff's "hair flipping" when she turned around — a supposed intentional sign of disrespect, occurring in the heart of the preparation of the State's report, constitutes a "smoking gun" as to the Director's feelings about the Plaintiff at the time.**

Most tellingly, the Director had only one concern as to the Plaintiff, get the reporting finished, and don't bother investing time in addressing differences because the Plaintiff is not going to be here anyway:

Salinas dep. P. 120:

8       A.  I thought it was important to get past the

9          project, and her reporting, her lack of following that

10         process, I figured that she was eventually going to

11         move on.  It was hard to get an LVN.

12             Q.  She was going to move on to what?

13             A.  To another job.  It's very hard to get an LVN

14         at the salary that we were compensating at that time.

15             Q.  So you thought she was going to leave?

16             A.  Uh-huh.

17             Q.  Even if she wasn't terminated, she would just

18         leave?

19             A.  I thought that maybe she could get another job

20         very easily.

21             Q.  Did she ever say she wanted to get another job?

22             A.  Not that I recall.

23             Q.  Why do you think she wanted another job?

24             A.  A lot of our LVNs could find another job, not

25         just Belinda Mata, but a lot of them.  We're in that  [121]

1          situation with our LVNs and our RNs and our nurse

2          practitioners.

3              Q.  But that's the only reason you thought she

4          might move on, was because some of the other ones have?

5              A.  Not because the other ones have but because of

6          the compensation for the LVNs.

7              Q.  But she never told you those were her

```
8    intentions?

9        A.  No.
```

The Plaintiff was fired the very day she finished the critical assignment she had been working on. Further, the Plaintiff testified, condensed transcript attached as Exhibit, that she worked on this important assignment for weeks, but that even as it neared completion, no further work or assignments with the County Health were alluded to, supporting further the inference that her employment beyond this project was not desired and an avoided subject.

Salinas dep. P. 42-43:

```
    She was working on a very important

22    project up to the day she was terminated, correct?

23        A.  Yes.

24        Q.  In fact, she had just finished it the day she

25    was terminated, correct?
                                                [43]

 1        A.  Yes.

 2        Q.  She finished your expectations of what she was

 3    to do on a very important project, right?

 4        A.  Yes.
```

It is undisputed that the Plaintiff <u>actually did comply</u> with the County's written policy regarding notification, which is the Defendant's Exhibits, on absence notification, and she was supposedly terminated for not "calling in" which was an instruction that apparently applied just to her, and is not in that policy.

**Salinas dep. P. 38-39:**

24      A.  "Absence without leave, including failure to

25  notify supervisor of sick leave and repeated tardiness [39]

1  or early departure."

2      Q.  Is that the provision that Ms. Mata violated?

3      A.  I believe so.

4      Q.  You terminated Ms. Mata, correct?

5      A.  Yes.

6      Q.  And you believe that it was because of

7  violation of that policy?

8      A.  I believe that I terminated her because she

9  failed to report her absence to her supervisor.

10      Q.  You were present for her deposition where a

11  note was admitted as an exhibit that she left notifying

12  her supervisor of her coming in late, correct?

13      A.  Yes.

14      Q.  You don't dispute that she did leave a note for

15  her supervisor, correct?

16      A.  Correct.

17      Q.  And that note was notification of when she

18  would be coming in, correct?

19      A.  It was notification, correct.

There is a letter from the County, attached as Exhibit 1 hereto, that in the light most favorable to Plaintiff, raises the appearance that the County, inexplicably and to the point

of deception, avoided mentioning the Plaintiff's role because of resentment or the anticipation that the Plaintiff would soon be gone.

The supposed reasoning for the Plaintiff's termination, that by leaving a note she deprived the immediate supervisor of approval, is inconsistent with a much greater transgression that supervisor went unpunished and unnoticed and for doing. The Plaintiff was allowed by her immediate supervisor to work from home and track her hours spent. Her work hours were flexible.  But, according to the Director, not only was this decision was highly unusual and not appropriate under these circumstances, but the Director would not have expected the decision to be made by the immediate supervisor.  Thus, a termination is hoped to be supported for pretense that a the Plaintiff deprived the Defendant of approving a couple of hours of work time, when it is uncontested that the Plaintiff's entire hourly regime was improper, at the fault of a different person who went unpunished.  Pointing out this inconsistent reasoning sheds light on just how trivial the advanced reason for termination was to the Defendant, and thus the probability that it was untrue.

Salinas dep. P. 85-6:

```
25      Q.  If Esmer had come to you before this had been [86]

 1   done, suggesting it to you, what would you have said to

 2   that idea of letting Belinda Mata track her own hours

 3   working at home and supervise herself?

 4      A.  I would have been against the idea.
```

**Salinas dep. P. 84:**

```
3      A.  Employees are generally not allowed to work at
     4   home.
     5       Q.  Yeah.  Why is that the policy of the county?
     6       A.  It is our department policy.
     7       Q.  Yes, why?
     8       A.  Because we have -- we want to be able to
     9   control the amount of time spent on a project.  We want
    10   to be able to control for workers' compensation type of
    11   issues.  We just want a more controlled environment.
```

The Director herself believes she has wrongfully terminated employees, and she testified to claims in addition to the recitation below.

**Salinas dep. P. 34:**

```
11     Q.  Do you believe you have ever wrongfully
    12   terminated an employee?
    13                MR. BURST:  I'll object as calling for a
    14   legal conclusion.  If she can answer it --
    15       A.  I think it's possible.  I would have to go back
    16   and look at a list of individuals that have been
    17   terminated.
```

**Salinas dep. P. 32-33:**

```
16     Q.  Have you ever regretted a decision that you
```

```
17      made in your capacity as director?

18          A.  Yes.

19          Q.  Let's talk about some regrettable decisions.

20          A.  Okay.

21          Q.  Tell me some examples.

22          A.  There was one employee that was terminated, and

23      I later rehired him, and I regretted terminating him to

24      begin with because I did not feel that possibly he was

25      given an opportunity to work.

Q.  So I take it he contested his termination?

2           A.  Uh-huh.

3           Q.  And you eventually hired him back?

4           A.  In another position, yes, I did.

5           Q.  What would have happened if he didn't contest

6       his termination?

7           A.  It probably would have ended there.  I would

8       not have sought him to rehire him.
```

## D. No Legal Argument of Defendant's Disposes of the Claims for Relief

### i.   The Director's Termination of the Plaintiff Allegedly Resulted from the Plaintiff not Phoning in, which was "Policy," unique to the Plaintiff, that the Director Testified She could Make and Enforce, Thus the Claimed *Pembaur* Defense Does not Apply

Even though the Plaintiff asserts a pretense for termination, for purposes of the

argument that the "Director was not a policy-maker," it must be noted that the Director

testified she was enforcing a policy or rule, more specific than what appeared in the

handbook, that she and her subordinate duly made regarding the Plaintiff. It is undisputed that the Plaintiff actually notified the Department of her absence. The Director claims to have been enforcing a specific telephone instruction regarding absence that appeared in a warning to the Plaintiff. **The Director even testified that the Director's subordinate can set policy, let alone herself:**

Salinas dep. P. 93:

```
 2        Q.  Does Esmer's title carry the inherent authority

 3    to vary the personnel handbook or well understood

 4    policies, like letting an hourly employee work at home

 5    by herself?

 6                MR. BURST:  Object as a compound question.

 7        A.  The personnel handbook can be -- can be -- you

 8    can deviate from it based on the situation.

 9        Q.  Esmer can?

10        A.  I expect her to make a good judgment, but she

11    can.

12        Q.  She has the authority to do that?

13        A.  Yes.

14        Q.  Under oath, sitting here today, giving your

15    testimony, would you have said in 2002 that Esmer has

16    the inherent authority to make a decision like that on

17    her own?

18        A.  A termination decision?

19        Q.  No.

20        A.  A handbook decision?
```

```
21        Q.  A decision to let Belinda Mata work at home on

22   her own, supervising herself, reporting her own hours?

23        A.  If Esmer made that decision, yes.
```

### ii.    *Pembaur* is Satisfied Regardless Because the Director's Termination was Delegated and Authorized

Page 8, Paragraph 20 of the Defendant's Motion recites an incomplete rendition of the *Pembaur* hypothetical.  Defendant cites the hypothetical for the proposition that an nonpolicy-maker's actions do not give rise to liability.  Defendant omits, conveniently, the last full sentence from the relevant paragraph:

"However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability."   The last sentence of cited Headnote 12.

It was disingenuous to omit this critical line, especially in that the Director testified the Department personnel vary from and shape policy for themselves within the Department.  The testimony of record favorable to the Plaintiff must be taken as true.  The Defendant wholly fails to establish this defense as a matter of law, and does not even analyze the facts under the correct rendition of law, because of the ommission.

### iii.    Plaintiff asserts no Sabine Pilot or Whistleblower Claim; Even the Defendant's Health Department Director Testified the Suit is About Speech on a "Public Health Concern"

Defendant's requested ruling in this regard should be denied as moot because it contests no such relief is sought.

Salinas dep. P. 27:

```
1     Q.  Okay.  What is your understanding of Ms. Mata's
   2     lawsuit?
   3        A.  That it's not a whistle blower's lawsuit, but
   4     it is a lawsuit of public health concern.
```

### III.  Prayer

Wherefore, premises considered, Plaintiff respectfully requests Defendant's Motion for Summary Judgment be denied.

Respectfully Submitted,

**BREWER ANTHONY & MIDDLEBROOK, P.C.**

By:_____
David R. Joe, Admitted to the
United States District Court,
Northern and Southern Districts of Texas
Texas Bar No. 24003872
Federal Bar 34002
1702 E. Tyler Street
Suite 1
Harlingen, TX, 78550
Office: (956) 428-5500
Fax: (956) 428-5518
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Response was served in accordance with the Federal Rules of Civil Procedure this 30th day of June, 2005, on counsel of record:

Richard Burst. Esq.
Cameron County Commissioners'
Court, Civil Legal Division
964 E. Harrison Street
Ste. 420
Brownsville, TX 78520
Fax 956 550-1348

_____
DAVID R. JOE