Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
BELINDA MATA            ) (
      Plaintiff         ) (
                        ) (
VS.                     ) (   CASE NO. B-04-092
                        ) (
CAMERON COUNTY HEALTH   ) (
DEPARTMENT, THE COUNTY OF) (
CAMERON                 ) (
      Defendants        ) (
```

ORAL DEPOSITION OF
YVETTE SALINAS
APRIL 4, 2005

ORAL DEPOSITION OF YVETTE SALINAS, produced as a

witness at the instance of the PLAINTIFF, taken in the

above styled and numbered cause on APRIL 4, 2005,

reported by MAUREEN STINGLEY, Certified Court Reporter

No. 691, in and for the State of Texas, at the offices

of Bryant & Stingley, Inc., 2010 East Harrison Street,

Harlingen, Texas, pursuant to the Federal Rules of

Civil Procedure and any provisions stated on the record

or attached therein.

## Page 2

APPEARANCES

COUNSEL FOR PLAINTIFF:
DAVID R. JOE
BREWER, ANTHONY, MIDDLEBROOK,
BURLEY & DUNN, P.C.
1702 East Tyler Street, Suite 1
Harlingen, Texas 78550

COUNSEL FOR DEFENDANTS:

RICHARD O. BURST
CIVIL LEGAL DEPARTMENT
COMMISSIONERS COURT
964 East Harrison Street
Brownsville, Texas 78520

### INDEX

                                          PAGE
Appearances ........................................ 2

YVETTE SALINAS

Examination by Mr. Joe ............................ 4

Errata Sheet/Signature Page ...................... 152

Reporter's Certificate ............................. 153

Attached to the end of the transcript: Stipulations

## Page 3

### EXHIBITS
                          PAGE

NUMBER  DESCRIPTION                       IDEN.

1   Excerpt from policy manual .............. 38

2   Memorandum to Texas Department of Health
    from Belinda Mata dated 5-21-02 ......... 71

3   Excerpt from policy manual ............. 103

4   Letter to Texas Department of Health from
    Maria San Pedro dated 5-30-02 .......... 125

5   Letter to Belinda Mata from Yvette
    Salinas dated 6-4-02 ................... 139

## Page 4

1       YVETTE SALINAS,
2   having been duly sworn, testified as follows:
3              EXAMINATION
4   BY MR. JOE:
5      Q. Ms. Salinas, good morning. My name is David
6   Joe, and I represent Belinda Mata in this case that
7   you're here today on.
8              Previously you sat in on the deposition of
9   Belinda Mata I believe sometime in November of 2004; is
10  that right?
11     A. Yes, I did.
12     Q. Okay. And apart from attending that
13  deposition, have you ever had your deposition taken
14  before or attended a deposition before?
15     A. That's the only time I have participated in a
16  deposition.
17     Q. All right. There are just a few rules I would
18  like to go over very briefly. First, let me thank you
19  for your voluntary appearance here today. If you do
20  need a break at any point in time, please let me know
21  in advance and we will work something out, okay?
22     A. Uh-huh.
23     Q. If you don't understand any of my questions and
24  need it to be restated or rephrased, just ask me and I
25  will be happy to do so. Will that be okay?

## Page 5

1      A. Okay.
2      Q. And please articulate your answers orally so
3   the court reporter can transcribe what you're saying.
4   Would that be okay?
5      A. Okay.
6      Q. All right. And you understand that your
7   deposition today, though we're in an informal setting
8   today, is under oath and it can be used in trial the
9   same as testimony given in court can be used. Do you
10  understand that?
11     A. Yes.
12     Q. All right. Are you under any sort of
13  medication today that would prevent your ability to
14  complete this deposition?
15     A. I do not believe so.
16     Q. Or any medication that would affect your
17  answers in this deposition?
18     A. I do not believe I have taken any medication
19  that would affect my answers.
20     Q. Okay. Or any medication that would affect your
21  memory?
22     A. Or any medication, no, that will affect my
23  memory, no.
24     Q. Okay. And anything besides medication that
25  you're aware of that might affect your memory?

Page 6

1    A. Can you repeat the question?
2    Q. Is there anything apart from medication that
3  might affect your memory of things that happened in
4  2002 I should be aware of?
5    A. Not that I know of.
6    Q. Have you had a chance to consult with your
7  attorney, Mr. Burst, prior to this deposition?
8    A. Yes.
9    Q. Okay. Before we go any further, don't tell me
10  any of the contents of the discussion that you have had
11  with Mr. Burst, but there are a few things I'm entitled
12  to know --
13    A. Okay.
14    Q. -- about the conversations you have had with
15  Mr. Burst, such as the time, the place, anyone else
16  that was present, how long you talked to him, so forth.
17  So starting with the time, can you tell me when you
18  talked with Mr. Burst in preparation for this
19  deposition?
20    A. Last Friday.
21    Q. All right. And where did that meeting take
22  place?
23    A. In his office conference room.
24    Q. Okay. And how much time did you spend with him
25  preparing for this deposition?

Page 7

1    A. I believe our appointment was at 9:30, and it
2  started at 9:30 and ended around 11:00.
3    Q. All right. Was anyone else present in that
4  meeting?
5    A. Yes.
6    Q. Who was that?
7    A. Esmer Guajardo, who is my assistant, was
8  present.
9    Q. Anyone else?
10    A. I know that Douglas Wright walked in and out.
11    Q. Who is he?
12    A. Douglas Wright, the chief legal counsel, walked
13  in and out. And I don't really recall him
14  participating, but he walked in and out before.
15    Q. And did you review any documents in preparation
16  for the deposition?
17    A. Yes, I did.
18    Q. Do you recall what they were?
19    A. I reviewed the documents that were in the file
20  that were numbered.
21    Q. Uh-huh.
22    A. Okay. I reviewed the deposition, and I
23  reviewed another document put out by Raba Kistner.
24    Q. Who is that?
25    A. Raba-Kistner?

Page 8

1    Q. Yes.
2    A. Is a consulting firm.
3    Q. Robin, did you say?
4    A. Raba.
5    Q. Raba?
6    A. R-A-B-A, K-I-S-T-N-E-R.
7    Q. What document was that?
8    A. That was a document that had to do with, I
9  guess, the building or the environmental component. It
10  was an analysis.
11    Q. Did it have to do with asbestos?
12    A. Yes, sir.
13    Q. Okay. Now, apart from that meeting that you
14  had with your attorney, which we have agreed you won't
15  discuss the contents of, did you have any meetings back
16  at your place of employment, or conversations in
17  preparation for this deposition?
18    A. At my place of employment on Morgan Boulevard,
19  we didn't --
20    Q. The county department of health, correct?
21  You're still employed with them?
22    A. The name of our organization is Cameron County
23  Department of Health and Human Services now.
24    Q. Okay.
25    A. So, yes, I am employed by them.

Page 9

1    Q. Right.
2    A. Well, by the county, Cameron County.
3    Q. All right. And at that place of employment,
4  did you have any conversations regarding this upcoming
5  deposition?
6    A. With Richard Burst?
7    Q. No, no. Conversations that did not include
8  Richard Burst or any other attorney. Conversations
9  with other employees, for example.
10    A. Yes, I did.
11    Q. All right. And who did you have conversations
12  with?
13    A. My secretary, Ana Martinez.
14    Q. Yes.
15    A. Martha Canas, who handles our human resource
16  material.
17    Q. Yes.
18    A. Possibly Pedra Hinojosa.
19    Q. Yes.
20    A. I have had conversations with Maria San Pedro,
21  who is no longer with our department.
22    Q. Anyone else?
23    A. The new director of nurses, Herb Valentino.
24    Q. Anyone else?
25    A. Oscar Buitron, who was the former WIC director.

Page 10

1  Leticia Montiel, who is the current WIC director.
2  Possibly Fidel Calvillo, the infirmary supervisor.
3      Q. Is that all?
4      A. I believe so.
5      Q. So maybe as many as nine employees?
6      A. If that's what it comes out to.
7      Q. Yes, that's what it comes out to. And these
8  are all conversations that you're having with these
9  employees in preparation for the deposition for Belinda
10 Mata's former employment?
11     A. There is one other, Yvette Ortega, from the
12 Harlingen clinic. And these are people that I have
13 discussed the matter with.
14     Q. Okay. All right. What we may do is come back
15 and visit the conversations you have had with them, but
16 I made an agreement with your attorney that we would
17 attempt to get this deposition and your co-worker's
18 deposition done before 1:00. So for the sake of time I
19 had better proceed with my questions, and if we can, we
20 will come back and talk about those conversations.
21     A. Okay.
22     Q. Let me get some back information from you. Can
23 you please state your full name for the record?
24     A. Yes, Yvette Salinas.
25     Q. And where are you currently employed?

Page 11

1      A. At Cameron County Department of Health and
2  Human Services, located at 1122 Morgan Boulevard in
3  Harlingen.
4      Q. All right, and what is your title there?
5      A. Health administrator.
6      Q. And what is your residential address and
7  telephone number?
8      A. 5800 North 23rd Lane in McAllen, Texas. And my
9  phone number is 956-630-6625.
10     Q. And how long have you worked for Cameron
11 County?
12     A. Since 1990.
13     Q. And what titles have you held with Cameron
14 County?
15     A. I have been the WIC coordinator, the WIC
16 director, the interim health administrator, and the
17 health administrator.
18     Q. Do you have any relatives working for Cameron
19 County?
20     A. No, not to my knowledge.
21     Q. Okay. At any time since, say, 1989, have you
22 had any relatives that worked for Cameron County?
23     A. No, not that I know of.
24     Q. Are you aware of any relatives assisting you
25 with your -- did you apply for the director position

Page 12

1  where you're employed today?
2      A. I did apply.
3      Q. Okay. To your knowledge, did any of your
4  relatives or close friends help you obtain that
5  position?
6      A. No.
7      Q. Okay. Do you have any degrees?
8      A. Yes.
9      Q. Certifications? What degrees do you hold?
10     A. I hold one degree, a bachelor in science.
11     Q. Where did you obtain that?
12     A. Southwest Texas State University in San Marcos.
13     Q. What year?
14     A. 1986.
15     Q. And where did you attend high school?
16     A. McAllen High School.
17     Q. Were you born in McAllen?
18     A. Yes.
19     Q. Do you hold any certifications?
20     A. No.
21     Q. At your residential address, do you reside with
22 anyone else?
23     A. No.
24     Q. Do you have any children?
25     A. No.

Page 13

1      Q. Are you married?
2      A. No.
3      Q. Are you divorced?
4      A. No.
5      Q. Since 1990, have you held any employment
6  besides employment with Cameron County?
7      A. Yes.
8      Q. Where else have you worked?
9      A. I worked at Mom's Pharmacy.
10     Q. When was that?
11     A. Probably about two years ago.
12     Q. Was that while you were the director?
13     A. Uh-huh, yes.
14     Q. And what did you do for Mom's Pharmacy?
15     A. I did clerical work.
16     Q. And what was your reason for obtaining that
17 employment?
18     A. I was trying to help a friend whose sister was
19 a pharmacist there.
20     Q. Your employment was full-time, though, correct,
21 at the time you worked for Mom's Pharmacy?
22     A. My employment with Cameron County was
23 full-time. The Mom's Pharmacy was maybe two or three
24 hours on a Saturday, probably maybe -- maybe six or
25 seven Saturdays.

Page 14

1    Q. All right. So it wasn't a position that you
2 held primarily to obtain income?
3    A. No.
4    Q. Is it fair to say that your only source of
5 income since 1990 has been your income from Cameron
6 County?
7    A. Yes.
8    Q. Apart from Mom's?
9    A. Uh-huh.
10   Q. Do you have independent wealth that would
11 enable you to not work if you chose not to?
12   A. No.
13   Q. If you lost your position with Cameron County,
14 in your estimation, how long would your personal
15 savings maintain your current standard of living
16 without obtaining subsequent employment?
17   A. My savings alone, which would not include
18 retirement or 401(k) plans?
19   Q. Yes.
20   A. So you're talking about like a savings account
21 at a bank? Is that the question?
22   Q. Savings at a bank, other assets you could
23 liquidate.
24   A. Okay. Savings account at a bank, probably two
25 or three months. Other assets, like a home, which --

Page 15

1 is that considered liquidating?
2    Q. Well, I assume you wouldn't want to liquidate
3 your home.
4    A. Okay.
5    Q. Is that right?
6    A. That's correct.
7    Q. All right, so you would need to find another
8 position within two or three months?
9    A. That's correct.
10   Q. All right. And since you have been the
11 director, have you sought employment anywhere else?
12   A. Yes.
13   Q. Where?
14   A. With the Milagro clinic in McAllen.
15   Q. And what do they do?
16   A. Primary health care for low income.
17   Q. And would that have been full-time employment?
18   A. Yes.
19   Q. And why were you looking into employment there?
20   A. I was asked to apply, and it was within the
21 City of McAllen, where I reside.
22   Q. Did you take a position there?
23   A. No.
24   Q. Were you offered a position?
25   A. Yes.

Page 16

1    Q. Why did you not take the position?
2    A. Because I felt that Cameron County offered me a
3 lot more diversity and challenges as opposed to the
4 position at the Milagro clinic.
5    Q. Have you looked for employment anywhere else
6 besides that clinic since you have been the director?
7    A. By "director," you mean health administrator?
8    Q. Let's just say your current title, since you
9 have held that title.
10   A. Okay, no.
11   Q. Did you tell anyone at Cameron County that you
12 were looking for other employment or that you had
13 applied for other employment?
14   A. I spoke to the county judge and the health
15 authority and Remy Garza and told them I had been
16 offered this position.
17   Q. And what was your purpose for telling them that
18 you had been offered another position?
19   A. I wanted to make sure that they were happy with
20 my work.
21   Q. And were they?
22   A. Yes.
23   Q. Did they offer you any different terms or
24 incentives to stay?
25   A. No.

Page 17

1    Q. What did they say to you?
2    A. That -- the county judge told me he would
3 prefer for me to stay.
4    Q. Is this Gilbert Hinojosa?
5    A. Yes.
6    Q. Why did he say he would prefer for you to stay?
7    A. He said he didn't have any problems with my
8 work.
9    Q. And when was this?
10   A. It was probably two or three years ago.
11   Q. Is one of the reasons you chose to stay with
12 Cameron County the positive feedback you received from
13 these people?
14   A. That was one of the reasons.
15   Q. What were the other reasons?
16   A. I enjoyed my co-workers. It would have been
17 difficult for me to leave them. The position at the
18 Milagro clinic had a staffing of about maybe 11
19 individuals, and I was accustomed to working with more
20 individuals, more programs. So I felt like if I stayed
21 with Cameron County it would keep me busier and it
22 would be more challenging than that position at Milagro
23 clinic.
24   Q. Was there any particular reason that you
25 approached the county judge about your -- his

**Page 18**

1  satisfaction with your job?

2     A. I approached Remy and told him that I had

3  applied for this job and they had offered me the

4  position, but I needed to know where I stood with

5  Cameron County because if there was any dissatisfaction

6  with my work, then it would a good opportunity for me

7  to move on since the pay was comparable.

8        So Remy didn't get to me -- back to me in

9  an appropriate timeframe, and I had a meeting with the

10  county health authority and the county judge around the

11  same time. So I went ahead and I asked him that

12  question, and he told me that, yes, Remy had mentioned

13  it to him and that he had instructed Remy to tell me

14  that, yes, he was happy with my work and that he was

15  surprised that Remy did not relay that message to me.

16     Q. Can you tell the ladies and gentlemen of the

17  jury who Remy is?

18     A. Remy Garza?

19     Q. Yes.

20     A. I'm not sure what his title is, but he's

21  possibly the chief administrative assistant to the

22  county judge.

23     Q. Okay. And who is actually responsible for your

24  review?

25     A. The commissioners court.

**Page 19**

1     Q. The commissioners court. Do they review you

2  every year, perhaps?

3     A. As needed.

4     Q. As needed? So they don't review you

5  necessarily every year?

6     A. I have not been reviewed.

7     Q. Ever?

8     A. Not by the commissioners court.

9     Q. Did you feel, after talking to Mr. Hinojosa,

10  reasonably assured that your employment would remain in

11  place so long as you wanted to -- so long as you

12  desired to keep the position?

13     A. No.

14     Q. You didn't feel secure in your employment?

15     A. I felt that the county judge was happy with my

16  work and I felt that the county health authority was

17  also happy with my work.

18     Q. So it was your understanding if you continued

19  to perform at the same level as you had been, they

20  would still be happy with your work?

21     A. The county health authority and the county

22  judge?

23     Q. Yes.

24     A. Yes.

25     Q. Now, the county offers certain benefits and

**Page 20**

1  retirement plans that were superior to what you could

2  have obtained at the -- what did you say the name of

3  that clinic was?

4     A. Milagro clinic.

5     Q. Is that correct?

6     A. Yes.

7     Q. Does the county have a pension plan for

8  employees in your position?

9     A. I don't know what a pension plan is. Is it a

10  retirement plan?

11     Q. Sure, yes, we could call it that.

12     A. Okay. Yes, the county does have a retirement

13  plan.

14     Q. All right. And provides insurance?

15     A. Yes, it does.

16     Q. Health insurance and life insurance?

17     A. Possibly. I don't know off the top of my head.

18     Q. Do you know any other types of insurance that

19  the county supplies you with?

20     A. They supply us with the opportunity to purchase

21  insurance.

22     Q. Yes. What types of insurance can you purchase?

23     A. There's two in particular that I know of that

24  can be purchased. There's cancer and heart, heart

25  attack type of insurance.

**Page 21**

1     Q. Okay. As you sit here today, do you have any

2  plans to change your employment?

3     A. No.

4     Q. Do you intend to retire with Cameron County?

5     A. I would like to, yes.

6     Q. If you retire with Cameron County, will you

7  have a greater vested retirement benefit than you have

8  today?

9     A. I don't understand the question.

10     Q. How many years would it be from today that you

11  would be eligible for retirement with full benefits?

12     A. I believe that I can retire in about eight to

13  10 years.

14     Q. Receiving full benefits? Do your benefits go

15  up incrementally each year as your tenure with the

16  county increases?

17     A. I don't know.

18     Q. Does the county's contribution to your

19  retirement plan increase annually?

20     A. I don't know.

21     Q. Do they contribute to your retirement plan or

22  match your contributions?

23     A. Yes.

24     Q. Does it happen periodically?

25     A. I don't know.

Page 22

1   Q. Are you eligible to be promoted to a higher
2   position than you hold today with Cameron County?
3   A. I do not believe so.
4   Q. Are you eligible for any raises?
5   A. I do not believe so.
6   Q. What about cost of living adjustments?
7   A. When the county employees get a salary
8   increase, I do too.
9   Q. Why do you think you're not eligible for any
10  raise or promotion?
11  A. I am at the highest level that I can be as a
12  department head who works for the commissioners court.
13  Q. And it's your testimony you have not received
14  any raises since you have held this position?
15  A. I received the raises that are approved by the
16  commissioners court and given to the county employees.
17  Q. Have you been satisfied with those raises to
18  this point in time?
19  A. Yes.
20  Q. Do you consider yourself a loyal employee of
21  Cameron County?
22  A. Yes.
23  Q. What is your understanding of the duty that an
24  employee owes to its employer in terms of loyalty?
25  A. In terms of loyalty?

Page 23

1   Q. Yes.
2   A. I need to perform the duties -- I need to
3   perform the duties as outlined, whether they are county
4   policies, state policies, and I need to have a
5   commitment to the county.
6   Q. Do you believe it's also important not to cast
7   the county as your employer in a bad light publicly?
8   A. Can you repeat that?
9   Q. Do you believe it's important for a person in
10  your position not to cast the county, which is your
11  employer, in a bad light publicly?
12  A. Yes, I do.
13  Q. Do you believe it's important to protect the
14  public's image of your employer, which is the county?
15  A. To a point, yes, I do.
16  Q. Would you be reluctant to say or do anything
17  that you thought would hurt the reputation of the
18  county?
19  A. No.
20  Q. Have you ever done so?
21  A. I don't recall.
22  Q. Okay, so your testimony is that you wouldn't be
23  reluctant to cast the county in a bad light, but you
24  don't recall ever having done so personally; is that
25  correct?

Page 24

1   A. Can you repeat that?
2   Q. Your testimony, if I understand it, is that you
3   would not be reluctant to cast the county in a bad
4   light, but you don't recall that you have ever done so?
5   A. That's correct.
6   Q. Do you recall whether you have ever said
7   anything that would bring embarrassment upon the county
8   or its officials?
9   A. No, I don't recall.
10  Q. Do you recall whether in your experience
11  working for the county you have ever come across any
12  set of circumstances or facts that if made public would
13  bring embarrassment to the county or its officials?
14  A. Repeat that.
15  Q. Since you've been an employee for Cameron
16  County, do you recall any circumstances that you have
17  ever come across that, if communicated, would bring
18  embarrassment to the county or its officials?
19  A. I'm sorry. I'll need you to repeat that again.
20  Q. I can rephrase it. Since the time that you
21  have worked for Cameron County, as an employee, have
22  you ever become aware of anything that would be
23  embarrassing to the county if made public?
24  A. Yes.
25  Q. What are those circumstances?

Page 25

1   A. Well, there was a circumstance where the fee
2   for the radiology license certification was not paid
3   within a certain timeframe. So we had to -- so the
4   state ceased our ability to utilize the x-ray machines.
5   So we had to incur additional costs because we had to
6   privatize that service while we were going through the
7   paperwork process of paying for that.
8   Q. Okay. Anything else?
9   A. Well, there was another time where an animal
10  control officer dragged an animal across the yard in
11  front of another person who offered to give him a cage,
12  and that was not handled very well. So that was a bad
13  situation. We have various programs within our
14  department. So --
15  Q. Anything else?
16  A. Anything embarrassing for the county? Some of
17  our contracts are not up to date. So it would give the
18  appearance that we are not following them correctly.
19  So that could turn into an embarrassing situation.
20  Q. Are any of these things items that you have any
21  control over?
22  A. I'm supposed to oversee all of them.
23  Q. All right. But you testified earlier that you
24  can't recall ever making anything public that would
25  embarrass the county. So would it be fair to say that

Page 26

1    you have handled these things internally?
2        A. The animal being dragged across the yard was in
3    the newspaper.
4        Q. But did you make that public or did someone
5    else?
6        A. Someone else did.
7        Q. And the other items were handled internally?
8        A. The contracts are handled within our
9    department. The x-ray and the paying of that bill was
10   in coordination with the auditor's office.
11       Q. Okay.
12       A. But, yes, it's within Cameron County.
13       Q. You felt that it was appropriate and possible
14   to handle that without going outside the county itself
15   in each of those instances?
16       A. Well, with the radiology machine, we did work
17   with the state. So that was outside of Cameron County.
18       Q. The state brought that to your attention?
19       A. Yes.
20       Q. Okay. And what about the instance of all the
21   immunizations and vaccinations being out of date that
22   are the subject of this lawsuit? Would you include
23   that in your list of several items that could bring
24   embarrassment to the county?
25       A. Yes, it could.

Page 27

1        Q. Okay. What is your understanding of Ms. Mata's
2    lawsuit?
3        A. That it's not a whistle blower's lawsuit, but
4    it is a lawsuit of public health concern.
5        Q. Okay, let me ask you, don't mention Mr. Burst
6    or anything he told you in answering this question.
7        A. Okay.
8        Q. But why do you say that it's not a whistle
9    blower's lawsuit?
10       A. Well --
11       Q. If you don't have any reason apart from a
12   conversation with Mr. Burst --
13       A. No, I don't.
14       Q. -- just say that.
15       A. I don't.
16       Q. Now, why do you say -- and the same
17   instructions apply. Why do you say it's a public
18   health lawsuit?
19       A. Because that's what I was told by Richard
20   Burst.
21       Q. Okay. Well, I just asked you not to restate
22   what he had told you. I want to be clear. I'm not
23   asking you to repeat any conversation you had with your
24   attorney, him or any other attorney for the department.
25           Do I take it to mean that there's no other

Page 28

1    reason that you're saying that it's a public health
2    lawsuit?
3        A. No.
4        Q. Apart from something an attorney said? For
5    instance, none of these other 10 people that you have
6    talked to have characterized it as a public health
7    lawsuit?
8        A. No, they have not.
9        Q. And you didn't reach that conclusion yourself?
10       A. No, I did not.
11       Q. Did you read the lawsuit?
12       A. Yes.
13       Q. Do you understand -- do you believe you
14   understand the contentions of the lawsuit?
15       A. I read the lawsuit some time ago. So I
16   don't -- I know it's there. I know I have read it, but
17   I don't remember the details in it.
18       Q. Fair enough. Did you understand it at the
19   time?
20       A. Yes.
21       Q. Do you believe that -- or did you believe at
22   the time that Ms. Mata's termination from the county is
23   at the crux -- is at the crux of the lawsuit?
24       A. I don't understand the term "crux."
25       Q. Sure. Do you understand it to be, well, in

Page 29

1    your words, a public health lawsuit or a wrongful
2    termination lawsuit?
3            MR. BURST: I'm going to object to this
4    line of questioning, this question in particular,
5    because you're asking for a legal conclusion which she
6    has no reason to know. She has answered she can't
7    answer it.
8        Q. If you can answer. Do you understand this to
9    be a suit that she is bringing as a member of the
10   public or a suit she is bringing as an employee who was
11   fired?
12       A. I don't know.
13       Q. Did you understand at the time that she is
14   claiming she was wrongfully terminated? When I say,
15   "At the time," I mean the time you read the lawsuit.
16       A. I don't remember if there was a wrongful
17   termination statement in there.
18       Q. Okay. All right. Well, let me go at this
19   another way. Why do you think you're here today giving
20   testimony?
21       A. Because -- because of the expired vaccine
22   that -- because of the expired vaccine that I feel --
23   okay. I feel like I'm here giving testimony because
24   Ms. Mata had a problem with the expired vaccine and
25   that possibly she feels that she may have been

Page 30

1  terminated because of the expired vaccine and her
2  involvement in that.
3     Q. Okay. Do I take it that you mean in your
4  answer or imply in your answer that she wasn't
5  terminated for her involvement in the expired vaccine?
6     A. Can you repeat that?
7     Q. Let me just ask a different question
8  altogether. Was Ms. Mata terminated for her
9  involvement in reporting the expired vaccine?
10    A. I did not terminate her for that reason.
11    Q. Was that part of it?
12    A. No.
13    Q. What reason did you terminate her for, then, if
14 it wasn't for reporting the expired vaccine?
15    A. She was terminated -- I make the decision
16 whether to terminate or not, and Esmer Guajardo, her
17 immediate supervisor, approached me and told me that
18 this was the third instance that she did not follow the
19 procedure for reporting an intended absence or lateness
20 or what have you, and that a note had been left on the
21 door for all the staff to see whenever they got to
22 work, and her recommendation was to go ahead and to
23 terminate.
24    Q. Okay. But it's correct that at the time that
25 you terminated Belinda Mata, you were aware that she

Page 31

1  had reported expired vaccines to the State of Texas,
2  correct?
3     A. That's correct.
4     Q. All right. You sat through Ms. Mata's
5  deposition, I believe the entire deposition, and you
6  listened to her testimony, correct?
7     A. Yes.
8     Q. And you have talked to these other individuals.
9  As we sit here today, do you believe there is any merit
10 to Ms. Mata's assertions that she was wrongfully
11 terminated?
12       MR. BURST: Object to calling for a legal
13 conclusion, but if she can answer it --
14    A. Can you rephrase the question?
15    Q. Yes. Having sat through Ms. Mata's deposition,
16 having read the lawsuit earlier, as you said you did,
17 having talked to all of these individuals, is there, in
18 your mind, any merit to Ms. Mata's contentions?
19       MR. BURST: Object as calling for a legal
20 conclusion. She can answer if she can.
21    Q. Yes, you can answer the question.
22    A. I don't understand "Ms. Mata's contentions."
23    Q. Have you ever truly understood Ms. Mata's
24 contentions?
25    A. Yes, I understand that she had some concerns

Page 32

1  about the vaccine and that she may feel that she may
2  have been terminated because of that.
3     Q. All right. Is there any merit in your mind to
4  her contention that that was part of the reason she was
5  terminated?
6     A. No.
7        MR. BURST: Object -- answer.
8     A. No.
9     Q. And why is that?
10    A. I'm the only one in the department that
11 terminates. So I have to have real clear in my mind
12 why someone is being terminated. And I know that she
13 was terminated because she failed to report her
14 absence, as Ms. Guajardo had previously instructed her
15 to do.
16    Q. Have you ever regretted a decision that you
17 made in your capacity as director?
18    A. Yes.
19    Q. Let's talk about some regrettable decisions.
20    A. Okay.
21    Q. Tell me some examples.
22    A. There was one employee that was terminated, and
23 I later rehired him, and I regretted terminating him to
24 begin with because I did not feel that possibly he was
25 given an opportunity to work.

Page 33

1     Q. So I take it he contested his termination?
2     A. Uh-huh.
3     Q. And you eventually hired him back?
4     A. In another position, yes, I did.
5     Q. What would have happened if he didn't contest
6  his termination?
7     A. It probably would have ended there. I would
8  not have sought him to rehire him.
9     Q. Let's discuss any other instances of a
10 regrettable employment action.
11    A. Sometimes on the warning notices, sometimes
12 I'll see that the goal is not outlined, and I regret
13 not catching it, that the goal was not outlined.
14 Sometimes --
15    Q. You're talking about instances where you have
16 taken action against an employee?
17    A. Uh-huh.
18    Q. But you believe that the goal was not outlined
19 for them before the action was taken against them?
20    A. No. On warning notices, we try to have three
21 criteria on the warning notices, and one of them is the
22 action that we feel was incorrect. The second one is
23 what we expect in the future, and the third one is to
24 let them know that future actions like this could lead
25 to disciplinary action, including termination.

Page 34

1    Q. All right. So name one employee who was
2 reinstated. You said that you regretted some warnings
3 not stating the goal or the objective. What else?
4    A. During my term?
5    Q. Uh-huh.
6    A. During my health administration?
7    Q. Talking about your decisions.
8    A. My decisions as health administrator?
9    Q. Yes.
10    A. Sometimes I regret not firing them sooner.
11    Q. Do you believe you have ever wrongfully
12 terminated an employee?
13        MR. BURST: I'll object as calling for a
14 legal conclusion. If she can answer it --
15    A. I think it's possible. I would have to go back
16 and look at a list of individuals that have been
17 terminated.
18    Q. In your mind, when you terminate employees --
19 give the Court an idea of how many times you have
20 terminated an employee.
21        MR. BURST: Object as to time relevant.
22    Q. We're talking about the time you have held your
23 title, current title.
24    A. Okay. I might terminate an employee once every
25 six weeks.

Page 35

1    Q. All right. So how many weeks -- how many years
2 have you held the title?
3    A. Since 1990.
4    Q. Okay.
5    A. I'm sorry. Since 1998.
6    Q. '98?
7    A. Uh-huh.
8    Q. About seven years?
9    A. It was six years last year.
10    Q. At the time the plaintiff was terminated, you
11 may have terminated more than 50 employees?
12    A. Possibly.
13    Q. And is it your experience as administrator that
14 you're more certain of some terminations being
15 justified than you are of others? Is that correct? Or
16 are they all absolutely equally justified?
17    A. I'm certain of the terminations, but I would
18 not say that they are equally justified.
19    Q. All right. In your mind, wouldn't it be
20 accurate to say that there are clearly warranted
21 terminations, justifiable terminations, gray area
22 terminations and instances where there is not enough
23 evidence to take any action at all?
24    A. I terminate somebody based on a reason and not
25 because -- not at all.

Page 36

1    Q. I understand. But sometimes as an
2 administrator you have to make decisions about a
3 termination that are tough and other times it's
4 relatively easy, correct?
5    A. Yes.
6    Q. All right. That's what I'm getting at. And
7 can you recall where Ms. Mata's termination fell? Was
8 it one that you thought was clear-cut, not requiring
9 much deliberation? Was it in a gray area? Did you
10 resist Esmer's suggestion at all? What can you tell me
11 about your personal thoughts on Ms. Mata's termination?
12    A. I believe that Ms. Mata's termination was
13 overdue.
14    Q. Was overdue?
15    A. Overdue.
16    Q. For the reason of absences or tardiness?
17    A. One of the reasons.
18    Q. One of the reasons?
19    A. Uh-huh.
20    Q. Aren't those the reasons that were given to
21 her?
22    A. Yes.
23    Q. That was the third and final warning?
24    A. That was the third warning. That was the
25 reason why she was terminated.

Page 37

1    Q. All right. And that's the reason you told her;
2 is that right?
3    A. I did not tell her, but that is the reason why
4 she was terminated. That was the last reason why she
5 was terminated.
6    Q. All right. And the other reasons were the
7 warnings that didn't result in termination?
8    A. Yes.
9    Q. All right. And?
10    A. Well, she was terminated because she failed to
11 report to work.
12    Q. Did you have a problem with the quality of her
13 work on the day you terminated her, or you terminated
14 her for not reporting to work?
15    A. Those are two questions. Unless -- can you
16 rephrase that?
17    Q. You just testified you terminated her for not
18 reporting to work -- actually, I should say not giving
19 notice that she would not be reporting to work; is that
20 correct?
21    A. On the third time that it happened, yes, and
22 based on the recommendation of Esmer Guajardo.
23    Q. Did anyone ever recommend that she be
24 disciplined or terminated for poor performance?
25    A. No.

Page 38

1    Q. Had you made any determinations about her
2  performance being lacking at the time she was
3  terminated?
4    A. No.
5    Q. Let me show you an exhibit that I would like to
6  mark as Deposition Exhibit No. 1.
7      (Salinas Exhibit No. 1 was marked)
8    Q. I'm just going to hand you a page from the
9  policy manual, and directing your attention to one of
10 the reasons for disciplining an employee.
11   A. Uh-huh.
12   Q. Does that page appear familiar to you?
13   A. Yes, it does.
14   Q. What is it?
15   A. Well, it looks like a policy from the personnel
16 manual.
17   Q. The one that applied to Ms. Mata while she was
18 an employee of yours?
19   A. Yes.
20   Q. Does the policy specifically address being
21 absent?
22   A. Absent without leave?
23   Q. Yes. Can you read that provision?
24   A. "Absence without leave, including failure to
25 notify supervisor of sick leave and repeated tardiness

Page 39

1  or early departure."
2    Q. Is that the provision that Ms. Mata violated?
3    A. I believe so.
4    Q. You terminated Ms. Mata, correct?
5    A. Yes.
6    Q. And you believe that it was because of
7  violation of that policy?
8    A. I believe that I terminated her because she
9  failed to report her absence to her supervisor.
10   Q. You were present for her deposition where a
11 note was admitted as an exhibit that she left notifying
12 her supervisor of her coming in late, correct?
13   A. Yes.
14   Q. You don't dispute that she did leave a note for
15 her supervisor, correct?
16   A. Correct.
17   Q. And that note was notification of when she
18 would be coming in, correct?
19   A. It was notification, correct.
20   Q. Wouldn't it be a fair statement to say that you
21 did not have to terminate Ms. Mata on June 4th for
22 violating that policy if you had decided that her note
23 did provide notification that she would be coming in
24 late?
25   A. That was a long question.

Page 40

1    Q. It was a short question. I just said it very
2  slowly. Let me restate it. Let me rephrase it.
3      Do you believe you could have, within your
4  discretion, exercised any lesser means to get your
5  point across about being absent besides terminating
6  Ms. Mata?
7    A. Yes, that option was available to me.
8    Q. And it would not have violated any policy for
9  you to have exercised some discretion over a lesser
10 means of discipline than termination, correct?
11   A. No, it would not have violated any policy.
12   Q. And you don't always utilize termination, which
13 is the ultimate form of discipline, when there's a
14 violation of a policy, do you?
15   A. No, I do not.
16   Q. In fact, more often than not, you would tend, I
17 would presume, not to exercise the ultimate form of
18 discipline, which is termination, when there's a policy
19 violation, right?
20   A. There's many times I do not use termination.
21   Q. And looking at that policy today, do you
22 believe you could have determined that her note was the
23 very sort of notification of being out that that policy
24 discusses?
25   A. I do not feel that she fulfilled the

Page 41

1  obligations of notifying her supervisor.
2    Q. But you admit that she made an effort, don't
3  you?
4    A. I believe she made an effort.
5    Q. And you admit that what she wrote in the note
6  would have been identical to what she could have told
7  her supervisor, correct?
8    A. No, I do not believe that.
9    Q. What would you have thought she would have told
10 her supervisor that would have been different?
11   A. I believe that there would have been a
12 conversation and an understanding between the two, and
13 that would have been different.
14   Q. But oftentimes employees can't reach and talk
15 to supervisors before they are actually late or absent;
16 isn't that right?
17   A. I do not know.
18   Q. You don't have any idea whether there are
19 circumstances that prevent your employees from reaching
20 their supervisors before they are absent?
21   A. We have a policy that they are to report to
22 their immediate supervisor, and there are instances
23 where someone could be hospitalized, unable to talk.
24 So, yes, there are instances.
25   Q. Why did you feel it was appropriate, if we

Page 42

1  assume you weren't holding anything against Ms. Mata,
2  as the petition alleges, to utilize the most extreme
3  form of discipline in the case of her leaving a note
4  saying she will be in later?
5      A. I do not believe that Ms. Mata at that point
6  could follow the procedure of reporting absences,
7  tardiness.
8      Q. Was this simply a decision you made because she
9  technically -- in your mind, she technically did not
10 comply with the request?
11     A. Can you repeat that?
12     Q. You said that in your mind you did not think
13 she could follow the specific procedures given to her
14 for notification about coming in late?
15     A. Uh-huh.
16     Q. That's why you terminated her, because you
17 didn't think she could follow the procedures; is that
18 right?
19     A. That's correct.
20     Q. But her -- she is not employed -- let me put it
21 a different way. She was working on a very important
22 project up to the day she was terminated, correct?
23     A. Yes.
24     Q. In fact, she had just finished it the day she
25 was terminated, correct?

Page 43

1      A. Yes.
2      Q. She finished your expectations of what she was
3  to do on a very important project, right?
4      A. Yes.
5      Q. All right. You testified earlier that her
6  performance was not the issue, her job performance was
7  not the issue. It was her ability to comply with
8  instructions about coming in late that was the issue
9  that led to her termination, right?
10     A. Yes.
11     Q. Did you not think that the value of her
12 employment and her ability to work on the project that
13 she had been working on outweighed Esmer's request that
14 she use a cell phone to call Esmer to notify her as
15 opposed to any other means of notifying her?
16     A. No, I did not.
17     Q. Why did you not think that was far more
18 important, that her employment was far more important
19 than the specific means she used to notify Esmer of
20 when she would be in?
21     A. I could have someone inventory the vaccines.
22 That could -- that job duty could be done by somebody
23 else. What would be difficult was to continue to
24 employ somebody who was not following reporting
25 procedures, and I could not have other employees follow

Page 44

1  that type of example, as well.
2      Q. So did you consider telling Ms. Mata that a
3  note is not technically compliant with the request,
4  "You need to make sure you call," or did that never
5  cross your mind as an alternative to firing her?
6      A. Yes, it did cross my mind.
7      Q. Why did you rule it out?
8      A. Because she had already previously done it in
9  the short amount of time that she had been employed
10 with our department.
11     Q. She had done what?
12     A. This had been a repetitive behavior as far as
13 not properly notifying when she was expected to be at
14 work.
15     Q. She had left notes before and was told not to
16 leave notes?
17     A. That was one of the times.
18     Q. Well, what -- if you remember, what are the
19 complaints against Ms. Mata's notification?
20     A. Well, one of the times, in looking through the
21 file, it shows that Esmer called her around 8:45,
22 wondering where she was, when I believe Esmer was
23 expecting her to be there at work at 8:00, and then
24 Belinda said that she would be in at 10:00. And so
25 when that didn't happen, I believe later on somebody

Page 45

1  got a phone call -- or maybe she didn't even show up
2  until 1:00. So she -- my understanding was that she
3  had a problem with maintaining a schedule and notifying
4  her supervisor of what her intentions were.
5      Q. So you believe that her termination was
6  justified when you terminated her, and you believe --
7  you actually said it was overdue, I believe, earlier in
8  your deposition?
9      A. Yes.
10     Q. When do you think she should have been
11 terminated?
12     A. In the first two weeks, I did write a
13 termination letter because she had not reported to
14 work. Esmer wasn't at the office yet, and one of the
15 employees came and told me she had not reported to
16 work, so we thought that she had just stopped working.
17 So I set up that termination letter.
18         So then Esmer came in, and we talked about
19 it. And Esmer felt that she wanted to work with
20 Belinda Mata because it was difficult to find an LVN.
21 So she wanted to work with her and make sure that this
22 type of activity did not continue to happen. At that
23 point, I felt like, "Well, she has only been here for a
24 little while. It has already happened. So it will
25 probably happen again."

Page 46

1    Q. Have you had training on laws that are relevant
2  to the employer-employee relationship?
3    A. Some.
4    Q. What kind of training?
5    A. I remember years ago I attended one in McAllen.
6    Q. For the county?
7    A. When I was working for the county.
8    Q. Cameron County?
9    A. That was, my best guess, maybe eight years ago.
10   Q. That's the last one?
11   A. No. And then I know that the human resources
12 director has provided some training. I know that -- I
13 work closely with some of the staff in trying to
14 research some of the employee questions.
15   Q. Laws? What do you mean by "questions"?
16   A. Questions like break time, what is considered
17 at-work time, and so --
18   Q. And how many employees do you have under your
19 control?
20   A. We probably have -- my best guess is maybe 250.
21   Q. And you're in charge of hiring -- or you're in
22 charge of firing all of them?
23   A. Yes.
24   Q. Those terminations. And that has been true
25 since you took this position in '98?

Page 47

1    A. Yes.
2    Q. All terminations go through you? Have you ever
3  had an employment claim lodged against you for wrongful
4  termination or discrimination?
5    A. Yes.
6    Q. How many?
7    A. There's one that I can think of that was not
8  related to a worker's comp situation.
9    Q. That was not related to one?
10   A. Right.
11   Q. Are you suggesting this one is related to
12 worker's comp?
13   A. No, I'm not.
14   Q. What was that one that you're talking about
15 related to?
16   A. The complaint was an age discrimination or
17 disability discrimination.
18   Q. And what happened in that case?
19   A. I believe it's closed and no further action has
20 been taken.
21   Q. You didn't testify in that case?
22   A. No.
23   Q. The case just went away or went to trial, or
24 what happened?
25   A. We provided the documentation that was asked of

Page 48

1  us, and I guess the decision was made by the agency.
2    Q. Would you consider it important for a person
3  who has ultimate authority to fire, like you do, to be
4  familiar with relevant employment laws?
5    A. I think it's important for me to be familiar
6  with personnel laws.
7    Q. The personnel policy handbook?
8    A. The personnel policy handbook, but also when
9  the personnel policy handbook doesn't provide enough
10 information, then to -- there's two departments that we
11 contact, and one of them is human resources and the
12 other one is legal counsel.
13   Q. So do you consider yourself familiar with the
14 personnel policy handbook?
15   A. When I have a question, that's where I go.
16   Q. Does it talk about anti-discrimination laws or
17 provision that apply to your department?
18   A. It does talk about it.
19   Q. Are you familiar with those?
20   A. I'm familiar with six, seven reasons why you
21 can't discriminate, whether it's age, religion, color,
22 so forth, so forth.
23   Q. Would one of those provisions be handicapped,
24 or disability, I should say?
25   A. I believe that's one of them, uh-huh.

Page 49

1    Q. One would be age?
2    A. Uh-huh.
3    Q. Religion?
4    A. Uh-huh.
5    Q. National origin?
6    A. Uh-huh.
7    Q. Marital status?
8    A. Maybe -- I don't know about marital status, but
9  maybe. I don't think so, but I would have to go back
10 and check.
11   Q. What about appearance? Can you discriminate on
12 the basis of appearance?
13   A. I don't think you can discriminate, but I think
14 you can have a personal appearance policy.
15   Q. But you don't think it would be legal to
16 discriminate against a person on the basis of, say,
17 their weight or their personal appearance?
18       MR. BURST: Objection. Calling for a
19 legal conclusion. She can answer if she knows.
20   A. If their weight were to interfere with their
21 job duties, then I do think that could be a
22 consideration.
23   Q. But if it doesn't, you can't discriminate
24 against them on the basis of weight?
25   A. If it doesn't affect their job duties --

Page 50

1    Q. You cannot --
2    A. -- I do not think that we would take that into
3 consideration.
4    Q. Do you think it would be illegal to take it
5 into consideration?
6    A. If something doesn't interfere with their job
7 duties, then they can apply.
8    Q. Now, do you recall whether the handbook
9 addresses a doctrine in Texas known as employment at
10 will?
11    A. No, I do not recall if the handbook addresses
12 that.
13    Q. What is your understanding of what employment
14 at will is?
15    A. At-will employment, I understand it to mean
16 that a person can be terminated with or without reason.
17    Q. Do you believe that doctrine applies for the
18 county?
19    A. Yes, I do.
20    Q. When you make your decisions, do you believe
21 that that's the doctrine you're making your decisions
22 under?
23    A. The employees that have been terminated have
24 been for a reason.
25    Q. Well, do you believe you have to have a reason

Page 51

1 to terminate an employee?
2    A. I believe that all the employees that have been
3 terminated, there has been a reason to terminate them.
4    Q. Well, I thought you just said that you
5 understood the county to be an employer at will.
6    A. I do.
7    Q. So are you suggesting that the county cannot
8 terminate someone without a reason?
9    A. No, I'm not.
10    Q. Are you suggesting that it does not terminate
11 someone without a reason, even though it could?
12    A. I do not know what other department heads do.
13    Q. Let's just talk about your department.
14    A. Uh-huh.
15    Q. Do you believe that you could legally terminate
16 an employee without having a reason?
17    A. Yes.
18    Q. But you don't do it?
19    A. I have not.
20    Q. Okay. But you would be within your rights to
21 do it, correct?
22    A. I believe I would be, but that is something
23 that I would check with human resources and legal
24 before doing that.
25    Q. Do you believe it's possible for a department

Page 52

1 head, such as yourself, to discriminate against an
2 employee without realizing that they are doing it?
3        MR. BURST: I'm going to object to the
4 form of that question as calling for a legal
5 conclusion. She can answer if she knows.
6    A. I didn't understand the latter part of what you
7 said, without them realizing that they are doing it.
8    Q. Without actually realizing that you're -- do
9 you believe that it's possible for a department head to
10 be discriminating against an employee without realizing
11 that there's a legal right that they are unaware of?
12        MR. BURST: I'm going to object to the
13 form as calling for a legal conclusion. You can answer
14 it if you can.
15    A. Can you rephrase it?
16    Q. Sure. Let me rephrase it. You're aware of the
17 protected classes of employees that we talked about
18 that can't be the reasons for adverse employment
19 action, right?
20    A. Okay.
21    Q. Okay. As a department head, do you believe
22 that it's possible there were other similar
23 anti-discrimination laws that protect employees that
24 you might not be aware of that pertain to an employee
25 that you're taking action against?

Page 53

1    A. It's possible.
2    Q. Is it possible that a department head such as
3 yourself could have a reason to terminate an employee
4 that has to do with a violation of a policy but at the
5 same time that department head personally wanted to
6 terminate the employee even before the violation
7 occurred?
8    A. Can you shorten the question?
9    Q. I don't know if I can shorten that one.
10    A. Okay.
11    Q. I guess what I'm trying to say is isn't it
12 possible that a department head can desire to terminate
13 an employee even before the justification has arisen to
14 do so?
15    A. Yes.
16    Q. All right. Is it possible that the department
17 head can desire to terminate an employee but
18 consciously chooses to wait for the proper reason to
19 arise before doing so?
20    A. Yes.
21    Q. All right. Is it possible that the department
22 head could want to terminate an employee for a reason
23 that perhaps violates the employee's rights that the
24 department head doesn't even know about but waits for
25 the justification to occur before doing so?

**Page 54**

1    A. Yes.
2    Q. And if the department head wants to terminate
3  the employee, don't you believe that it might be easier
4  for that department head to make the decision that a
5  justification occur warranting the termination simply
6  because that person already wanted to fire that
7  employee?
8    A. I think it's possible.
9    Q. What do you think should be the outcome in the
10  case of a department head wanting to terminate an
11  employee even before the employee does that act that
12  ends up causing their termination?  What do you think
13  should be the outcome for the department head who
14  terminates that employee because they were quick or
15  maybe even too quick to reach the decision that the
16  employee justified the termination?
17    A. Can you repeat that?
18    Q. Yeah. It's an awkwardly worded question. Do
19  you think a termination under the circumstances that I
20  last described should stand or be reversed?
21    A. Can you repeat the question?
22    Q. Yeah. If the department head that fired an
23  employee wanted to fire the employee and waited for a
24  reason and hastily latched onto a reason, what should
25  be the outcome of that employee's termination if it's

**Page 55**

1  appealed or sued over?
2    A. Well, I guess it would depend on the
3  circumstances because you're talking about something
4  hastily being done. So I don't know the answer to your
5  question.
6    Q. Do you think that an employee fired under such
7  circumstances should be entitled to reinstatement?
8    MR. BURST: Object as asked and answered
9  and calling for a legal conclusion. Answer it if you
10  can.
11    A. I believe that there's a lot of variables
12  involved. So it's difficult for me to answer that
13  question.
14    Q. Are you aware of any provision in the handbook
15  that says you can't discriminate against an employee
16  because they have spoken out publicly on a matter of
17  public concern?
18    A. I don't know if there is.
19    Q. You don't know one way or the other?
20    A. I can't -- I don't know.
21    Q. You do know that somewhere in the handbook it
22  says you can't hold against a person their gender,
23  their religion, their age, their disability, their
24  national origin, their religion and such, right?
25    A. Yes.

**Page 56**

1    Q. But you don't know whether the handbook
2  specifically says you can't hold against an employee
3  the fact that they have spoken out publicly on a matter
4  of public concern, correct?
5    A. I don't know.
6    Q. You don't know?
7    A. No.
8    Q. And you did testify that you believe yourself
9  to be familiar with the handbook, correct?
10    A. Yes.
11    Q. Do you believe that the handbook -- was it your
12  understanding that the handbook is a relatively
13  complete resource in terms of anti-discrimination
14  policies the county is to follow under the law?
15    A. It is one source.
16    Q. All right. Let me put it this way. Do you
17  believe that the county is bound by law not to
18  discriminate against an employee who has spoken out on
19  a matter of public concern? In other words, do you
20  believe that that's a legal requirement or merely
21  aspirational or not aspirational or a legal requirement
22  but maybe just a myth?
23    A. Okay, I don't know what "aspirational" is.
24    Q. Well. By that -- let's analogize it to the
25  fact that you know that the county is an employer at

**Page 57**

1  will.
2    A. Uh-huh.
3    Q. Meaning it doesn't have to have a reason to
4  fire employees. But it doesn't fire employees for no
5  reason. It waits until it does have a reason, even
6  though it doesn't legally have to, correct?
7    A. Uh-huh.
8    Q. What I'm saying is on the issue of
9  discriminating against an employee who has spoken out
10  on a matter of public concern, do you believe that
11  there's a law that prevents that or -- which would be
12  Choice A -- B, there is no law that prevents that, but
13  the county would try not to do it anyway, which is
14  Choice B, or, C, there is not even any such thing and
15  there's no goal of the county to either avoid it for
16  legal reasons or any other reasons?
17    MR. BURST: Object to the form of the
18  question. Compound and also it calls for a legal
19  conclusion.
20    Q. It's just your understanding because you're the
21  person in charge of firing as many as 250 employees.
22  That's why I'm asking you this question.
23    A. I believe that there may be something like that
24  that I would need to consult with our legal counsel
25  before firing an employee.

Page 58

1    Q.  Okay.  If that was an issue?
2    A.  Uh-huh.
3    Q.  In the case of Belinda Mata, did you consult
4    legal counsel before firing her?
5    A.  I believe I may have called, but --
6    Q.  When would you have done that?
7    A.  I would have done it that day.  I don't really
8    recall if I did, but I -- I think I did.
9    Q.  Well, let me understand this.  Ms. Mata, to
10   your thinking, was overdue for termination on the
11   grounds of not following what you described to be
12   specific instructions regarding notification about
13   tardiness.
14   A.  Uh-huh.
15   Q.  Why would you need to consult legal counsel in
16   that circumstance?
17   A.  Because I had a situation that we were very --
18   we were trying to be very strict with time reporting as
19   we were trying -- we have had problems in the past.  So
20   we needed to work with our employees that could follow
21   our procedures, but at the same time I did have that
22   situation where the vaccines had not been shipped to
23   the state within the appropriate timeframe.
24          So I was concerned that if I let this
25   employee go, which I wanted to, based on the inability

Page 59

1    to adhere to our time reporting procedures, would there
2    be a consequence because of this other issue that she
3    was working on.  So I think I would have called.
4    Q.  You thought you might be violating her rights?
5    A.  Yes.
6    Q.  By firing her?
7    A.  Yes.
8    Q.  All right.  And if it turns out you didn't
9    consult legal counsel, if you're wrong about that, you
10   still think -- I'm sorry -- you still are testifying
11   that you were concerned about violating her rights at
12   the time you fired her; is that right?
13   A.  I had to make a decision, and I thought it was
14   important for us to employ individuals that could
15   adhere to the time reporting.  We had already had those
16   problems within our department, and we had been advised
17   to do so.
18   Q.  Okay.  What rights of Ms. Mata's were you
19   concerned that you might be violating?
20   A.  Because she was working on the vaccine and she
21   was the one that had initially reported that to me.
22   Q.  Initially reported what to you?
23   A.  That the vaccines were expired, that there were
24   a lot of vaccines that were expired.  I wanted to make
25   sure that I did not give the appearance that I was

Page 60

1    terminating her because of that.
2    Q.  So you were concerned even at that point in
3    time that you appeared to be violating Ms. Mata's
4    rights for having reported expired vaccines?
5    A.  Yes.
6    Q.  Were you concerned that -- did the same concern
7    apply to her reporting it to the regional supervisors,
8    that you would be retaliating against her for doing
9    that?
10   A.  No.
11   Q.  Did the same concern apply to her having
12   reported it to the Texas Department of Health?
13   A.  No.  I did not know she reported it to Austin.
14   I had instructed her to report it to the regional
15   office.
16   Q.  So you didn't know at the time she had been
17   terminated that she had been in contact with Austin,
18   with the Texas Department of Health?
19   A.  I do not recall that I knew that she had been
20   calling Austin.
21   Q.  So you might have known but you can't remember?
22   A.  I cannot remember that part.
23   Q.  But you can remember that you only instructed
24   her to report it to who?  The regional office?
25   A.  The regional office, yes.

Page 61

1    Q.  Okay.  Do you recall when the first time was
2    that you were informed that Ms. Mata had reported the
3    expired vaccinations to the Texas Department of Health?
4    A.  I recall -- to my knowledge?
5    Q.  Uh-huh.
6    A.  I don't know the timeframe, but I was the one
7    that told her to call the regional office at this phone
8    number.  And so that's how she ended up there.
9    Q.  You told her that after she came to you with
10   the question of the expired vaccinations?
11   A.  Yes.
12   Q.  All right.  Do you recall what your thought was
13   when you first were informed that she contacted the
14   Texas Department of Health since it wasn't who you told
15   her to contact?
16   A.  Do I recall what my thought was?
17   Q.  Yes.  I know you can't recall when it was.
18   A.  Uh-huh.
19   Q.  Do you recall what it was, whether it was
20   surprise, disbelief, what, whatever it was?  I don't
21   want to put words in your mouth.
22   A.  When Ms. Mata told me that there was a lot of
23   expired vaccine, I was very surprised, and I was
24   annoyed, if not angry, with the director of nurses.
25   Q.  All right.

**Page 62**

1    A. And I was grateful that Ms. Mata had reported
2    that to me, as it justified what I thought was a need
3    to have an immunization program supervisor.
4    Q. Okay. All right. So you were annoyed and
5    angry with the person who you thought was at fault.
6    You were grateful to Ms. Mata, who is a relatively new
7    employee, right?
8    A. Uh-huh.
9    Q. And logically, it's obvious that what Ms. Mata
10   was telling you had not been addressed before? You
11   didn't know about this previously?
12   A. No.
13   Q. All right.
14       MR. JOE: We'll take a break.
15       (Brief recess)
16   Q. We're back on the record. Right before we took
17   a break, I was asking you what your reaction was, your
18   unspoken mental reaction, to finding out that Ms. Mata
19   had contacted the Texas Department of Health as opposed
20   to regional department.
21   A. Oh. I didn't know she contacted the Texas
22   Department of Health in Austin.
23   Q. At some point you find out, though?
24   A. Okay.
25   Q. Right?

**Page 63**

1    A. I just thought that was part of the process.
2    Q. She had gone a step higher than what you had
3    chosen to direct her towards. She had gone above the
4    department of health to the department of health's
5    supervisors, which is the state department of health.
6    A. Uh-huh.
7    Q. And she had done so without being specifically
8    asked to do that, correct?
9    A. Possibly the regional office asked her to do
10   that.
11   Q. Well, you didn't ask her to do that, right?
12   A. No, I asked her to contact the regional office.
13   Q. And if the regional office didn't ask her, then
14   you would have no reason to dispute that she chose to
15   do that on her own, correct?
16   A. I don't know how she ended up there.
17   Q. You don't know. But you did find out at some
18   point?
19   A. At some point, yes, I did, but --
20   Q. But you don't recall -- or do you recall the
21   specific reaction you had when you found out that she
22   had done that?
23       MR. BURST: Objection; asked and answered.
24   You can respond.
25   A. I don't recall if it was before or after

**Page 64**

1    employment -- or before -- I mean during or after
2    employment with us. I don't know when I found out.
3    Q. You mentioned -- it's true, is it not, that the
4    county had a contract regarding thousands and thousands
5    of dollars of immunizations and vaccinations that it
6    turns out Cameron County was in clear breach of,
7    correct?
8    A. I don't know that.
9    Q. You don't know if there was such a contract?
10   A. I know we have a contract with the Texas
11   Department of Health and Cameron County, between the
12   two entities, yes, for the immunization program
13   services, yes. But I don't know about the breach of
14   contract.
15   Q. You alluded to an obligation to send back drugs
16   to the state within a certain timeframe, correct?
17   A. Yes.
18   Q. You viewed the county as having an obligation
19   to do that that it did not live up to, correct?
20   A. Yes.
21   Q. It turns out not living up to that was due to
22   somebody's incompetence, correct?
23   A. I don't know if it was incompetence or
24   negligence.
25   Q. Well, I don't distinguish between the two of

**Page 65**

1    those much for purposes of my question. But for
2    purposes of my question, you're saying it was either
3    negligence or incompetence, right?
4    A. I don't think it would have been incompetence.
5    I think it would have been more negligence.
6    Q. Okay. And that's why you were annoyed and
7    angry?
8    A. I was annoyed and angry because I believe that
9    the vaccine should have been disposed of properly.
10   Q. And it was your understanding that they had not
11   been, correct?
12   A. Ms. Mata reported to me that we had a lot of
13   expired vaccine, several years, and so because of the
14   several years, I would have thought it should have been
15   disposed of properly.
16   Q. What was your understanding of the disposal
17   process?
18   A. I did not know it.
19   Q. You had no concept of what the county should
20   do?
21   A. No. That's why I asked her to call the
22   regional office.
23   Q. Do you have any concept of an agreement that
24   the county has, a contractual agreement the county has
25   with respect to these expired immunizations?

**Page 66**

1    A. I know we have a contract.
2    Q. Who is it with?
3    A. The Texas Department of Health.
4    Q. Do you know what the contract is about?
5    A. The contract talks about performance measures,
6  it talks about the dollar amount, it talks about --
7    Q. The dollar amount of the vaccinations?
8    A. The dollar amount that is awarded to Cameron
9  County to provide immunization services.
10    Q. And tell me how this contract works. Does the
11  state supply drugs to the county that the county
12  administers to the public? Explain it to me.
13    A. Cameron County and the Texas Department of
14  Health contract together. Sometimes the contract comes
15  in late. Sometimes it's ahead of time. And then they
16  will ask the county to provide the immunization program
17  services.
18        In the past, the vaccines were drop
19  shipped to the administrative office, and from there,
20  those vaccines would be disseminated to the clinics and
21  to some of the physicians that were participating in
22  that particular program. And the providers would show
23  up and pick up their vaccines.
24    Q. All right. And is it your understanding the
25  county was in breach of that contract and financially

**Page 67**

1  liable as a result of breaching that contract?
2        MR. BURST: Objection. It's a compound
3  question and is --
4        MR. JOE: We'll break it up.
5    Q. Are you aware that the county was in breach of
6  that contract?
7    A. No.
8    Q. Are you disputing that the county was in breach
9  of a contract?
10    A. No.
11    Q. You just don't know?
12    A. I don't know.
13    Q. As director, do you have any particular duties
14  with respect to these contracts?
15    A. Yes.
16    Q. Is there some reason why you don't know
17  anything about whether a breach occurred with the
18  contract we're talking about today?
19    A. Because I did not have the information as to
20  the details as to the vaccine and why were they expired
21  and who did what and what the state's opinion was going
22  to be, and until I had all that information, it would
23  be difficult for me to assess. If I had --
24    Q. Even as a result of this lawsuit, you haven't
25  had the occasion to reexamine what that contract was

**Page 68**

1  about that Ms. Mata was performing under?
2    A. I have looked at the contract. The contracts
3  come in annually. I flip through them. I don't read
4  all the contracts word for word.
5    Q. Do you sign them?
6    A. Yes, I do.
7    Q. You don't read them word for word. Do you
8  believe you understand what they say?
9    A. Yes, I believe that when I read them, I
10  understand what my interpretation is.
11    Q. From reading the part that you have read?
12    A. Yes.
13    Q. Which is not necessarily all of it?
14    A. Yes.
15    Q. Do you remember if you read anything in the
16  contract that would suggest that having all these
17  expired vaccines on hand breached the agreement with
18  the State of Texas?
19    A. I do not believe that I read something in the
20  contract that was --
21    Q. Have you been told that it would breach the
22  agreement?
23    A. I know that I was concerned about having the
24  financial obligation, yes.
25    Q. To who?

**Page 69**

1    A. To the state.
2    Q. What would have been the magnitude of the
3  financial obligation?
4    A. I don't know.
5    Q. Would it have been tens of thousands or
6  hundreds of thousands of dollars?
7    A. I don't know because it depends on what was
8  happening and who brought those expired vaccines to us
9  and how did they end up with us. So it could have been
10  nothing, or it could have been a lot of money.
11    Q. Well, okay. Some time has gone by. A number
12  of years have gone by. What was the outcome?
13    A. The state did not ask us to compensate them for
14  anything.
15    Q. You're remembering that with certainty?
16    A. Yes.
17    Q. Okay. So the state forgave noncompliance with
18  the contract?
19    A. The state did not charge us -- did not charge
20  Cameron County anything for those expired vaccines.
21    Q. Okay, but the state did not determine that the
22  county was innocent of a breach of the contract, did
23  it?
24    A. I don't know what the state did.
25    Q. Well, at the point in time that Ms. Mata was

## Page 70

1    fired, you didn't know whether the state would impose
2    financial sanctions on the county or not, right?
3        A. I did not know.
4        Q. And you were very concerned that it would?
5        A. No, I was not.
6        Q. Well, who would have been responsible for the
7    financial imposition if it had been imposed?
8        A. Cameron County.
9        Q. But who within Cameron County dropped the ball?
10       A. The director of nurses had oversight of the
11   immunization program, which included disposal of
12   expired vaccines, but I administratively supervised the
13   director of nurses.
14       Q. Does that mean she reported to you?
15       A. She reports to two individuals, me
16   administratively, and Dr. Gonzalez as the health
17   authority.
18       Q. All right. Does that mean that she's a direct
19   report of yours?
20       A. She's what?
21       Q. A direct report of yours?
22       A. Yes, the position is.
23       Q. All right, the position is a direct report of
24   yours. Does that mean that you bear the burden of her
25   job responsibilities, too?

## Page 71

1        A. Yes.
2        Q. So is it fair to say that if financial
3    impositions had occurred, sanctions had occurred, it
4    would have been your fault?
5        A. Not my fault. It would have been my
6    responsibility.
7        Q. And you viewed it that way?
8        A. Yes.
9        Q. Who hired Ms. Mata?
10       A. I hire all the employees within the department.
11       Q. And what was the title that you were filling
12   when you hired Ms. Mata?
13       A. I believe it was a communicable disease LVN.
14       Q. Could it have been immunizations program
15   supervisor?
16       A. It could have been.
17          (Salinas Exhibit No. 2 was marked)
18       Q. That item that's marked as Deposition Exhibit
19   No. 2 purports to be a memo authored by Belinda Mata.
20   Have you ever seen that document before?
21       A. I may have.
22       Q. Okay. As far as her title is concerned, are
23   you aware of anyone who took issue with how she
24   described her title in that document?
25       A. No.

## Page 72

1        Q. Do you believe she's correct in how she titles
2    her position?
3        A. I would have to see the job description in the
4    paperwork to see if she's correct.
5        Q. Do you have any idea what the duties of that
6    job position are?
7        A. Immunization program supervisor?
8        Q. Yes.
9        A. I know what it was intended to be.
10       Q. Okay. What was that?
11       A. The immunization program supervisor was to
12   oversee the immunization grant, including the staffing
13   and anything to do with the immunization program,
14   whether it was the contract, compliance or outreach or
15   staffing or interviewing.
16       Q. Okay. And what was Esmer's title?
17       A. Assistant health administrator.
18       Q. Okay. And that's who Belinda Mata reported to?
19       A. Administratively, yes.
20       Q. Okay. Is there some other means of reporting?
21       A. Esmer is not a nurse. So Belinda Mata would
22   have had to go to Ms. San Pedro for medical, nursing,
23   immunization-related questions.
24       Q. Okay. Did Belinda Mata have discretion to
25   decide how to handle the expired immunizations?

## Page 73

1        A. No.
2        Q. In other words, did someone tell her exactly
3    what procedures she should follow in cataloging and
4    handling these expired immunizations?
5        A. Yes, I did, and she was also consulting with
6    the regional office.
7        Q. You told her exactly how she should do --
8    exactly how she should catalog expired immunizations
9    and report them?
10       A. After she contacted the regional office and she
11   came back and she told me that she needed to inventory
12   them, we sat down and we discussed how she was going to
13   inventory them as far as the columns. I specifically
14   wanted the Excel program, and so we went through what
15   some of the columns should be.
16       Q. All right, but wouldn't it be true to say that
17   the reason you told her to call some other department
18   was because you didn't have any idea what the
19   specific procedures were for handling expired
20   immunizations?
21       A. Yes.
22       Q. All right. So she brought the problem to you.
23   You didn't know how to address it. So you deferred to
24   someone else and told her to call someone else?
25       A. Uh-huh.

Page 74

1    Q. All right. And you told her -- or I should put
2    it this way. You allowed her and instructed her, in
3    fact, to communicate directly with some third party to
4    find out what she was supposed to do, right?
5    A. Yes.
6    Q. You didn't have to even be in the middle of it,
7    right?
8    A. Right.
9    Q. All right, so you entrusted Belinda Mata to
10   correctly interpret the instructions she was given by
11   some third party?
12   A. Not fully.
13   Q. She -- did you tell her, "Come back and tell me
14   what they said"?
15   A. Well, we did.
16   Q. You're under oath.
17   A. We did.
18   Q. Did you tell her that, though? Did you tell
19   her that, or did you tell her simply, "Find out the
20   correct procedures and do this, catalog expired
21   immunizations"?
22   A. I told her to contact the regional office and
23   to find out what the process was.
24   Q. Because you didn't know, and that's all you
25   told her, right?

Page 75

1    A. That's what I recall telling her.
2    Q. Okay. Now, what time period did that
3    conversation take place during, to the best of your
4    memory? Let me lay a timeframe here. She was fired on
5    June 4th of 2002.
6    A. Uh-huh.
7    Q. So approximately how many weeks before then do
8    you suppose you had this conversation with her?
9    A. I would think that it was sometime in May.
10   Q. Any document you can think of which would
11   memorialize when that conversation occurred?
12   A. I have not seen a document like that.
13   Q. Did she make a mistake when she contacted the
14   Texas Department of Health?
15   A. No, no.
16   Q. Was it, in fact, maybe a better suggestion than
17   what you had given her?
18   A. The regional office is the Texas Department of
19   Health.
20   Q. I'm talking about the Texas Department of
21   Health in Austin.
22   A. Okay.
23   Q. And what are you talking about?
24   A. The regional -- the Texas Department of Health
25   in Austin has a regional office that's the Texas

Page 76

1    Department of Health in Harlingen. I told her to
2    contact the regional office.
3    Q. All right.
4    A. The Texas Department of Health Immunization
5    Program.
6    Q. And you're aware that she ultimately contacted
7    Judi Chase, correct?
8    A. That's okay.
9    Q. Where does Judi Chase work?
10   A. She works in Austin.
11   Q. All right. For the Texas Department of Health?
12   A. Uh-huh.
13   Q. And she got instructions from Judi Chase on
14   procedures for cataloging and reporting these drugs,
15   right?
16   A. I don't know.
17   Q. Is it your understanding that she did?
18   A. I understand that she got instructions on how
19   to inventory them for disposal, that they were to be
20   disposed through the Texas Department of Health. I
21   knew that.
22   Q. Okay. Did you require that that communication
23   go through you?
24   A. I sent her to the Texas Department of Health,
25   the regional office.

Page 77

1    Q. You didn't send her to Judi -- let's understand
2    one thing.
3    A. Uh-huh.
4    Q. Belinda Mata was in contact with Judi Chase --
5    A. Okay.
6    Q. -- at the Texas Department of Health.
7    A. Uh-huh.
8    Q. That for some period of time you were unaware
9    of, right?
10   A. Okay.
11   Q. We don't know when you became aware of it
12   because you don't remember when you became aware of it.
13   A. Okay.
14   Q. But you didn't tell her to do that, right?
15   A. Right.
16   Q. All right. You didn't tell her to do that, and
17   we have already covered whether it was a mistake for
18   her to do that or not. Do you have any reason to
19   dispute whether or not she was given specific
20   instructions on how to catalog expired immunizations by
21   Judi Chase?
22   A. When she told me that the vaccines needed to be
23   inventoried and disposed, then we went through the
24   format that she would utilize. Now, some of the
25   information was probably information that she could

Page 78

1  identify them from or based on her conversations with
2  whoever from TDH, and then some of the information was
3  mine.
4      Q. And at some point there was an issue over how
5  Belinda Mata was filling out spreadsheets and what
6  fields of information she was including, correct?
7      A. There was an issue not what she was completing
8  but what was going to be submitted.
9      Q. Right.
10     A. To Austin or to the regional office.
11     Q. Okay, she put in more information than you
12 desired her to put in?
13     A. No. She put in information that we had agreed
14 on previous to that. So I already knew that
15 information was there.
16     Q. Didn't you send her back a number of times to
17 revise the spreadsheets?
18     A. I don't think it was a number of times. I know
19 one time I did.
20     Q. What were you sending her back to do?
21     A. I was -- I had asked her -- Esmer had come into
22 my office and said that Belinda was getting ready to
23 finalize the Excel form, that it was completed, but
24 that it was possible she was sending information that
25 was not being asked.

Page 79

1         So at that point Belinda walked in and she
2  showed me the Excel sheets. And so I'm looking at
3  them. And so I asked her, "What did the state ask you
4  to report?"
5         And she says, "Well" -- that they had
6  given her a form.
7         And I said, "Well, where is that form?"
8         So she went to go get the form and she
9  came back. So the form was missing one column that was
10 not on the Excel sheet. So I asked her to just provide
11 the information that the statement is asking. So the
12 one column that was missing needed to be added because
13 that's what the state was asking. And all the other
14 columns did not need to be forwarded to the state.
15        So the Excel spreadsheet was missing one
16 column that was being asked by the state, and it did
17 have -- I don't know -- it did have additional columns
18 that were not on the form.
19     Q. But you don't have any reason to dispute that
20 in an understanding between Belinda Mata and Judi Chase
21 she did the spreadsheet exactly as those two had
22 discussed, do you? You can't dispute that?
23     A. I don't know what her conversation was with --
24     Q. Because you didn't insist on being in the
25 middle of those conversations, did you?

Page 80

1      A. No, but we did have an understanding of what
2  the Excel spreadsheet was going to look like.
3      Q. And she had all the communication -- Belinda
4  Mata had all the communication with the state, correct?
5      A. Yes.
6      Q. All right. So you put a brand new employee two
7  levels below you in contact with the state?
8      A. Uh-huh.
9      Q. And as we sit here today, you can't dispute
10 that she filled out the forms the way the state and her
11 orally understood they would be filled out, regardless
12 of whether they looked like a later generated form that
13 you saw, right? You can't dispute it, right?
14     A. I cannot dispute what her conversation was with
15 Judi Chase.
16     Q. So for all you know, she did it exactly as
17 those two had discussed it and understood it to be
18 done, right?
19     A. Yes.
20     Q. All right. And later on, when you saw her work
21 product, you wanted some fields of information,
22 including the costs of each of the drugs that was
23 expired and on hand, just struck out of the report,
24 correct?
25     A. I wanted -- that information was not on the

Page 81

1  form. The state had given her the format to complete.
2  So that was one of the columns that was not on that
3  form. So, yes, I did ask for her not to include that
4  column.
5      Q. Even though it was already put in, the work was
6  already done --
7      A. It was put in at my request.
8      Q. -- now you wanted it struck?
9      A. That cost column was put in at my request.
10     Q. Wasn't the form that Belinda Mata generated
11 agreed upon by Belinda Mata and the state and not
12 something that you prescribed to her?
13     A. Belinda Mata and I went through the form
14 together before the Excel form was even created. She
15 had some input and I had some input. That form was --
16 that form was designed by the two of us. Now, what
17 input is Judi Chase's from Belinda Mata, I don't know.
18 All I know is that I wanted it on Excel, and because
19 Excel would give us the capability to add and delete or
20 reorganize columns, I wanted it on Excel, and the cost
21 column was my suggestion.
22     Q. And do you have any notation or computer
23 program saved on your computer or personal memorandum
24 where you sketched out how you wanted this report to
25 look that would back up what you're suggesting today

Page 82

1  about having prescribed for Belinda Mata how the report
2  should look?
3      A. No.
4      Q. You thought about it for the first time and
5  told her orally, and there's nothing to substantiate
6  what you're saying; is that right?
7      A. I do not have anything in my hands to
8  substantiate. Belinda and I went through that form
9  together. So, you know, it could have been in my
10 handwriting, it could have been in her handwriting.
11 You know, it would have to be called, but some of the
12 stuff was stolen from our office. It could have been
13 in that stack. I don't know.
14     Q. What was stolen from the office?
15     A. Some county forms, some -- when we called -- on
16 her last day, we called the police because she was
17 taking some county property with her, paperwork.
18     Q. So you're talking about Belinda Mata stole
19 documents from the county?
20     A. Yes.
21     Q. Did you listen to the part of her deposition
22 where this was discussed, and did you hear her
23 explanation of that accusation?
24     A. Yes.
25     Q. Do you recall her saying that there was

Page 83

1  absolutely nothing that she had the county didn't have
2  and that she was only taking -- let me back up. Do you
3  understand she was doing work at home?
4      A. I understood that she did do some at home.
5      Q. On-the-clock work at home?
6      A. I understand that she did not have access to
7  Internet, and so when she would tell Esmer she had
8  worked at home, then we would credit her the time.
9      Q. All right. So she took things home all the
10 time, right?
11     A. I do not know that she took the paperwork home.
12     Q. Well, you could infer that there were some
13 things that she had to take home, some
14 personally-generated notes, if nothing else, that went
15 back and forth because she did work at home, correct?
16     A. I did not know that she was doing that type of
17 work at home.
18     Q. It's kind of surprising, is it not, that she
19 was allowed to do work at home?
20     A. I know that she did not have access to the
21 Internet, and she had Internet at home, and she was
22 trying to learn communicable diseases. And so that was
23 the type of work I had understood that she was being
24 credited for.
25     Q. Are any other employees, to your knowledge,

Page 84

1  allowed to work at home that are paid by the hour like
2  Belinda Mata?
3      A. Employees are generally not allowed to work at
4  home.
5      Q. Yeah. Why is that the policy of the county?
6      A. It is our department policy.
7      Q. Yes, why?
8      A. Because we have -- we want to be able to
9  control the amount of time spent on a project. We want
10 to be able to control for workers' compensation type of
11 issues. We just want a more controlled environment.
12     Q. Yes. All right, so there are good reasons to
13 have a policy that employees only be allowed to work at
14 work?
15     A. Yes.
16     Q. All right. So Belinda Mata working at home was
17 a violation of a policy of your department, correct?
18     A. Belinda Mata working at home without previously
19 consulting with her supervisor would have been a
20 violation.
21     Q. Yeah, but some supervisor let her work at home
22 because obviously you're well aware that she was doing
23 it, right?
24     A. I was well aware that we credited her the time
25 when she voiced it but not that she was doing it.

Page 85

1      Q. You were aware that she was credited for
2  working at home but not that she was working at home?
3      A. I was aware that -- when she stated that she
4  worked at home, that we would credit her the time, but
5  I was not aware that the supervisor allowed her to work
6  at home.
7      Q. Oh, so you thought Belinda hadn't even sought
8  approval for doing it? Yes?
9      A. Yes.
10     Q. Well, why -- didn't that surprise you? Isn't
11 that a more blatant violation and usurpation of her
12 rights than writing a note instead of placing a
13 telephone call was of Esmer's?
14     A. I don't think it was more of a violation, but,
15 yes, I do have a problem with it.
16     Q. Okay. But you didn't take any action because
17 shortly you found out that Esmer or someone else, in
18 fact, had approved it. So you couldn't and didn't take
19 any action against Belinda Mata because it turns out
20 someone else approved it, right?
21     A. I did not take any action because Esmer is the
22 immediate supervisor, and it would have been her role
23 to take the action. But that leave -- that time was
24 approved after the fact.
25     Q. If Esmer had come to you before this had been

Page 86

1  done, suggesting it to you, what would you have said to
2  that idea of letting Belinda Mata track her own hours
3  working at home and supervise herself?
4      A. I would have been against the idea.
5      Q. Does Esmer know that now?
6      A. I don't know.
7      Q. Did you ever bother to express to her that you
8  disapproved of her letting Belinda do that?
9      A. I do not know that Esmer knew that she was
10 working at home with Esmer's consent.
11     Q. I thought we just covered that. I thought we
12 just discussed the fact that you knew Belinda had
13 authorization to work at home from her supervisor.
14     A. No.
15     Q. Which is it? You don't know that to be the
16 case?
17     A. I know that Belinda worked at home, came to
18 work and reported she worked at home so we credited her
19 the time.
20     Q. And didn't you also just get done testifying
21 that you came to learn Belinda had authorization to do
22 that? Didn't you just finish saying that?
23     A. No.
24     Q. Well, do you know that Belinda had
25 authorization to do that from her supervisor?

Page 87

1      A. To work at home?
2      Q. Yes.
3      A. I do not know.
4      Q. Well, are you assuming she did?
5      A. I do not know.
6      Q. So this whole discussion that we have had about
7  her supervisor authorizing Belinda, now you're saying
8  you don't know that to be the case?
9      A. I know that Belinda worked on the Internet at
10 home learning communicable disease, came to work,
11 reported to Esmer. I spent three or four hours
12 studying up on the diseases, and I know that Esmer
13 credited her that time.
14     Q. And you don't know whether Belinda had approval
15 for that or not?
16     A. I believe that she did not have approval for
17 that.
18     Q. She did not have approval from Esmer to do
19 that?
20     A. Right.
21     Q. All right. If you believe that Belinda Mata
22 did not have approval to work at home and it's against
23 policy to work at home, why then did your department
24 approve paying her for it, if that's the case?
25     A. Because we are obligated to pay her for work

Page 88

1  that is performed, whether we have knowledge or not.
2      Q. At home? You're suggesting now that Belinda
3  did have authorization, to your knowledge, to work at
4  home, and you thought you were compelled to pay her for
5  it even though there's a policy that says you can't do
6  it and you don't think she has permission to do it?
7      A. Yes.
8      Q. And what if it turns out she did have
9  authorization to do it, from Esmer?
10     A. Then that would have been between her and
11 Esmer.
12     Q. Has Esmer violated a policy?
13     A. Has Esmer worked at home?
14     Q. Has Esmer violated the policy by condoning or
15 authorizing Belinda to do that?
16     A. No.
17     Q. Because Esmer is entitled to vary the policy at
18 will?
19     A. Because Esmer is entitled to what the policy?
20     Q. Why is it that Esmer hasn't violated the policy
21 if she lets Belinda Mata work at home?
22     A. Because I believe that there are certain
23 instances where it is acceptable.
24     Q. Have you ever done it before?
25     A. Yes.

Page 89

1      Q. For who?
2      A. For Esmer.
3      Q. So Esmer has worked at home?
4      A. Yes.
5      Q. And tracked her own hours. Anybody else?
6      A. I don't know that Esmer tracked her hours
7  because she is considered exempt.
8      Q. Is Belinda Mata the only person who had to
9  track her hours that has ever worked at home and been
10 paid for it, to your knowledge?
11     A. It's very rare that it happens, but it does
12 happen, such as the infirmary. When the staff is on
13 call, they get called at home, and they have to track
14 their hours.
15     Q. Because they are on call?
16     A. Uh-huh.
17     Q. But Belinda Mata is not on call when she's at
18 home, is she?
19     A. I don't recall if she was on call. I believe
20 she was because --
21     Q. Working on the Internet -- working on the
22 Internet at home is not a duty that you would associate
23 with someone who is on call, is it?
24     A. No.
25     Q. So the time we're talking about that she was

**Page 90**

1  compensated for is time only Belinda Mata has been paid
2  for, to your recollection, within the department?
3      A. Can you repeat that question?
4      Q. Sure. No one else that is required to track
5  their hours has ever been paid for supervising their
6  own Internet-type research or home study work, as it
7  may have been, except Belinda Mata?
8      A. I don't know of any other employee that --
9      Q. And you would not have approved it had it come
10 to you in the form of a question before it happened?
11     A. I may have approved it.
12     Q. You just said that you would have been against
13 it.
14     A. I would have been against it, but if there
15 would have been a good justification, then I may have
16 approved it.
17     Q. Or may have disapproved it, but you never got
18 the chance to make a decision, correct?
19     A. Correct.
20     Q. And is that a problem?
21     A. It's a problem that we have to compensate
22 employees for time that we think is questionable.
23     Q. No, is it a problem that you never got to pass
24 judgment on that issue?
25     A. No.

**Page 91**

1      Q. Okay. But it was a real problem when Esmer
2  didn't get to pass judgment on Belinda's being out for
3  the morning of the 4th? It was such a problem that
4  Belinda Mata got terminated for it. But it was no
5  problem when the only employee in your memory who has
6  ever been allowed to work at home under those
7  circumstances did not do so with you having the benefit
8  of passing judgment on it, and that's what you're going
9  to tell the jury?
10     A. Can you repeat the question?
11     Q. Yeah, I can certainly repeat the question.
12 You're saying that it was not a problem that Esmer did
13 not get your approval to let Belinda work at home
14 supervising herself when she is an hourly employee, but
15 it was a heck of a problem warranting Belinda Mata's
16 termination when Esmer didn't get to pass judgment on
17 the note Belinda left saying that she wouldn't be in
18 until later in the morning.
19         MR. BURST: Object as stating facts not in
20 evidence.
21     Q. Isn't it true that the whole problem with
22 leaving a note is that Esmer didn't get to say okay to
23 it, she didn't get to say yes or no to that note?
24 That's the whole problem with that note as opposed to a
25 phone call, correct?

**Page 92**

1         MR. BURST: I object. Counsel is not
2  letting her respond.
3      Q. Go ahead.
4      A. Belinda had already been advised of what the
5  process was to report. She had been provided the means
6  to communicate, and she did not follow that procedure.
7  That was the problem that day.
8         MR. JOE: I'll object to that as being
9  nonresponsive.
10     Q. The problem with it being a note as opposed to
11 a telephone call is that Esmer didn't get to say yes or
12 no, correct?
13     A. Correct.
14     Q. And you chose to find that problem to be so
15 significant as to ostensibly warrant Belinda Mata's
16 termination when the issue of you getting to decide
17 whether Belinda varies from the policy about being paid
18 by the hour -- I mean about working at home when she's
19 paid by the hour is meaningless, it didn't make a
20 difference that you got to pass on that or not; is that
21 right? Do I understand your testimony?
22     A. I did not know that there was a question, other
23 than, "Is that right?" The problem was that there was
24 a history of not following the process to report, and
25 if Esmer approves her to work at home because the

**Page 93**

1  situation warrants it, then it's okay.
2      Q. Does Esmer's title carry the inherent authority
3  to vary the personnel handbook or well understood
4  policies, like letting an hourly employee work at home
5  by herself?
6         MR. BURST: Object as a compound question.
7      A. The personnel handbook can be -- can be -- you
8  can deviate from it based on the situation.
9      Q. Esmer can?
10     A. I expect her to make a good judgment, but she
11 can.
12     Q. She has the authority to do that?
13     A. Yes.
14     Q. Under oath, sitting here today, giving your
15 testimony, would you have said in 2002 that Esmer has
16 the inherent authority to make a decision like that on
17 her own?
18     A. A termination decision?
19     Q. No.
20     A. A handbook decision?
21     Q. A decision to let Belinda Mata work at home on
22 her own, supervising herself, reporting her own hours?
23     A. If Esmer made that decision, yes.
24     Q. I'm not asking you if the county would honor
25 the decision of Esmer's if she made it. I'm asking you

Page 94

1  if, under oath now, in 2002, the question was posed to
2  you, "Does Esmer have the authority to let Belinda Mata
3  work at home and report her own hours and vary the
4  policy of the handbook in doing so without talking to
5  you about it" --
6          MR. BURST: Objection to form,
7  speculation.
8      Q. My question is would you have said, "Yes, she
9  does," or, "No, she doesn't"?
10     A. It would depend on the situation. Yes, she
11  would.
12     Q. She would? Esmer would?
13     A. Depending on the situation.
14     Q. Does Belinda Mata, depending on the situation,
15  have the ability to decide to work at home?
16     A. I don't believe so.
17     Q. You don't?
18     A. No.
19     Q. Because there's some magic line in the sand
20  between Belinda Mata and Esmer?
21     A. I don't think there's a magic line.
22     Q. Well, then why could Esmer make the decision
23  but Belinda couldn't?
24     A. Because Esmer is the supervisor and can
25  evaluate the situation.

Page 95

1      Q. Belinda Mata's title carries the word
2  "supervisor."
3      A. Uh-huh.
4      Q. So could Belinda Mata by virtue of her title
5  have made that decision?
6      A. No.
7      Q. But Esmer could?
8      A. Esmer could make it for her, such as the Court
9  could make it for me.
10     Q. Are you suggesting that you do have to ask a
11  supervisor of yours for permission to do that before
12  you can do it, and that's the only requirement?
13     A. I am suggesting that the employee should ask
14  the supervisor before doing it, and if the supervisor
15  approves it, then the employee should not be held
16  accountable for that decision.
17     Q. I understand the employee shouldn't be held
18  accountable for something the supervisor gave her
19  permission to do. But my question is how high do you
20  have to go in your department before you can make this
21  sort of decision on your own?
22     A. Normally it would be me, and if I'm not
23  available, it defers down to the program directors, of
24  which Esmer is one of them.
25     Q. So Esmer should have talked to you about it

Page 96

1  before she did that; is that right?
2      A. If Esmer made the decision to do it and
3  explained the situation to me, she did not -- she could
4  make the decision and then come and tell me later what
5  happened, and that would be okay. But she would not
6  have the authority to tell her, "You can always work at
7  home." I don't have that authority either. But for
8  short-term situations, to get a project completed, yes,
9  that can be handled between the supervisor and the
10  employee.
11     Q. And do you have some basis for this, or are you
12  just saying this because that's how it happened here
13  and because you didn't discipline Esmer and you're
14  trying to explain away the fact that you didn't
15  discipline Esmer?
16     A. My basis is me and the decisions that I make
17  for the department.
18     Q. Okay. So everything you have said just now
19  about procedure exists only by your reckoning; is that
20  right?
21     A. As far as an employee working at home and
22  whether it's acceptable or unacceptable?
23     Q. Yes.
24     A. I think I have discretion over that.
25     Q. Okay. And by your reckoning, Esmer didn't have

Page 97

1  to ask you before as long as you found out at some
2  point and Esmer didn't tell her she could always do it?
3  Esmer is off the hook; is that right?
4      A. As long as she didn't always do it and it was a
5  special circumstance, then I would be okay with it.
6      Q. And Esmer doesn't even need to talk to you
7  about that? Can Esmer authorize overtime?
8      A. Yes.
9      Q. All right. And does it change your
10  understanding or raise the stakes to the gravity of
11  going to you that Belinda may have been earning
12  overtime while she was working at home reporting her
13  own hours?
14     A. Does it raise the stakes?
15     Q. Yes, the importance of getting your approval
16  since now the employee is costing the department even
17  more than the regular hourly rate?
18     A. It's acceptable to earn more, depending on the
19  circumstance. You know, it might require.
20     Q. The circumstances might require overtime, but
21  the policy is that you have to get approval for
22  overtime before you perform it, right?
23     A. Yes.
24     Q. You're going to get paid regardless or you're
25  going to get comp time regardless, but you need to get

Page 98

1  approval first, right? It's important. The department
2  has to determine it's important to get approval before
3  you do overtime?
4     A. As a standard.
5     Q. As a standard. And here we have got the
6  situation where Belinda Mata was not only working at
7  home tracking her own hours, but she was working
8  overtime hours, right?
9     A. I would have to look at the time sheets, but I
10 think I did see some.
11    Q. But if it turns out she was, you don't have a
12 problem with Esmer not having come to you about any of
13 that before it happened?
14    A. No.
15    Q. No, not in this case?
16    A. Not in the other cases within the programs
17 either. It's not a problem until it's excessive.
18    Q. At the beginning of our deposition, you talked
19 about some embarrassing situations the department has
20 faced such as contracts that the county -- the
21 department is not in compliance with, remember?
22    A. Uh-huh.
23    Q. You talked about someone pulling a dog across a
24 lawn or something like that?
25    A. Uh-huh.

Page 99

1     Q. All right. You considered that an embarrassing
2  situation?
3     A. Uh-huh.
4     Q. I guess because it was upsetting, it looked
5  like it was abusive to an animal? Is that why?
6     A. Because I feel it traumatized the family
7  members that were at the home.
8     Q. Okay, it traumatized the family members, all
9  right. How significant an embarrassment by comparison
10 to those standards is the fact that you in your
11 department had years and years of expired medications
12 on hand that a brand new employee discovered for the
13 first time?
14    A. It would have been -- it was -- it was a bad
15 situation.
16    Q. Was it about as embarrassing as any situation
17 that you faced?
18    A. Yes.
19    Q. Was it compounded by the fact that you didn't
20 have a policy or procedure you could tell Belinda to
21 follow to handle it, and you had to punt it to another
22 agency?
23    A. No.
24    Q. Did it compound it that Belinda was brand new
25 to the agency and here she was dealing with your

Page 100

1  supervisors directly?
2     A. No.
3     Q. Did it compound it that Belinda had more
4  information -- more particular information about the
5  expirations and the value of it than anyone else did at
6  the department?
7     A. No.
8     Q. None of these things affected how you perceived
9  Belinda?
10    A. No.
11    Q. What about the fact that Judi Chase in Austin
12 was dealing with Belinda directly?
13    A. No.
14    Q. No, it didn't bother you?
15    A. I would expect this type of situation to make
16 its way up to Austin to a program director in Austin.
17    Q. Did you ever consider taking -- when you
18 realized that it would be addressed this way -- taking
19 control back, away from someone who was brand new like
20 Belinda and putting the project in the hands of someone
21 who had more experience?
22    A. Taking control of the inventory away from her?
23    Q. The project took several weeks to complete,
24 right?
25    A. Yes.

Page 101

1     Q. So it was a project she was working on pretty
2  much full-time, right?
3     A. Yes. She was very focused on it.
4     Q. For several weeks?
5     A. I don't know how many, but --
6     Q. Two to three?
7     A. Yes.
8     Q. Four? All right. That's a project.
9     A. Uh-huh.
10    Q. By most department standards, right?
11    A. Uh-huh.
12    Q. You could have given that project to someone
13 who had more experience with the department than
14 Belinda, right?
15    A. I could have reassigned that project, yes.
16    Q. Did you hesitate to for some reason? Did you
17 think that it would appear to be overreaching or
18 improper to take it away from the person who discovered
19 it?
20    A. No.
21    Q. Or that the state would assume that Belinda
22 being as new as she was had no allies within the
23 department to make sure she was protected and you
24 didn't want to suspicion the state that you didn't like
25 Belinda's candidness and innocence in the deal, because

Page 102

1 she was brand new, by giving it to someone else?
2        MR. BURST: Object to the form of the
3 question.
4    A. I -- what was the question?
5    Q. Why did Belinda stay on this task? It was
6 potentially the biggest embarrassment that you have
7 faced in your position, you just said.
8        MR. BURST: Object as stating facts not in
9 evidence. You can answer.
10    A. I don't think it was the biggest potentially
11 embarrassing position that I have -- situation that I
12 have had to face. It appeared to me that, you know,
13 that it would not be a difficult task to inventory the
14 items, and, you know, it seemed like she was working on
15 the project. I didn't have any problems with her
16 working on the project, and staff assisted her as
17 needed.
18    Q. And she was doing a good job working on the
19 project, right?
20    A. I didn't have any problems with her working on
21 the project inventorying the items --
22    Q. You didn't have a performance issue with her?
23    A. Not until it came to the submission of the
24 form.
25    Q. Then you told her to change it?

Page 103

1    A. Then I told her to change it.
2    Q. You didn't have a problem with her proficiency
3 at generating it?
4    A. She did not know how to work on the Excel
5 software. So she was provided assistance. That was a
6 problem.
7    Q. But Belinda didn't -- when you formed your
8 expectations of what she should do, knowing what her
9 skill set was, she performed to your satisfaction,
10 right?
11    A. As far as inventorying the items, yes.
12    Q. Yes. So my question would be -- let's look at
13 this exhibit, No. 3.
14        (Salinas Exhibit No. 3 was marked)
15    Q. Which you may recognize from the policy manual.
16    A. 12.03?
17    Q. Yeah. Discipline.
18    A. Okay.
19    Q. My question is why skip so far down to
20 termination with Belinda Mata if she hasn't been
21 demoted and she hasn't been suspended?
22    A. Why terminate?
23    Q. Why skip -- doesn't the policy manual that I
24 just submitted as an exhibit give some steps, some
25 progressive discipline steps, and I think you said

Page 104

1 earlier that you try to follow progressive
2 discipline --
3    A. Okay.
4    Q. All right. You testified that you had
5 discretion not to find that that note was a violation.
6 You testified that you could have found that it didn't
7 violate the instructions or you could have found that
8 it did but you're not going to go to termination. You
9 testified to those things, right?
10    A. Uh-huh.
11    Q. And I'm saying is this not yet one more reason
12 for not jumping straight to termination, that the --
13 namely that the county has two defined steps short of
14 termination that didn't apply in the case of Belinda
15 Mata?
16        MR. BURST: Object as stating fact not in
17 evidence.
18    Q. To your knowledge, Belinda wasn't suspended
19 when you terminated her, was she?
20    A. No.
21    Q. And she wasn't demoted when you terminated her,
22 was she?
23    A. No.
24    Q. She hadn't been demoted since she started,
25 right?

Page 105

1    A. Right.
2    Q. And she hadn't been suspended since she
3 started?
4    A. Right.
5    Q. And you could have suspended her, right?
6    A. Yes.
7    Q. Or demoted her?
8    A. Yes.
9    Q. In fact, if you had done so, you would have
10 been right in line with that policy, right?
11        MR. BURST: Object as stating facts not in
12 evidence.
13    Q. Is that right?
14    A. This is one method of doing it.
15    Q. The method that appears in the policy manual?
16    A. Yes, this is one method.
17    Q. One method?
18    A. Uh-huh.
19    Q. You strive to do that, correct? It's one
20 method that's important enough that it's the one
21 selected for the policy manual, right?
22    A. It's one method that's available to me.
23    Q. Yes.
24    A. But it's not the only method in determining
25 what action should be taken.

Page 106

1    Q. Yeah, of course it's going to have been worded
2  in such a way that you don't automatically violate it
3  if you skip steps. But it was deemed important enough
4  to put in the policy manual, right? You would presume
5  so because there it stands in the policy manual?
6    A. I would presume so, but I didn't write the
7  policy manual.
8    Q. Let me look -- I have got a copy here. I'll
9  just look at it. Let me see what Mr. Burst is
10  referring to.
11    MR. JOE: I know that, Richard.
12    Q. Okay. Since it's not controversial that it's
13  important enough to have put it in the policy manual,
14  can you explain why in this case you didn't choose to
15  demote or suspend Belinda Mata?
16    MR. BURST: Object as asked and answered.
17    Q. And skipped straight to termination?
18    MR. BURST: Object as asked and answered.
19    A. I did not believe that she could follow the
20  reporting process.
21    Q. That's why you didn't demote her or suspend
22  her?
23    A. That's correct.
24    Q. Well, isn't it always going to be the case that
25  an employee that has reprimands in the file like

Page 107

1  Belinda Mata who commits the offense again could be
2  deemed not to be able to comply with a certain request
3  or instruction? Couldn't you always say that about an
4  employee who garners another infraction?
5    A. Yes.
6    Q. All right. So it's kind of assumed, is it not,
7  in this policy that the people who garner a demotion or
8  a suspension have already offended or repeatedly
9  offended a policy such as to receive a reprimand,
10  right?
11    A. I don't recall demoting. I have suspended. I
12  don't know that we have had an employee that has had
13  this type of problem in the short amount of time of
14  employment, which was a critical factor.
15    Q. So back to my question about why you didn't
16  demote or suspend her. It's merely because she had
17  garnered another perceived infraction, right?
18    MR. BURST: Object as asked and answered.
19    Q. More specifically, I should say, it's because
20  you didn't think she was capable of following that
21  instruction?
22    A. I did not think she was capable of following
23  the reporting procedure.
24    Q. Why did you not think she was?
25    A. Because this was the third time in the short

Page 108

1  amount of time that she had been there.
2    Q. Did she tell you that she disagreed with that
3  instruction and was never going to follow it, that she
4  was simply going to leave a note whenever the situation
5  arose?
6    A. She did not tell me anything like that.
7    Q. I didn't think she did. Did she tell you that
8  she didn't understand that you perceived the difference
9  between a call and a note?
10    A. She did not tell me anything like that.
11    Q. Well, then, why do you think she wasn't capable
12  of understanding it?
13    A. Because it was the third time.
14    Q. It wasn't the third time she left a note
15  instead of making a call, was it?
16    A. It was the third time that she did not contact
17  her supervisor. There was documentation in the file
18  that indicated that they had an understanding. So it
19  did not appear that she was going to follow her
20  supervisor's direction.
21    Q. Okay. Do you think that having stopped by
22  there and taken the time to write out a note and
23  conspicuously placed it such that it was found by an
24  employee she intentionally violated any agreement that
25  she had with Esmer, if according to you she had? I'm

Page 109

1  not saying that she did. But do you think from where
2  you stood that she intended to violate an agreement she
3  had by Esmer and the way she chose to do it was to go
4  write out a note and leave it on the door so it would
5  be found by another employee?
6    A. I do not know what her intentions were.
7    Q. Do you think she did? Did you think she did at
8  the time?
9    A. That she did intend to violate?
10    Q. Yeah, an agreement.
11    A. It's possible.
12    Q. Or do you think it's more likely that she
13  didn't intend to, she just, according to Esmer, didn't
14  technically comply with what Esmer's expectations were?
15  Which is more likely?
16    A. I think that she did not comply with what was
17  being asked of the reporting procedure.
18    Q. Technically, she did not comply, even though if
19  she wanted to blow off the agreement with Esmer, she
20  could have just simply done nothing, couldn't she?
21    A. She could have done nothing.
22    Q. All right. And basically, your termination of
23  Belinda Mata would have occurred had she done nothing
24  at all, correct?
25    A. Yes.

Page 110

1    Q. All right. So I guess my question is basically
2  you treated her leaving a note that was found before
3  the office ever opened that clearly stated when she
4  would be in the same way you would have treated her if
5  she had done nothing at all and intentionally blown off
6  Esmer?
7    A. By that third time that she did not --
8    Q. Just -- let's just talk about June 4th.
9    A. I did it the first time.
10   Q. Just June 4th. You treated the note the same
11  way you would have treated her ignoring Esmer and you
12  altogether and not come in with making no attempt at
13  all to contact anyone?
14        MR. BURST: Objection to counsel not
15  letting her answer the question that was asked.
16   Q. You skipped right to termination in both
17  instances. You would have terminated her if she had
18  done nothing, and you did terminate her when she wrote
19  a specific note that was found before the office ever
20  opened?
21   A. If she had failed to report to work, she would
22  have been terminated. If she failed to follow the
23  procedure as set forth between her and her supervisor
24  Esmer and Esmer recommended termination, then she would
25  have been terminated.

Page 111

1    Q. And what would you have done if she left
2  messages for Esmer and Esmer never called her back?
3    A. I would have had to look into the situation.
4    Q. Well, doesn't the agreement -- or aren't you
5  relying on a supposed agreement that says that Esmer
6  has to talk to her and tell her it's okay?
7    A. I'm relying on an agreement that Belinda Mata
8  was to contact and communicate with her supervisor.
9    Q. And if she had called and left a message and
10  Esmer never called her back, what would you have done?
11   A. If she had called and left a message at the
12  office for Esmer to call her back, then possibly I
13  would have look at that, as well. If she had called
14  and left a message on her cell phone, then I would have
15  possibly looked at that situation, as well.
16   Q. Do you know what time it was that Belinda Mata
17  left a note on the door?
18   A. No, but I recall it was before the staff
19  arrived there at work, and it was --
20   Q. When does that happen?
21   A. The staff normally gets to work between 7:30
22  and 8:00.
23   Q. And if Belinda said she left the note on the
24  door at 5:30, you would have no reason to dispute that,
25  correct?

Page 112

1    A. No.
2    Q. And if that's the time that she would have had
3  to call Esmer, are you suggesting that 5:30 a.m. in the
4  morning she do so, she call Esmer?
5    A. If she had called Esmer at 5:30 in the morning,
6  then she probably would not have been terminated. If
7  she had communicated with Esmer at 5:30 in the morning,
8  then it would have been a different situation.
9    Q. And what if she called in, and like most
10  people, 5:30 in the morning the phone goes unanswered
11  because they are not awake or they are not going to
12  answer the telephone that rings at 5:30 in the morning?
13   A. Then I would have expected her to call back
14  again, to leave a message to at least back herself up
15  that an attempt was made, to have somebody else maybe
16  call her place because she was unable. I mean, I would
17  have expected something besides just leaving a note on
18  the door and no additional communication.
19   Q. No additional communication. Did Esmer ever
20  try to call Belinda?
21   A. On that day?
22   Q. Uh-huh.
23   A. I do not recall.
24   Q. Would it surprise you if Esmer did not try to
25  call Belinda?

Page 113

1    A. At that point, I would not have been surprised,
2  but I think normally Esmer would have tried to call
3  her. But I don't know what happened that day other
4  than there was a note on that door, Belinda Mata was
5  the one that was responsible for calling and
6  communicating with Esmer, and that did not happen.
7    Q. You don't remember asking Esmer if she tried to
8  call Belinda?
9    A. I don't recall.
10   Q. You don't remember the thought crossing your
11  mind, "Did we try to contact her?"
12        MR. BURST: Object as asked and answered.
13   A. I don't recall.
14   Q. Do you think it -- under oath, do you think it
15  did make a difference or didn't make a difference to
16  you?
17   A. I think that the burden would have had to have
18  been on Belinda. So for Esmer to call her again, I
19  would have expected some type of consequence.
20   Q. Are you aware of anything urgent that Belinda
21  missed out on before she came in to work?
22   A. Work-related, no.
23   Q. So she didn't miss anything important?
24   A. Not that I know of.
25   Q. Did it ultimately make a difference to the

Page 114

1  department whether she was there in the office that
2  morning or not?
3      A. It made a difference to the department in the
4  sense that she had left the note on the door letting
5  everybody that she was not following the process and
6  that perhaps we would start getting future notes on the
7  door from the staff, as well. So that was a problem
8  for me.
9      Q. Did Esmer have the authority to dictate to
10 Belinda how the notification of being out should be
11 communicated?
12     A. Yes.
13     Q. So where the policy says notify, you're saying
14 that Esmer can get more specific and tell Belinda Mata
15 that notification has to be given in a certain way?
16     A. The communication process can be dictated by
17 Esmer, yes.
18     Q. Can Esmer say, "You have to call" -- just an
19 example, "You have to call between 8:00 and 8:10 on my
20 cell phone"?
21     A. I do not --
22     Q. "Or the notice is invalid"?
23     A. I don't think that between 8:00 to 8:10 on her
24 cell phone would be very reasonable when the county
25 policy allows up to 9:00, or one hour.

Page 115

1      Q. Okay. So if Esmer said, "It has got to be up
2  to 9:00, but it has to be by fax because I'm not going
3  to take a call. Even though that might apply to other
4  employees, you're going to have to fax me," is that an
5  enforceable agreement in your mind?
6      A. No.
7      Q. Isn't the real policy whatever would apply to
8  anyone else in the same situation? Isn't that the real
9  policy that you're charged with enforcing?
10     A. Yes, to a point. It depends on the history,
11 depending on the amount of time they have been there.
12     Q. Okay. So whatever the policy is that applies
13 to Belinda, it's really the same policy that applies to
14 everyone else. And it doesn't matter what Esmer can
15 get Belinda to sign, what Esmer writes up and asks
16 Belinda to sign because she's mad at Belinda. That's
17 not the policy you're charged with enforcing, is it?
18     A. Can you rephrase the question?
19     Q. If Esmer decides at a point in time when she's
20 in a disciplining mood to get real nitpicky with
21 Belinda and tell her, "You know, just so there's no
22 confusion anymore, you have to reach me and we have to
23 discuss it at a certain time of day," or, "You have to
24 fax in a notification and bring in a report that shows
25 the fax went through to my fax number," or some other

Page 116

1  very specific detailed instruction for notification
2  that doesn't apply to anybody else, you're not charged
3  with enforcing that agreement?
4          MR. BURST: Object as stating facts not in
5  evidence.
6      A. The conditions for employment cannot -- I could
7  not support something that would appear to harass an
8  employee.
9      Q. Exactly. In fact, when somebody starts writing
10 requirements and conditions for one employee that don't
11 apply to all employees, that all employees don't have
12 to sign off on, that's a suspect term and condition,
13 isn't it?
14     A. Yes.
15     Q. Just right off the bat, it's suspect, and it
16 deserves heightened scrutiny because it's a suspicious
17 possibly invalid agreement, isn't it?
18     A. Yes.
19     Q. Have you ever fired anyone else who attempted
20 to notify their supervisor that they would be coming in
21 late but the supervisor's claim was that they didn't
22 have the chance to approve it?
23     A. I don't know.
24     Q. You can't remember? You can remember Belinda,
25 so Belinda would be the only person you can remember

Page 117

1  firing for that reason?
2      A. I have reviewed Belinda's records. I know why
3  I terminated her. There's other employees that I have
4  terminated that I don't recall off the top of my head.
5  But some have been terminated for failure to report to
6  work.
7      Q. You're sure of that, but are you also recalling
8  instances where they have failed to offer any sort of
9  notification at all?
10     A. I believe there may have been an employee
11 within another program who disputed that.
12     Q. Disputed that they were able to reach their --
13     A. That they attempted to, but then the staff --
14 nobody knew if they had called in.
15     Q. Yeah. That's a real risk with trying to call
16 in, that if you don't reach somebody, that you tried to
17 call in and give notification is always subject to
18 someone else saying, "No, you didn't." Isn't that
19 true?
20     A. I believe it would be.
21     Q. This note is a little more certain than a call,
22 right, an unanswered call?
23     A. I don't know that it's more certain. The note
24 could have flown away.
25     Q. Yeah, but it didn't.

## Page 118

1   A. It didn't.
2   Q. It was found.
3   A. But that's not to say it's more certain.
4   Q. Well, in this case no one is disputing that the
5   note was received.
6   A. No.
7   Q. So however Belinda managed to make sure that it
8   didn't fly away, she succeeded, right?
9   A. She succeeded in leaving a note.
10  Q. There were no personal differences that you had
11  with Belinda Mata at the time you terminated her; is
12  that correct?
13  A. Between Belinda Mata and myself?
14  Q. Right.
15  A. I thought she treated me flippant. I thought
16  she was disrespectful at times.
17  Q. Okay. Was this when she was doing the report?
18  A. Yes.
19  Q. In what ways did you think she was
20  disrespectful?
21  A. Sometimes she would -- when she would talk, she
22  sounded annoyed and agitated when I was asking her how
23  she was coming along with the project. When I asked
24  her how soon could she be finished on the project,
25  because I needed to know if I could get her more

## Page 119

1   assistance, she sounded like I was asking her to finish
2   it too quickly.
3       So from her demeanor and her tone of
4   voice, she -- and sometimes even the way she walked,
5   the way she grabbed something and turned around and her
6   hair flipped, you know, flew in the air because she was
7   so quick and stomped out, and, I mean, there were times
8   when she was disrespectful.
9   Q. Are you suggesting that she doesn't know
10  etiquette or manners or she's antisocial, or did she
11  lose her temper? I mean, can you tell me specifically
12  what it was you perceived in her that made you think
13  that's just not the way she is, that she had an
14  attitude problem?
15  A. Sometimes she was very nice and very friendly,
16  and other times she was flippant and disrespectful.
17  Q. What do you mean by "flippant"?
18  MR. BURST: Object as asked and answered.
19  MR. JOE: No, I asked about disrespectful.
20  A. She was -- when -- she was curt when I would
21  ask her a question on how the project was coming along.
22  She was short, like she knew what she was doing, she
23  didn't need any help, that, you know -- not to ask her
24  any more questions.
25  Q. Did you address this with her?

## Page 120

1   A. No.
2   Q. Ever?
3   A. No, I didn't.
4   Q. Did you ever address her being disrespectful
5   with you?
6   A. No.
7   Q. Okay. Any reason why not?
8   A. I thought it was important to get past the
9   project, and her reporting, her lack of following that
10  process, I figured that she was eventually going to
11  move on. It was hard to get an LVN.
12  Q. She was going to move on to what?
13  A. To another job. It's very hard to get an LVN
14  at the salary that we were compensating at that time.
15  Q. So you thought she was going to leave?
16  A. Uh-huh.
17  Q. Even if she wasn't terminated, she would just
18  leave?
19  A. I thought that maybe she could get another job
20  very easily.
21  Q. Did she ever say she wanted to get another job?
22  A. Not that I recall.
23  Q. Why do you think she wanted another job?
24  A. A lot of our LVNs could find another job, not
25  just Belinda Mata, but a lot of them. We're in that

## Page 121

1   situation with our LVNs and our RNs and our nurse
2   practitioners.
3   Q. But that's the only reason you thought she
4   might move on, was because some of the other ones have?
5   A. Not because the other ones have but because of
6   the compensation for the LVNs.
7   Q. But she never told you those were her
8   intentions?
9   A. No.
10  Q. And you said that you wanted to get past the
11  project.
12  A. I wanted Esmer to supervise her.
13  Q. And get that project done?
14  A. And I wanted Esmer to supervise her, including
15  her deficiencies.
16  Q. Are you suggesting that she just needed to get
17  that project done and that her employment with the
18  county was very uncertain and tenuous once that project
19  was done?
20  A. No.
21  Q. Okay. So if she hadn't left a note as opposed
22  to calling in, she wouldn't have been fired on June
23  4th?
24  A. No.
25  Q. She would have maintained her job?

Page 122

1    A. If she had followed the reporting procedure,
2  she would not have been fired on June 4th.
3    Q. That's what I thought, too, based on your
4  earlier testimony, but June 4th was the day that she
5  did get finished with that job, right?
6    A. June 4th is the day that that event occurred.
7  And inventorying vaccines could have been delegated to
8  somebody else.
9    Q. She got done the afternoon of June 4th, right,
10 right before quitting time?
11   A. Maybe.
12   Q. All right. And she left the note, which was so
13 upsetting to everybody, earlier in the morning, and you
14 could have let her go when she showed up, right?
15   A. I don't know if the note was so upsetting to
16 everybody. I do know that I was gone for most of the
17 day, and Esmer called to give me this information of
18 what had happened. So I was really not there to review
19 the information. When I got to the office and I
20 reviewed it, then I signed the letter, and then I left
21 again.
22   Q. Who wrote the letter?
23   A. The letter is usually written by Martha Canas.
24 It's usually a standard form.
25   Q. Well, who told Martha to write the letter?

Page 123

1    A. It would have been me agreeing to it. I may
2  not have physically or verbally told Martha. It could
3  have been through Esmer that, yes, I agreed to do it,
4  to sign off on it, to prepare it.
5    Q. When did that occur? What time of day?
6    A. I was -- I just know that I wasn't there that
7  day.
8    Q. You were out of the office?
9    A. I was out of the office.
10   Q. And then you came in and signed the letter?
11   A. I came in and signed the letter and then I left
12 again.
13   Q. Okay. So whatever conversation you had about
14 what Belinda did would have been by telephone?
15   A. It would have been by telephone, and then I
16 would have come in and reviewed the information.
17   Q. And it was probably a short conversation
18 because you were out working?
19   A. Not because I was out working but because I
20 already knew about the history of not reporting to
21 work.
22   Q. Had it been discussed recently?
23   A. I don't recall.
24   Q. It could have been?
25   A. Well, recently -- she was employed for two

Page 124

1  months so at least --
2    Q. I know. I realize that. Was there any
3  discussion about Belinda being gone as soon as that
4  project was done?
5    A. No.
6    Q. She was going to leave?
7    A. No. In fact, I think the day before or right
8  before then, I had even signed some paperwork to do
9  some budgetary transfers. If the intent was to
10 terminate her, I wouldn't have bothered to do those
11 budgetary transfers.
12   Q. Well, Belinda had worked pretty much full-time
13 on this report for several weeks up to June 4th, right?
14   A. I believe that's what was required.
15   Q. And it got done on June 4th?
16   A. Yes.
17   Q. What was she next going to work on?
18   A. Probably she was going to work on immunization
19 program activities and communicable disease activities,
20 as well.
21   Q. Had there been any discussions about her doing
22 that?
23   A. Yes.
24   Q. With whom?
25   A. Between me and Esmer, for sure, and possibly

Page 125

1  with Belinda Mata. But I know that the intent was to
2  make the immunization program a little bit more
3  independent, and so that was the hope in hiring
4  Belinda.
5    (Salinas Exhibit No. 4 was marked)
6    Q. Okay, this letter is No. 4. I'll let you look
7  at that for a minute.
8    A. Okay.
9    Q. All right. Now, at the time that letter was
10 written, May 30th, 2002, Belinda works for the
11 department doing the very sorts of things that the
12 author is addressing to the Texas Department of Health,
13 right?
14   A. As far as "expired vaccines from the providers
15 in our county and have not been returned," the time
16 span, so, yes, I would have expected her to oversee
17 that.
18   Q. Okay. My question about this exhibit is that
19 Maria San Pedro, Registered Nurse, is writing about
20 returning expired vaccines. That's the project Belinda
21 is working on, right?
22   A. Uh-huh.
23   Q. Basically he says, "We have had a tough time
24 lately. We haven't had anybody here doing that."
25   A. Uh-huh.

Page 126

1    Q. "We hired one in August 2001."
2    A. Uh-huh.
3    Q. "The newly hired left our department this past
4    month."
5    A. Uh-huh.
6    Q. Okay. "And we have not returned any vaccine or
7    medications to the Central Pharmacy since April 24,
8    2001. We have received expired vaccines from the
9    providers in our county and have not returned the
10   vaccines in the time span indicated. I am unable to
11   inform you how the 1994 vaccine was still in our
12   department."
13       All right. In that entire letter, which
14   was written several days before Belinda left, there's
15   absolutely no mention of Belinda Mata working for the
16   county trying to cure the very sort of thing that's
17   talking about, and I find that very curious. And I'm
18   asking you why it is that Belinda is not mentioned in
19   recounting what the county has been faced with and what
20   it's doing to fix the problem.
21       MR. BURST: Object to the form of the
22   question. It's complex and actually testimony of
23   counsel.
24   Q. You can answer that question.
25   A. I don't know why Ms. San Pedro did not include

Page 127

1    Belinda Mata in this letter. My understanding was that
2    Ms. San Pedro, who had oversight of these vaccines, was
3    supposed to write a statement as to how this happened.
4    So how this happened may not necessarily include a
5    statement about Belinda Mata.
6    Q. Well, she's talking about someone who left in
7    April, if I understand that letter. "Our new hire left
8    last month," I think is what she said. That implies no
9    one is there. She's just ignoring Belinda Mata, as if
10   Belinda isn't going to be there much longer. No need
11   to even mention her name. Do you see my point?
12       MR. BURST: Objection to the form of the
13   question.
14   Q. Do you see my point?
15       MR. BURST: Object to the form of the
16   question. Counsel is giving testimony. You're
17   testifying. You're not asking her questions. If you
18   want to ask her questions, go ahead, but you're
19   testifying.
20   Q. Okay. My question is do you see my point about
21   how odd it is that Belinda's name is not mentioned
22   there?
23       MR. BURST: Object to the form of the
24   question, stating facts not in evidence.
25   Q. Belinda's name is not mentioned in that letter,

Page 128

1    is it?
2    A. No.
3    Q. Don't you find that that's odd, that her name
4    is not mentioned?
5    A. Again, my understanding is that she was to
6    write a statement as to why the vaccine was in our
7    possession.
8    Q. Well, who told her to write a statement?
9    A. I would think Belinda did.
10   Q. Belinda told her to write a statement like
11   that?
12   A. I don't know.
13   Q. Well, who is -- how does Belinda -- director of
14   nursing services -- is Belinda over the director of
15   nursing services?
16   A. No.
17   Q. You didn't have anything to do with the
18   generation of that letter?
19   A. No.
20   Q. You didn't see it before it was written?
21   A. I saw it when it was a packet.
22   Q. Before it went out?
23   A. Yes.
24   Q. Did you think that it was odd that Belinda's
25   name didn't appear anywhere in it?

Page 129

1    A. No.
2    Q. Do you think that letter is misleading to the
3    state? More specifically, do you think it gives the
4    state the appearance that the county doesn't have
5    anybody working on it?
6    A. No.
7    Q. Okay. The letter says that, "Our new hire left
8    last month."
9        MR. BURST: Objection; stating facts not
10   in evidence.
11   Q. That's what the letter says, right?
12       MR. BURST: No, it doesn't.
13   Q. Let me make sure I don't misread it. "The
14   newly hired left our department this past month."
15   Don't blame me for the fact that it just says, "The
16   newly hired," which are two adjectives, and it includes
17   no noun following two adjectives. I didn't write it,
18   but I believe what she is meaning is "The newly hired
19   person left last month."
20       "The newly hired person that was working
21   on this is gone" is what the state could infer from
22   reading that letter. Is that a fair statement?
23   A. That the newly hired person left recently.
24   Q. That's how you would read it, too?
25   A. Uh-huh.

Page 130

1   Q. And that leaves the state with the impression
2   that the county tried to hire someone but they left
3   last month and they are not there right now because it
4   doesn't talk about anybody being there right now.
5       MR. BURST: Objection to counsel
6   testifying. Form of the question. If you have got a
7   question, ask her.
8   Q. Would that be your understanding of the letter?
9   A. No.
10  Q. What would be yours?
11  A. That they will comply to send the expired
12  vaccine. So it doesn't matter if somebody is in that
13  position or not, she will comply with sending the
14  vaccine.
15  Q. But it would appear she is trying to explain
16  why -- that the county is hard-pressed to have done
17  this earlier and doesn't have anybody there?
18      MR. BURST: Object to the form of the
19  question. It's a compound question.
20  A. Can you repeat the question?
21  Q. Your reading of it would be that the letter
22  implies that the county has had a hard time staffing
23  the position and that no one is there performing the
24  function now?
25      MR. BURST: Object to a compound question.

Page 131

1   Q. If either one of those two you differ with,
2   just say which one.
3   A. In reading this letter, I would say that during
4   this time period of August through April 2001, the
5   county had a difficult time. But it does not fully
6   explain as to why all the expired vaccines were there.
7   Q. Is it possible in your mind that as of the
8   summer of 2002 the county could get bad press
9   publication over having all these expired immunizations
10  and vaccines in its possession?
11  A. I think that's possible.
12  Q. And that fingers could be pointed as to whose
13  fault that was?
14  A. I think that's very possible.
15  Q. And that taxpayers could have been upset about
16  the apparent wasting away of valuable medicines that
17  had to be purchased?
18  A. I think that's possible.
19  Q. And that someone could lose their job over it?
20  A. I guess that's a possibility.
21  Q. And that at the very least, there would be some
22  extreme embarrassment even if none of those things did
23  come to happen, come to pass?
24  A. Repeat that one. "At the very least"?
25  Q. At the very least, if there wasn't publication

Page 132

1   and an inquiry or someone losing their job, there would
2   still be some extreme embarrassment over the fact that
3   this happened?
4   A. Yes.
5   Q. Wouldn't you agree that people can tend to act
6   differently than they otherwise would when they are
7   confronted with these fears?
8   A. Could they act different? Yes, I do think they
9   could.
10  Q. All right, so is it possible that Esmer could
11  have acted differently because of the mistakes, you
12  could have thought Belinda was acting differently under
13  a stressful situation, you could have acted differently
14  or been afraid, you actually having probably the
15  highest ranking position there and the most to lose?
16  Isn't that possible?
17      MR. BURST: Object to form. It's a
18  compound question.
19  A. No. It was Ms. San Pedro that was responsible
20  for that expired vaccine, not Belinda Mata.
21  Q. No, I understand that you could think Belinda
22  is not responsible. She just came on. She was a brand
23  new employee. But couldn't every one of those other
24  people be -- feel extreme stress and act differently
25  than they otherwise would towards each other?

Page 133

1   A. I guess they could.
2   Q. Maybe been a little more defensive and a little
3   quicker to make judgments?
4   A. If they were under stress, I guess they could.
5   Q. What do you know about asbestos in the
6   building?
7   A. I know that staff were concerned that there was
8   asbestos in the building. I know that -- I did not
9   receive a report that there was asbestos in the
10  building until the spring of 2003.
11  Q. Are you aware of Belinda Mata being concerned
12  about asbestos in the building?
13  A. I was aware after she was terminated, yes. I
14  did find out.
15  Q. Are you aware of any conversation between
16  Belinda and Esmer?
17  A. About asbestos?
18  Q. Yes.
19  A. Yes.
20  Q. What is your awareness?
21  A. Staff are concerned that there's asbestos in
22  the building. It's the same old concern that everybody
23  questioned but nobody knew.
24  Q. What, if anything, did you understand Esmer to
25  have told Belinda?

Page 134

1   A. That staff had been concerned, that every so
2   often it was an issue as far as the air quality. Every
3   so often it would pop up.
4       Q. Would you have any reason to dispute that Esmer
5   told Belinda just to ignore the concerns, that she
6   didn't want to hear it, she had already heard it, there
7   wasn't anything that she could do?
8       A. I don't know if Esmer did that.
9       Q. So you can't dispute Esmer saying something
10  like that?
11      A. No, I can't.
12      Q. So if Esmer told her to ignore it, would that
13  be proper or improper?
14      A. I think it would depend on the type of
15  conversation that they were having.
16      Q. Okay, you have now heard Belinda Mata testify
17  in her deposition, and you have been kind enough to sit
18  through my questions. Do you understand, having read
19  the petition and attended both depositions and been
20  through the set of facts that gave rise to this
21  lawsuit, why it is that Belinda thinks you could have
22  held against her the way she handled the reporting and
23  rushed to judgment on letting her go over the alleged
24  technical infraction of writing a note as opposed to
25  calling Esmer?

Page 135

1       MR. BURST: I'll object to the form of the
2   question.
3       Q. Do you understand how she could see it that
4   way?
5       A. I can understand that it's possible that
6   Belinda believes that.
7       Q. Do you -- let me ask you this. Do you believe
8   that Belinda sincerely thinks that occurred?
9       A. I believe she may think that.
10      Q. Do you believe she has a reasonable basis to
11  think that even if and despite the fact that you may
12  disagree with her? Just looking objectively at the
13  facts, do you think she has a reasonable basis to
14  believe that?
15      A. I know why I terminated her, and I terminated
16  her, so, no, I do not feel that that is the basis.
17      Q. Well, you know what you believe, but you
18  recognize that no one else can tell what you believe
19  apart from what you say, right?
20      A. I recognize that I have to make the decisions
21  and I have to --
22      Q. Well, do you recognize that just looking
23  objectively, not subjectively through your eyes, but
24  objectively at what happened, that Belinda and others
25  could think that you held against her for the reasons

Page 136

1   we have talked about, like what you had to lose, and
2   this never happened before, and there was no policy or
3   procedure in place to cure it, that you were short with
4   Belinda and rushed to get rid of her as soon as the
5   report was gone?
6       MR. BURST: Object to the form of the
7   question. It's stating facts not in evidence, and also
8   counsel is testifying.
9       Q. Do you see how someone could see that?
10      A. If someone didn't have all the information that
11  I had, then it's possible.
12      Q. And the information that you're referring to
13  that you have is simply what you know in your head,
14  what you did consider and what you didn't consider that
15  you're willing to talk about, right? That's the
16  information you're referring to?
17      A. Yes.
18      Q. And no other information because you agree,
19  there's nothing out there that proves one way or the
20  other what you actually thought in your head?
21      MR. BURST: Object to the form of the
22  question. What is the question?
23      Q. Is that right?
24      A. The documentation would be the supporting --
25  how I arrived to the thoughts in my head.

Page 137

1       Q. You agree that it's possible that you could
2   write, "I'm terminating Belinda for writing a note
3   instead of calling Esmer," but in your heart you're
4   really terminating her because you're ticked off at how
5   she handled the reporting of the immunizations?
6       MR. BURST: Objection.
7       Q. You agree that's possible, correct?
8       MR. BURST: I object to the form of the
9   question. Stating facts not in evidence.
10      Q. But wouldn't you agree that that's possible for
11  you to say one thing but be motivated by another reason
12  altogether?
13      A. I didn't do that.
14      Q. I know you contend you didn't do that, but
15  isn't it --
16      MR. BURST: Object to the sidebar comment.
17  Counsel, you're being argumentative. I object. You
18  can ask a question, but you're responding --
19      MR. JOE: I have to object to the
20  responsiveness of saying, "I didn't do that" in
21  response to my question about "whether it's possible
22  that you could have."
23      MR. BURST: Fine, you have objected. Now
24  ask your question.
25      Q. Isn't it possible that you could have?

Page 138

1     MR. BURST: Object as asked and answered.
2     Q. I recognize you're going to say, "I didn't do
3  that." But I'm saying isn't it possible that you could
4  say and write that the reason you're terminating
5  Belinda is because she wrote a note instead of calling
6  Esmer?
7     MR. BURST: Object to the question.
8     Q. When, in fact, the real reason is that you
9  wanted to get rid of her because you were upset with
10 her about how she handled the reporting of the expired
11 vaccinations?
12    MR. BURST: Object as stating facts not in
13 evidence. There's no evidence that she was upset with
14 Belinda Mata at all. You're stating that in your
15 question and it's not in evidence. And I object to the
16 question, but you can answer it if you can.
17    Q. Well, you testified you were concerned, you
18 testified it was an embarrassment, you testified that
19 it was not in compliance, and you testified that it
20 could have cost a lot of money.
21    A. Yes.
22    Q. All right. So isn't it possible that those
23 four things could have motivated you while at the same
24 time you're saying that her writing the note is causing
25 her termination? Isn't it possible for you to say one

Page 139

1  thing and be motivated by something totally different?
2     MR. BURST: Object as asked and answered.
3     A. I didn't do it, but is it possible? Somebody
4  could make that argument, but that's not what I did.
5     Q. Do you have any documentation that your
6  attorney doesn't have which would shed light on that
7  very last question about why you really got rid of
8  Belinda Mata?
9     A. The documents of why I got rid of Belinda Mata?
10    Q. Uh-huh.
11    A. The only thing that is not there in writing is
12 Esmer's recommendation to terminate.
13    Q. And why isn't that one in writing?
14    A. At the time I would accept something verbally,
15 an explanation from the supervisor that would pinpoint.
16    Q. You don't have any notes -- you don't use a
17 microcassette recorder, digital recorder or anything
18 like that to document things that you're thinking?
19    A. No.
20    Q. All right. So whatever your attorney has is
21 all that I can expect to ever receive to show one way
22 or the other why it is that Belinda Mata was
23 terminated?
24    A. Yes.
25    Q. Okay. And the last exhibit is No. 5. I'm

Page 140

1  going to try to keep the tentative commitment to wrap
2  up by 1:00 here. Okay, you have seen that document,
3  right?
4     A. Yes.
5     Q. Okay. I think you said you did not write that
6  letter, you just signed it?
7     A. I would probably not have typed it. In fact,
8  it looks like Martha Canas typed it for me.
9     Q. Is it in fact true that Belinda's services were
10 no longer needed effective immediately on June 4th,
11 2002, at 5:00?
12    A. Yes.
13    Q. Her services are no longer needed, okay, but
14 you --
15    A. Her specific services.
16    Q. The services she was providing, you're
17 testifying, didn't come to a natural end just because
18 the report was done. You're suggesting she would have
19 had a job and would have done something else after the
20 report, right?
21    A. Yes.
22    MR. BURST: Object to the form of the
23 question as not stating facts in evidence.
24    Q. So her services were needed, correct?
25    A. Her services were not needed. The work that

Page 141

1  was being performed by her was still needed.
2     Q. Okay. So it was just written that way to be
3  deliberately vague and inoffensive?
4     A. It was written this way because this is the way
5  we have been advised to write our termination letters.
6     Q. Okay. Would Ms. Mata be eligible for rehire?
7     A. No.
8     Q. Do you know why?
9     A. Because I would be the one that would have to
10 hire her back, and I would have to believe that she
11 could follow the reporting policies.
12    Q. So this is not a decision that you believe you
13 made wrongly?
14    A. No.
15    Q. And if Belinda was unable to obtain suitable
16 employment elsewhere through this point in time and had
17 gone for now almost three years without employment, you
18 still wouldn't hire her back?
19    A. If she were to follow the application/interview
20 process, I would not hire her back.
21    Q. Because, I take it, you're absolutely certain
22 that Belinda Mata cannot follow instructions about
23 reporting today and it matters not that she's deprived
24 of income and her career with the county that you enjoy
25 having?

## Page 142

1    MR. BURST: Object to the form of the
2  question as argumentative, stating facts not in
3  evidence and calling for a legal conclusion.
4    A. There is another department that hires an LVN,
5  and if she wanted to work for Cameron County, then she
6  could apply there.
7    Q. And if they came to you as a reference, what
8  would you say?
9    A. I would tell them that her skills to do work on
10  the computer would probably -- they would need to help
11  her out with that, but if it wasn't a computer-related
12  job, then -- I mean if it was computer, then she had a
13  maybe want to either train her or consider somebody
14  else. I would tell them that -- if they asked me why
15  she got terminated, I would tell them that she had a
16  problem with adhering to the reporting process. So
17  that's something that they would want to consider.
18    Other than that, the work that she
19  provided in inventorying and following up with us and
20  following up with the state, overall, was acceptable.
21  The only problem we ran into was at the end. So I
22  would leave it at their discretion.
23    Q. And what was the problem at the end?
24    A. The problem at the end was that she was having
25  a difficult time formatting the form in the way that I

## Page 143

1  thought it should be submitted.
2    Q. Did it have to do with striking out fields of
3  information?
4    A. And adding a field of information.
5    Q. What was the new field?
6    A. It was -- on the form, it was the first one to
7  the left. On the Excel form, it was not included in
8  there, but on the form that the state provided her to
9  submit, it was on there. So I asked her to add that
10  column, and she had a problem with that. She said it
11  was going to be more work, and I said, "It doesn't
12  matter. We still have to do it in the format that they
13  are asking us, and what we're going to submit is what
14  they are asking."
15    Q. With respect to your comment about qualifying a
16  recommendation that she had a problem following the
17  reporting, I mean, with the call-in requirements or
18  whatever words you used, you would not contend, would
19  you, that numerous employees have maintained their
20  employment over bigger discrepancies between their
21  conduct and what they were told to do as it pertained
22  to being out than Belinda, would you?
23    A. Rephrase that question.
24    Q. You're maintaining throughout the deposition
25  that she had a real problem following instructions on

## Page 144

1  getting permission or notifying her employer that she
2  would be out, right? That's why she was terminated?
3    A. That she could not follow the process.
4    Q. She could not follow the process, exactly, that
5  is what you were saying. My question is, isn't it true
6  that there are any number of employees that have varied
7  from the instructions given them to a much greater
8  degree than Belinda and have not lost their job over it
9  since you have been director?
10    A. That's possible. It may have -- may have
11  happened at the clinic level. Maybe it didn't go up
12  through the chain of command. So it's possible. I
13  don't know that it would have happened in the short
14  timeframe.
15    Q. Well, are you suggesting that you're
16  100 percent consistent on addressing these issues and
17  that there isn't anybody you've treated more favorably
18  than Belinda?
19    A. I think each warning, each reprimand is done on
20  its own. Sometimes it's based on the action.
21  Sometimes it's based on the history. So it's difficult
22  for me to compare employees. But sometimes we do
23  compare them in order to try and figure out what
24  disciplinary actions should be taken.
25    Q. But wouldn't you agree that in all likelihood,

## Page 145

1  there are people that you have passed judgment on
2  accused of violating this process more egregiously than
3  Belinda did and they maintained their employment?
4    A. I do not know of another employee who has left
5  a note notifying their supervisor that they were going
6  to be late or out. It's possible it happened. This is
7  the only case that I know about.
8    Q. And isn't it possible that you have let people
9  remain with some form of discipline short of
10  termination who have made less effort than leaving a
11  note notifying their supervisor they would be out,
12  maybe even no effort at all, the same number of times
13  or more?
14    A. I don't think so.
15    Q. Out of 250 employees, there's no one there that
16  has got notations in their employment file that they
17  failed to report?
18    A. We have a lot of terminations because of that.
19  We have -- I would say that that might be up there as
20  the reason why to terminate.
21    Q. And there are people who have gotten away with
22  much more than Belinda was even accused of that
23  maintain their employment there, right?
24    A. I don't know what you mean by "gotten away
25  with."

Page 146

1  Q. They haven't tried at all to notify their
2  employer they would be out?
3  A. I don't know about those situations. I don't
4  think that happens. I think that's probably the
5  terminated employees.
6  Q. Okay, you said you talked to about nine or ten
7  people about this case before the deposition. Were you
8  talking to them all about different things or more or
9  less the same thing?
10  A. Different things.
11  Q. Can you summarize what you were discussing?
12  A. All right, Yvette Ortega, she's a nurse
13  practitioner at the Harlingen clinic. I wanted to know
14  the checks and balances of entering the vaccine dates
15  on the computer system. So she explained that to me
16  one time.
17      Oscar Buitron, who was the former WIC
18  director, I recall that I talked to him not -- not
19  really about this lawsuit, but more about the
20  termination process of Belinda Mata, and the same thing
21  with Letty Montiel, Esmer Guajardo.
22  Q. Let me pause for a second. What did those two
23  have to offer about the termination process of Belinda?
24  A. They didn't offer anything other than maybe we
25  talked about the historical information about leaving a

Page 147

1  note on the door or the communication process on how to
2  report.
3  Q. What did they say about leaving a note on the
4  door?
5  A. Well, we feel that the communications process
6  is complete when the employee has verbally communicated
7  with their supervisor, that it's a two-way
8  communication and not a one-way communication.
9  Q. That's what they both said?
10  A. That's what -- I don't remember about Oscar
11  Buitron, but I remember that with Letty Montiel and
12  with Esmer Guajardo.
13  Q. Was there any consideration given for
14  exceptional circumstances or an attempt at being better
15  than nothing?
16  A. We expect our employees to communicate. We
17  understand that there are times where there may be an
18  accident, you may be in the hospital, but there needs
19  to be a very good reason why you did not pick up the
20  phone and call.
21  Q. Okay. What else?
22  A. Maria San Pedro -- Maria San Pedro, Esmer and
23  myself were part of a -- I guess a conversation with
24  Judi Chase and Brad Prescott when they came down to
25  look at our inventory of the vaccines. So when I left

Page 148

1  the room, there was some discussion between Ms. San
2  Pedro, Judi Chase, and Esmer, but I was not in the
3  room. I was with Brad Prescott walking around the
4  building. So there was some discussion there.
5  Q. Tell me once more, who are the two individuals
6  you talked to about two-way communication and needing
7  to pick up the telephone?
8  A. Our program supervisors function like that, our
9  program directors function that way. We have different
10  levels within the department.
11  Q. Program directors do function that way?
12  A. The program directors -- we have several
13  programs within the department, and normally --
14  Q. Was Belinda a program director?
15  A. No.
16  Q. All right. Do the other departments function
17  that way that are program directors?
18  A. The programs within our department, the
19  standard method is to call your supervisor and
20  communicate your absence, or if the supervisor is not
21  there yet, to let them know what the situation is, and
22  if they are needed, to return the call.
23  Q. When did you have these conversations?
24  A. These conversations with these people have --
25  Q. These --

Page 149

1  A. -- have been in the last -- when did Belinda
2  leave? In 2002?
3  Q. Well, I'm talking about the ones with these two
4  individuals about program directors needing to make
5  contact with supervisors, two-way contact. Were those
6  more recent?
7  A. I think that that has been the process.
8  Q. Well, I mean, when did the conversations
9  themselves occur? When did you talk to them about
10  that?
11  A. Individually, when something would come up,
12  when they had a problem with an employee.
13  Q. Well, you said you had talked to them about
14  that with respect to Belinda's lawsuit. When did that
15  conversation occur?
16  A. Oh. No, I may have used Belinda as an example
17  and not the lawsuit information.
18  Q. Okay. At the point in time that you may have
19  talked to an attorney about firing Belinda --
20  A. Uh-huh.
21  Q. -- was she fired or not?
22  A. Yes.
23  Q. All right. So you didn't talk to anyone before
24  you fired her. Then you were concerned about it. Then
25  you talked to an attorney?

## Page 150

1    A. No. I believe that I would have called -- I
2  believe I did call and I talked to Dylbia or Richard,
3  but I think it was Dylbia, which is an attorney there.
4  And I believe that she would have told me, you know,
5  "Anybody can sue, and if you don't know any other
6  information," such as what I had described, "and this
7  is why you're doing it, then" -- that I could proceed.
8    Q. So you think you talked to the attorney before
9  or after?
10    A. Before.
11    Q. Because you were out of the office that day,
12  right?
13    A. I was out of the office that day.
14    Q. So you called an attorney from being out of the
15  office?
16    A. I think I called when I was there at the
17  office, when I was looking at the paperwork and before
18  I completed it.
19    Q. You don't remember if it was a man or a woman
20  you talked to?
21    A. I think it was Dylbia. There are times when I
22  have called in to say, "I have this concern," and then
23  I'm reminded that we're at-will employees and as long
24  as I don't have any information such as -- and then
25  they describe, you know, the whistle blower's type of

## Page 151

1  information, then --
2    Q. The what kind?
3    A. Like whistle blower's type of information.
4    Q. The whistle blower's.
5    A. If I don't have that kind of knowledge, then I
6  can proceed.
7    Q. Did you tell them that you did or didn't have
8  that kind of knowledge in this case?
9    A. In this case, I did not think I had any
10  knowledge. I mean, I would have explained the
11  circumstance of the expired vaccines, but that's the
12  only circumstance I would have explained.
13        (Brief recess)
14        (Deposition adjourned)
15
16
17
18
19
20
21
22
23
24
25

## Page 152

ERRATA SHEET/SIGNATURE PAGE
PAGE LINE CHANGE            REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, YVETTE SALINAS, have read the foregoing
transcript and hereby affix my signature that same is
true and correct, except as noted above.

_____
YVETTE SALINAS


THE STATE OF TEXAS
COUNTY OF _____
       SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned authority on this the _____ day of
_____, 2005.


_____
Notary Public in and for
The State of Texas

## Page 153

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
BELINDA MATA        X
       Plaintiff   X
                   X
VS.                X  CASE NO. B-04-092
                   X
CAMERON COUNTY HEALTH   X
DEPARTMENT, THE COUNTY OF X
CAMERON            X
       Defendants  X

REPORTER'S CERTIFICATE
       I, MAUREEN STINGLEY, Certified Court
Reporter, certify that the witness, YVETTE SALINAS, was
duly sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
APRIL 4, 2005; that the deposition was reported by me
in stenograph and was subsequently transcribed under my
supervision.
       I FURTHER CERTIFY that I am not a
relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
counsel, nor am I financially interested in the action.

       WITNESS MY HAND on this the _____ day of

_____, 2005.


_____
MAUREEN STINGLEY, CSR NO. 691
Expiration Date: 12/31/06
Bryant & Stingley, Inc.
Firm Registration No. 41
2010 East Harrison
Harlingen, Texas 78550