IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BELINDA MATA      )(
     Plaintiff    )(
                 )(
VS.            )(   CASE NO. B-04-092
               )(
CAMERON COUNTY HEALTH  )(
DEPARTMENT, THE COUNTY OF )(
CAMERON       )(
     Defendants   )(

ORAL DEPOSITION OF
BELINDA MATA
DECEMBER 8, 2004

WITNESS
COPY

ORAL DEPOSITION OF BELINDA MATA, produced as a

witness at the instance of the DEFENDANTS, taken in the

above styled and numbered cause on DECEMBER 8, 2004,

reported by LINDA LOCKLEAR, Certified Court Reporter

No. 6326, in and for the State of Texas, at the offices

of Bryant & Stingley, Inc., 2010 East Harrison Street,

Harlingen, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached therein.

Page 2

APPEARANCES
COUNSEL FOR PLAINTIFF:
DAVID R. JOE
BREWER, ANTHONY, MIDDLEBROOK,
BURLEY & DUNN, P.C.
1702 East Tyler Street, Suite 1
Harlingen, Texas 78550

COUNSEL FOR DEFENDANTS:

RICHARD O. BURST
CIVIL LEGAL DEPARTMENT
COMMISSIONERS COURT
964 East Harrison Street
Brownsville, Texas 78520

INDEX

                                                    PAGE
Appearances ........................................ 2
BELINDA MATA
Examination by Mr. Burst ........................ 4
Examination by Mr. Joe .......................... 98
Examination by Mr. Burst ....................... 106
Examination by Mr. Joe ......................... 122
Examination by Mr. Burst ....................... 124
Examination by Mr. Joe ......................... 125
Examination by Mr. Burst ....................... 128
Examination by Mr. Joe ......................... 129
Examination by Mr. Burst ....................... 129

Errata Sheet/Signature Page .................... 131

Reporter's Certificate .......................... 133

Attached to the end of the transcript: Stipulations

Page 3

EXHIBITS
PAGE

NUMBER DESCRIPTION                          IDEN.
1  Application for Employment ............... 39
2  Receipt for Handbooks .................... 40
3  Payroll Enrollment Verification Form ..... 41
4  Description of Job Duties ................ 43
5  Log Form of Drugs Returned to Central
   Pharmacy ................................. 50

6  Vaccine Log .............................. 54

7  Letter Dated June 4, 2002, From
   Ms. Salinas To Judi Chase ............... 57
8  Vaccine Log .............................. 60
9  Written Warning Notice .................. 71
10 Verbal Warning Documentation ............. 72

11 Handwritten Note Dated June 5, 2002 ...... 74


REQUESTED DOCUMENTS/INFORMATION

NUMBER DESCRIPTION                          PAGE

1  Copies of 2000, 2001 and 2002 tax returns  18

2  Copies of check stubs           20

Page 4

1        BELINDA MATA,
2   having been duly sworn, testified as follows:
3           EXAMINATION
4   BY MR. BURST:
5      Q. Would you state your name for the record?
6      A. Belinda Mata.
7         MR. BURST: Okay. And before we go any
8   further, it's my understanding that we're going to take
9   the deposition under federal rules and reserve all
10  objections except to form and responsiveness?
11         MR. JOE: Yes.
12         MR. BURST: Okay, great.
13     Q. Belinda Mata, how do you -- is it okay if I call
14  you Belinda, or do you want me to call you Mrs. Mata?
15     A. Miss is fine.
16     Q. Okay. Have you ever given a deposition before?
17     A. Yes, sir.
18     Q. You have? Before I ask you any questions about
19  that, let me introduce myself. I'm Richard Burst. I'm
20  an attorney. I represent Cameron County, the Defendant
21  in this case, who you've sued. Do you understand that?
22     A. Yes, sir.
23     Q. Okay. And I'm going to be asking you questions.
24  And, you know, just like everybody else, sometimes we
25  attorneys, particularly myself, will ask questions and

Page 5

1   sometimes they get complicated. You know, you think
2   you're being clear, but sometimes you just don't
3   understand the question. And if you don't -- if you
4   don't understand my question, just feel free to tell me.
5   Say, "I don't understand your question," or, "You need
6   to rephrase that." Will you do that?
7      A. Yes, sir.
8      Q. If you don't under -- what I'm saying now is, if
9   you don't understand my question, please don't try to
10  answer it. Just tell me, "I don't understand." Okay?
11     A. Yes, sir.
12     Q. Because, if you do that, then I'll try to
13  rephrase the question to make it clearer, okay?
14     A. Okay.
15     Q. Now, I see you're nodding your head. That's
16  another thing the reporter is probably going to ask me
17  to tell you, if I don't. She's taking down what you
18  say, and she can't take down if you're nodding your head
19  yes or nodding it no, so you really need to respond by
20  saying "yes" or "no" or indicating verbally your
21  response, okay?
22     A. Okay.
23     Q. Will you do that?
24     A. Yes, sir.
25     Q. Okay. Thank you. Back to what I was saying, if

2 (Pages 2 to 5)

Page 6

1  I ask you a question and you just do not understand,
2  you're going to tell me, correct?
3     A. Yes, sir.
4     Q. And so, if you answer the question, I'm going to
5  be able to believe that you understand the question, and
6  you're answering it to the best of your ability; is that
7  correct?
8     A. I hope so, sir.
9     Q. Okay. You said you've given a deposition
10 before. When was that?
11    A. I believe it was in 1996 or 1995.
12    Q. And what kind of a case was that involved in?
13    A. A sexual harassment case.
14    Q. Okay. Do you understand the term "plaintiff"
15 and "defendant"?
16    A. Yes, sir.
17    Q. Were you the plaintiff in that case?
18    A. Yes, sir.
19    Q. And you brought a sexual harassment case against
20 who?
21    A. My supervisor, Dr. Tim Chowdary.
22    Q. Tim Chowdary?
23    A. Chowdary.
24    Q. And where was that? What city were you in?
25    A. Weslaco.

Page 7

1     Q. Weslaco?
2     A. Yes, sir.
3     Q. Okay. And in that case that took your
4  deposition, have you -- was that case -- did you take it
5  to court, or was it settled, or what happened?
6     A. It didn't go to court. I believe the physician
7  filed bankruptcy.
8     Q. Who did?
9     A. The physician.
10    Q. So he filed bankruptcy?
11    A. Yes, sir.
12    Q. And so then the case was ultimately dismissed,
13 because he filed bankruptcy?
14    A. From what I understand, yes.
15    Q. Okay. Who was your attorney in that case?
16    A. Mr. Aaron Pena.
17    Q. All right. Have you been involved in any other
18 civil litigation?
19    A. No, sir.
20    Q. At the time you filed that suit were you still
21 working for the doctor?
22    A. At the time that I filed it, no.
23    Q. Okay. Had you quit, or were you terminated?
24    A. I was terminated.
25    Q. Okay. Did they give you a reason for

Page 8

1  termination?
2     A. No, sir.
3     Q. Did you ever find out why they claim they
4  terminated you?
5     A. No, sir.
6     Q. Okay. Have you ever been terminated from any
7  other position?
8     A. Cameron County Health Department.
9     Q. Other than the -- I understand this case. But,
10 other than this case and the case you've just told me
11 about with the doctor in Weslaco, have you been
12 terminated from any other position?
13    A. Not that I can recall right now, off the top of
14 my head.
15    Q. So right now you don't recall having been
16 terminated from any other job?
17    A. (Moving head side to side).
18    Q. You've got to answer, okay?
19    A. Oh, okay.
20    Q. What is your answer? You don't recall being --
21    A. I don't recall at this moment.
22    Q. Okay. Thank you.
23       I want to go -- ask you some questions
24 now -- more general questions about your background.
25 Were you born in the Valley in Texas, down in the Rio

Page 9

1  Grande Valley?
2     A. Yes, sir.
3     Q. Okay. And what is your hometown? Where were
4  you born?
5     A. Weslaco.
6     Q. And is that where you were raised, in Weslaco?
7     A. I was raised for the most part there but in
8  several places.
9     Q. Okay. What other places did you live during
10 your childhood?
11    A. Florida, Indiana, Chicago, Fort Worth and
12 Weslaco.
13    Q. Okay. Did you graduate from high school?
14    A. Yes, sir.
15    Q. Where did you graduate?
16    A. Mercedes High School.
17    Q. Excuse me?
18    A. Mercedes High School.
19    Q. Mercedes High School, okay. Were you living in
20 Weslaco at that time?
21    A. No.
22    Q. All right. Living in Mercedes?
23    A. Yes, sir.
24    Q. Okay. And did you -- I take it, from your
25 position, that you attended higher education?

3 (Pages 6 to 9)

Page 10

1    A. Yes, sir.
2    Q. And where did you go to school?
3    A. I attended UT Pan American in Edinburg; Texas
4    Southmost College LVN School at Weslaco and Texas State
5    Technical College.
6    Q. Okay. Did you obtain an associate's degree?
7    A. No, sir.
8    Q. Have you obtained a bachelor's degree?
9    A. No, sir.
10   Q. Excuse me?
11   A. No, sir.
12   Q. Explain to me -- you're an LVN?
13   A. Yes, sir.
14   Q. All right. As an LVN, what education or
15   requirements do you have?
16   A. One year of vocational training.
17   Q. Okay. And you received that where?
18   A. Texas Southmost College at Weslaco.
19   Q. Okay. And do you receive a license from the
20   State of Texas as an LVN?
21   A. Yes, sir.
22   Q. And when did you get your license?
23   A. 1987.
24   Q. Have you been continuously licensed as an LVN
25   since then?

Page 11

1    A. Yes, sir.
2    Q. Okay. Does the -- when you are licensed as an
3    LVN, is there a procedure or a -- well, a procedure
4    where someone, if they file a complaint, can file a
5    complaint on you as an LVN?
6    A. Repeat the question, please.
7    Q. All right. Let me withdraw. As an attorney, if
8    I'm licensed with the State Bar of Texas, if someone has
9    a complaint on me about the way I practice law, they can
10   file a complaint with the State Bar of Texas.
11   A. Okay.
12   Q. Is there an equivalent procedure where somebody
13   could file a complaint on you as an LVN?
14   A. Yes, sir.
15   Q. Where is that? Where would that be filed with?
16   A. I believe it'd be the Texas Board of Vocational
17   Nurse Examiners out of Austin.
18   Q. Okay. Has such a complaint ever been filed
19   against you?
20   A. No, sir.
21   Q. Okay. So you've never had a complaint filed?
22   A. A complaint, no, sir.
23   Q. All right. Are you married?
24   A. No, sir.
25   Q. Have you ever been married?

Page 12

1    A. No, sir.
2    Q. Okay. I notice in response to one of your
3    questions you have had -- or your answers to the written
4    questions we asked, you have been arrested twice for
5    DWI; is that correct?
6    A. Yes, sir.
7    Q. And in the first one were you convicted of DWI?
8    Do you understand the terminology "convicted"?
9    A. Convicted? No, sir, I don't know. I made a
10   deal or pled or something like that.
11   Q. Okay. That's fine. In your own words, you know
12   how you pled to the charge?
13   A. Right.
14   Q. And then they gave you some kind of a sentence
15   or deferred sentence in exchange for it?
16   A. Yes, sir.
17   Q. Okay. Where was that, or what court was that
18   in?
19   A. Some court in Brownsville.
20   Q. So it was in the county here in Cameron County?
21   A. Yes, sir.
22   Q. Okay. And you went to the county courthouse?
23   A. Yes, sir.
24   Q. Okay. What year was that?
25   A. 1999.

Page 13

1    Q. All right. Subsequently, you indicated you had
2    a second DWI; is that correct?
3    A. Yes, sir.
4    Q. And when was that?
5    A. That was also in '99.
6    Q. Okay. So you got -- were you still on probation
7    when you got the second one?
8    A. Yes, sir.
9    Q. And what action -- did you plead to the second?
10   A. No, sir.
11   Q. You did not? What happened with regard to it?
12   A. It went to trial. I was convicted of the second
13   one.
14   Q. Okay. And what sentence did you receive?
15   A. The judge ordered fines to be paid and alcohol
16   and substance abuse rehab.
17   Q. Okay. Did you complete that?
18   A. Yes, sir.
19   Q. Was that a felony?
20   A. No, sir.
21   Q. Was it a misdemeanor conviction?
22   A. Yes, sir.
23   Q. Okay. And did he give you some type of a
24   probated sentence?
25   A. That, I don't know. I don't understand that

BRYANT & STINGLEY, INC.
www.bryantstingley.com                    (956) 428-0755

Page 14

1  question.
2      Q. Did he -- were you told by the judge or your
3  lawyer that you had a certain number of years that you
4  were going to be on probation?
5      A. Following?
6      Q. Following that trial.
7      A. Yes, sir.
8      Q. Okay. How many years was that?
9      A. I think it was about four, three or four years.
10     Q. Are you still on it?
11     A. No, sir.
12     Q. Okay. Was the trial in 1999?
13     A. 2000.
14     Q. Okay. When did you go off probation?
15     A. Completed?
16     Q. Yes.
17     A. About a year or two ago.
18     Q. Okay. You don't know any more than that when it
19  was?
20     A. No, sir.
21     Q. Okay. In my -- in the notice of your deposition
22  I asked -- I issued what's called a subpoena and asked
23  you to bring with you certain documents today. Did you
24  bring those documents?
25     A. No, sir.

Page 15

1      MR. JOE: And, by the way, I think we've
2  produced everything that you're asking for already, but
3  if there's anything in particular that you need, for
4  conveniency, my office is two blocks away. We can go
5  see if we can find them.
6      MR. BURST: Okay. Let me ask her some
7  questions with regard to the things I asked for, and it
8  may be that that's not necessary, but let's see.
9      MR. JOE: Okay.
10     Q. The things that I asked you to bring or
11  categories I asked for are all original vaccine logs in
12  your possession.
13         Do you have any original vaccine logs or --
14  and what I mean by that are logs that you made up when
15  you were listing the vaccines.
16     THE WITNESS: Didn't I bring those to you?
17     MR. JOE: We've produced those.
18     Q. Okay. So I already have those. I'm going to --
19  I'll probably be asking you to identify them later, and
20  if those are the ones, that's fine.
21         Now, I asked you to bring all documents you
22  removed from the Defendant's office, which would be the
23  county health department's office at the time of your
24  termination or any other time, actually. It just says
25  all documents removed.

Page 16

1      Have you provided those to your attorney?
2      A. Yes, sir.
3      MR. JOE: I've provided those to you.
4      Q. Okay. And what documents -- when you left the
5  office after you were terminated -- the day of your
6  termination -- what documents did you take with you?
7      A. I don't remember exactly. Just things that I
8  had on my desk. As far as documents, I don't know for
9  sure.
10     Q. Were some of the things -- the vaccine logs, did
11  you take those with you at that time?
12     A. Not anything that would -- that the health
13  department needed without me being there. They were
14  nothing original.
15     Q. Okay. But were they copies of vaccine logs?
16     A. They were some of the ones that the health
17  department -- these two ladies had me change or alter.
18  They were the ones that I had prepared earlier --
19     Q. All right.
20     A. -- that they did not want.
21     Q. All right. Well, focusing on that right now,
22  did they ask you not to remove any documents at that
23  time, or did someone in the health department ask you
24  not to remove any documents?
25     A. Not to remove any property at that time.

Page 17

1      Q. Okay. Do you understand that documents that are
2  created there for the health department are property of
3  the county?
4      A. I understand that now.
5      Q. Okay. I asked you to bring with you copies of
6  your job applications, any applications you've made
7  after your termination from Cameron County.
8      A. I don't have any copies of job applications. I
9  turned them in. When I submit them, they don't give me
10  copies.
11     Q. So you don't keep copies when you turn them in?
12     A. No, sir.
13     Q. Okay. And then I asked for copies of your 2000,
14  2001, 2002 and 2003 tax returns.
15     THE WITNESS: I haven't turned in any tax
16  returns?
17     Q. If you want to talk to your attorney, that's
18  fine, about that.
19     MR. BURST: Do you have her tax returns?
20     MR. JOE: I don't believe I do.
21     Q. Do you understand what I'm saying when I say
22  "tax returns"?
23     A. Yes, sir.
24     Q. Those are what you file with the IRS when you
25  file your return on April 15th or before. Do you

BRYANT & STINGLEY, INC.
www.bryantstingley.com                    (956) 428-0755

Page 18

1  understand that?
2      A. Yes, sir.
3      Q. Do you not file those?
4      A. I have not filed 2003, but I have the previous
5  ones.
6      Q. All right. Is there some reason you didn't file
7  2003's?
8      A. Someone is using my Social Security number
9  somewhere else, so I need to clarify that, clear that
10  up.
11     Q. Okay. Would you provide your attorney with
12  copies of your 2000, 2001 and 2002 returns --
13     A. Yes.
14     Q. -- so that I can get them?
15     A. Yes.
16     Q. Okay.
17        MR. BURST: Is that all right with you?
18        MR. JOE: Sure. We'll produce the tax
19  returns to you. Can I ask you, though, if you're
20  needing simply to confirm wages earned, or is there some
21  other information in those tax returns that you'd be
22  seeking?
23        MR. BURST: Yeah, I want wages, what she's
24  earned plus a way of projecting what her -- if she's
25  claiming any front pay, what it would be.

Page 19

1        MR. JOE: Okay. So, when we produce those
2  to you, if there's nothing that we think is
3  confidential, we'll go ahead and produce them to you in
4  the submitted form. Otherwise, we'll note if there's
5  anything contained in the tax returns that doesn't
6  appear relevant to the case that we'd claim a privacy
7  right on.
8        MR. BURST: Okay. Let me say, then, as
9  regard to the tax returns, I have issued a subpoena
10  duces tecum, and I want it noted in the record that they
11  have not been provided, nor have any objections been
12  timely filed. And, you know, if they're not given to
13  us, then we'll take appropriate action.
14     Q. No. 5, I asked for copies of check stubs or I.S.
15  Form W-4s for 2004. And I take it you haven't brought
16  those with you, either?
17     A. No, sir.
18     Q. Do you understand what I'm talking about when I
19  say check stubs?
20     A. Yes, sir.
21     Q. And do you understand what I'm talking about
22  when I say W-4s?
23     A. W-4s. I believe those are the ones we sign at
24  the employer's office.
25     Q. That's correct.

Page 20

1      A. Okay.
2      Q. Do you have copies of any --
3      A. I don't believe I have any W-4s.
4      Q. Okay. Do you have copies of check stubs from
5  your employment?
6      A. Copies of check stubs?
7      Q. Now, we're talking for 2004.
8      A. 2004? I may have a couple around the house, but
9  I don't have copies of them. I had thrown away several,
10  so I can look to see what I have.
11     Q. All right. Thank you.
12        Was your first day of employment with the
13  county -- our records indicate it's April 5th, 2002. Is
14  that correct?
15     A. I think so. To the best of my knowledge, yes,
16  sir.
17     Q. Okay. I have -- if I have the county
18  paperwork -- and I may show you some of it here in a
19  little bit. But, if the county paperwork indicates in
20  writing your first day was April 5th, 2002, you don't
21  have any reason to disagree with that, do you?
22     A. No, sir.
23     Q. Okay. And do you agree that your date of
24  termination from the Cameron County Health Department
25  was June 4th, 2002?

Page 21

1      A. Yes, sir.
2      Q. You agree with that?
3      A. Yes, sir.
4      Q. Okay. You have indicated that there is a prior
5  settlement in this case; is that correct?
6        MR. JOE: Well, I may have responded to an
7  interrogatory or question on the subject with
8  information to the effect that there was a prior
9  settlement not in this case, because this case did not
10  exist at the time.
11        MR. BURST: Okay.
12        MR. JOE: But there is a prior settlement
13  with an attorney over some issues that had to do with
14  the claims asserted in this case but no prior settlement
15  in this case.
16        MR. BURST: I understand.
17     Q. Have you received a sum of money from some
18  attorneys, as a result of your termination from Cameron
19  County Health Department?
20        MR. JOE: Object to the form of that
21  question. The attorneys -- I may go ahead --
22        MR. BURST: Go ahead and state your
23  objection. I mean, what is your objection so I can
24  rephrase the question?
25        MR. JOE: Okay. Those attorneys did not

6 (Pages 18 to 21)

Page 22

1  compensate her for her termination. They compensated
2  her for some advice that was lacking that they gave to
3  her regarding her termination but not -- they did not
4  compensate her for her termination.
5       MR. BURST: Okay.
6       Q. Did you ask -- prior to going to the attorney
7  you're presently with, did you go to some attorneys
8  concerning your termination from the Cameron County
9  Health Department?
10      A. Yes, sir.
11      Q. Did those attorneys file any action on your
12  behalf?
13      A. No, sir.
14      Q. As a result of their failure to file action on
15  your behalf, did you collect a sum of money?
16      A. No, sir.
17      Q. You did not?
18      A. Not as a result of their failure to file on my
19  behalf.
20      Q. Okay. Did you collect some money from those
21  attorneys?
22      MR. JOE: May I interrupt here and just
23  state that she did collect some money, and the amount of
24  money -- I would need to go back and check, but the
25  amount of money may be confidential. I don't recall.

Page 23

1  There may be an agreement. I know there's an agreement.
2       There may be a term in the agreement that
3  says that what they agreed to pay was confidential that
4  she may have agreed to with them, but it's possible she
5  didn't. But I think, as a matter of fact, I believe
6  we've already discussed that amount, you and I.
7       In fact, can we go off the record for a
8  minute?
9       MR. BURST: Fine with me.
10      (Discussion off the record)
11      Q. We're back on the record, and you heard the
12  discussion between your attorney and I.
13      As a result of the contact with the other
14  attorneys and their failure to give you an accurate
15  statute of limitations, did they pay you for your
16  benefit $20,000?
17      A. That's correct.
18      Q. Okay. We were discussing your education awhile
19  ago. And, other than what we discussed, do you have any
20  other formal education?
21      A. No, sir.
22      Q. Okay. Do you have -- have you received
23  additional training as an LVN?
24      A. Additional training as an LVN in what sense?
25      Q. Excuse me?

Page 24

1       A. Such as what?
2       Q. Well, do you have, like, continuing education
3  courses or anything like that?
4       A. Yes, sir.
5       Q. And have you received some additional training?
6       A. Yes, sir.
7       Q. Are you required to do that on an annual basis?
8       A. I believe we're supposed to do it on -- before
9  we renew our licenses, which I believe is every two
10 years.
11      Q. Every two years?
12      A. Yes, sir.
13      Q. Okay. And have you kept your license current?
14      A. Yes, sir.
15      Q. So you've met whatever training obligations are
16 required of you?
17      A. Yes, sir.
18      Q. Okay. As a result of your discharge from the
19 Cameron County Health Department, have you visited or
20 had an appointment with any doctor?
21      A. A physician, yes, sir.
22      Q. And what doctor would that be?
23      A. Different doctors. Dr. Movva.
24      Q. Dr. who?
25      A. Movva. San Benito Medical Associates.

Page 25

1       MR. JOE: And just to be clear, he's asking
2  about as a result of your termination; not just who you
3  might have met with since your termination.
4       THE WITNESS: Oh.
5       A. As a result, then, no, sir.
6       Q. Okay. So you haven't seen a doctor specifically
7  because of your termination from the Cameron County
8  Health Department; is that correct?
9       MR. JOE: The effects of your termination.
10      Q. Is that correct?
11      A. Yes, sir.
12      Q. All right. Have you seen any professional, as a
13 result of your termination from the Cameron County
14 Health Department?
15      A. Any professional, as a result, not to my
16 knowledge right now, sir.
17      Q. Okay. Have you seen a psychologist because of
18 your -- let me try to phrase it a little differently.
19 As part of your petition, you claim mental anguish from
20 the termination.
21      Have you sought medical help because of
22 mental anguish, as a result of that termination?
23      A. I didn't go to a physician saying I had mental
24 anguish, but I do know, as a result of what happened, I
25 had a loss of sleep, sleeplessness, so I have gone to

7 (Pages 22 to 25)

Page 26

1  physicians for that.
2       MR. BURST: Object as nonresponsive.
3    Q. My question, though, is -- I think you've
4  answered it. You said you did not go to a physician
5  because of that?
6       MR. JOE: Objection, form.
7       MR. BURST: What's your objection?
8       MR. JOE: What do you mean by that?
9  Because of the loss of sleep or --
10      MR. BURST: Yeah. Good point.
11   Q. Did you go to a physician because of your loss
12  of sleep?
13   A. Yes.
14   Q. Who was that?
15   A. Dr. Movva.
16   Q. All right. And when is that that you went to
17  him?
18   A. It would have been 2002, 2003, as well as San
19  Benito Medical Associates.
20   Q. And did they prescribe anything for you or give
21  you anything?
22   A. Yes, sir.
23   Q. Okay. And are you on medication now?
24   A. At this moment today, no.
25   Q. Okay. Are you still taking medication?

Page 27

1    A. Yes, sir, if needed.
2    Q. All right. Are you currently employed?
3    A. Yes, sir.
4    Q. Where do you work?
5    A. I work for ASAP Nurses Agency.
6    Q. Okay. And how long have you been working for
7  them?
8    A. Since last year.
9    Q. Okay. Is that a full year?
10   A. Over a year.
11   Q. Over a year? And before that and subsequent to
12  your termination from the Cameron County Health
13  Department did you work for any other employment?
14   A. Yes, sir.
15   Q. And where were you employed before?
16   A. After the health department would have been an
17  adult day care center in Harlingen, ASAP Nurses Agency.
18  And I've been employed with Alpha Staffing since 2000.
19   Q. Since 2000?
20   A. Yes, sir.
21   Q. What's Alpha Staffing?
22   A. It's a staffing agency for nursing.
23   Q. Okay. And you were working for them at the same
24  time you were working for Cameron County?
25   A. Yes, sir.

Page 28

1    Q. So you --
2    A. I was on their payroll.
3    Q. You were on their payroll? Explain to me how
4  that works that you were on their payroll.
5    A. I am an employee of Alpha Staffing Agency. If
6  they need me, they can call me. If I'm available to
7  work, I'm able to go in.
8    Q. Okay. Do they only pay you when you work?
9    A. That's correct.
10   Q. Okay. While you were employed for Cameron
11  County did you do any work for Alpha Staffing?
12   A. I don't believe so, because it was such a short
13  period of time I was there.
14   Q. Okay. And you're talking about with the county?
15   A. Yes, sir.
16   Q. You were with the county for approximately three
17  months; is that correct?
18   A. I believe it was two.
19   Q. Two months, okay.
20   A. April to June.
21   Q. I think you're correct. I stand corrected.
22       Do you still do work for Alpha Staffing
23  currently?
24   A. I'm still employed by them, but they have very
25  little work at this time.

Page 29

1    Q. Okay. When's the last time you did actually do
2  work for Alpha Staffing?
3    A. For Alpha, I believe it was late last year.
4    Q. Okay. So, since Cameron County -- I mean,
5  you've continued to be on the payroll of Alpha Staffing,
6  and then you were on -- what was the -- next job was
7  with -- I forget.
8    A. An adult day care center.
9    Q. All right. And was that as an LVN?
10   A. Yes, sir.
11   Q. Okay. And then subsequent to that you went to
12  work where you are now?
13   A. Yes, and also a federal jail.
14   Q. Federal jail?
15   A. In Raymondville.
16   Q. Okay. Are you still working there?
17   A. No, sir.
18   Q. How long did you work there?
19   A. Approximately six months.
20   Q. And what year was that?
21   A. That would have been this year.
22   Q. This year?
23   A. Yes, sir.
24   Q. What was your reason for leaving there?
25   A. Insurance.

8 (Pages 26 to 29)

Page 30

1    Q. Explain. What do you mean by "insurance"?
2    A. They failed to give me insurance. That's why I
3    signed on or I hired on.
4    Q. Okay. What kind of -- health insurance?
5    A. Health insurance.
6    Q. And they told you they were going to give you
7    health insurance?
8    A. Right.
9    Q. And then after six months they did not give you
10   health insurance?
11   A. Right. It took too long, and I decided to
12   continue working with ASAP Nursing Agency.
13   Q. Were you working with ASAP during the time you
14   were working at the federal -- Raymondville Federal
15   Prison?
16   A. I was employed by them, but I did minimal work
17   for them.
18   Q. Okay. The ASAP Agency, is this a continuing
19   job, or is this -- do they place you at different
20   places?
21   A. They call me if they need me, and they can send
22   me to different assignments, locations.
23   Q. All right. Do you work full-time?
24   A. No, sir.
25   Q. Last month how often have you worked for them?

Page 31

1    A. I didn't work for them last month.
2    Q. Okay. So you don't have a full-time job?
3    A. No, sir.
4    Q. Did ASAP place you out with the federal prison?
5    A. No, sir.
6    Q. Okay. Have you had any other employment, other
7    than what you've already told me about, subsequent to
8    your termination from Cameron County?
9    A. No, sir. That should be it, to the best of my
10   knowledge.
11   Q. All right. Prior to your employment with
12   Cameron County -- for the year prior to your employment
13   with Cameron County who were you employed by.
14   A. I believe it was an agency out of Houston, a
15   staffing agency, Team Staff RX.
16   Q. Excuse me?
17   A. Team Staff RX.
18   Q. Okay. And how long -- now, is this the same
19   type of agency where they just place you at different
20   jobs?
21   A. Yes, sir.
22   Q. And do they actually pay your salary when you
23   work the other jobs?
24   A. I don't understand what you mean by "other
25   jobs."

Page 32

1    Q. Okay. A staffing agency -- this RX Staffing
2    agency, they place you someplace to work, okay. When
3    they place you, do you get paid by the workplace where
4    you're at, or does RX Staffing pay you?
5    A. Okay. I get paid by the staffing agency, which
6    would be Team Staff RX --
7    Q. Okay.
8    A. -- for 2001.
9    Q. Okay. Is that the same way it works with your
10   current position?
11   A. Yes, sir.
12   Q. All right. Have you sought -- since your
13   termination from Cameron County have you sought
14   permanent employment?
15   A. Yes, sir, at the federal facility, at the
16   federal jail.
17   Q. Is that the only one?
18   A. Yes, sir.
19   Q. You haven't sought any other permanent
20   employment as an LVN?
21   A. Sought as in looking for?
22   Q. Okay. Let me rephrase the question. Have you
23   looked for a job as a permanent job, full-time job, with
24   anyone else other than the federal prison?
25   A. The federal facility was one and the day care,

Page 33

1    the adult day care.
2    Q. And how long did you work at the adult day care?
3    A. I believe that was about five or six months.
4    Q. And how come you left it?
5    A. I didn't like the environment.
6    Q. They didn't terminate you?
7    A. No, sir.
8    Q. You left because you didn't like the
9    environment?
10   A. I didn't like the type of work.
11   Q. Did you have health insurance there?
12   A. Yes.
13   Q. Okay. Do you recall what your salary was?
14   A. Per hour, I believe it was $15 per hour.
15   Q. Okay. At that same day care center do you
16   remember approximately when you went to work?
17   A. 2003.
18   Q. Do you know what month it was?
19   A. Approximately June or July of 2003.
20   Q. Okay. And do you remember when you quit?
21   A. I believe it was in October of 2003.
22   Q. Okay. Yeah, that's the year you were terminated
23   from the county in June of 2002, and so a full year went
24   by before you went to work full-time.
25   Did you make application with any other --

9 (Pages 30 to 33)

Page 34

1   for any other jobs during that year?
2       A. I don't recall at this time.
3       Q. You don't know whether you made applications or
4   not?
5       A. I can't remember at this time whether I made
6   applications or not during that year.
7       Q. All right. Is there any document you would have
8   that would help you recall what applications you made?
9       A. No, sir.
10      Q. Are you drawing unemployment, or did you draw
11  unemployment?
12      A. Yes, sir.
13      Q. Okay. When did you start drawing unemployment?
14      A. I don't remember the exact date after Cameron
15  County Health Department. It was a few months or a
16  month or so after I was terminated by the health
17  department.
18      Q. How long did you draw unemployment?
19      A. I don't remember. Maybe -- I don't remember the
20  exact date.
21      Q. Okay. How did you hear about this job at the
22  day care center?
23      A. The Valley Morning Star.
24      Q. Okay. So you looked in the paper, and there was
25  a job available?

Page 35

1       A. Yes, sir.
2       Q. Is that -- do you know, is that the first
3   application for a full-time job you made after your
4   dismissal or termination from the Cameron County Health
5   Department?
6       A. Like I said before, sir, I don't recall at this
7   time if that was the first one or how many I'd done
8   during that year.
9       Q. Do you know if you made any during that year?
10      A. I'm sure I did, sir. I just don't remember for
11  sure where.
12      Q. You don't know where you made applications or
13  how many?
14      A. No, sir.
15      MR. JOE: Objection, form.
16      Q. All right. After October of 2003, when you --
17  and I understand from your testimony that you
18  voluntarily left the day care center; is that correct?
19      A. Yes, sir.
20      Q. Did you have another job lined up when you quit
21  that job?
22      A. I was employed with ASAP Nursing already, so
23  there was more work available at that time.
24      Q. All right. Correct me if I'm wrong, but ASAP,
25  they put you out on temporary job assignments; is that

Page 36

1   correct?
2       A. Yes, sir.
3       Q. So you didn't have a full-time job lined up when
4   you quit from the day care center?
5       A. No, sir.
6       Q. After that did you make any applications after
7   you quit the job then? Other than the federal prison,
8   did you make any job applications for a full-time job?
9       A. I don't recall for sure where, if I did.
10      Q. Okay. Let's break that down. You've told me
11  you don't recall where. Okay. First of all, let me ask
12  you, did you make any job applications between the time
13  you left the day care center and your employment with
14  the federal prison in Raymondville?
15      A. I've already stated I don't remember if I did,
16  sir.
17      Q. Okay. Now, I understand that you don't remember
18  if you made any job applications between your
19  termination with Cameron County and your employment with
20  the day care center. Now I'm asking you, after you
21  resigned or quit the day care center and before your
22  employment with the federal prison in Raymondville did
23  you make any job applications for a full-time job?
24      A. I don't recall, sir.
25      Q. Okay. And, if you don't recall, you wouldn't

Page 37

1   know who with; is that correct?
2       A. Yes, sir.
3       Q. All right. How did you learn about the job at
4   the federal prison in Raymondville?
5       A. I believe that was also in the newspaper, if I
6   remember correctly.
7       Q. Okay. Were you looking in the newspaper
8   regularly for jobs for the period of time after your
9   termination with the county, Cameron County?
10      A. Yes, sir. That's a habit. I always look at the
11  newspaper.
12      Q. You always look at the jobs available?
13      A. Yes, sir.
14      Q. Is that even when you're employed?
15      A. Yes, sir.
16      Q. Okay. And, as I understand it, you voluntarily
17  left the federal prison in Raymondville?
18      A. Yes, sir.
19      Q. How much were you making there as -- you were
20  working as an LVN, correct?
21      A. Yes, sir.
22      Q. And how much were they paying you?
23      A. $20 an hour.
24      Q. Okay. When you quit that job did you have any
25  full-time job lined up to go to?

BRYANT & STINGLEY, INC.
www.bryantstingley.com                      (956) 428-0755

Page 38

1    A. No, sir.
2    Q. After you left the federal prison in
3  Raymondville have you had any other full-time jobs?
4    A. No, sir.
5    Q. Since you left the federal prison in
6  Raymondville -- and, by the way, what -- let me rephrase
7  that. Let me withdraw the question.
8        What month and year did you leave the
9  federal prison in Raymondville?
10    A. I believe it was in September of this year.
11    Q. September of this year, 2004?
12    A. Either late August or early September of this
13  year.
14    Q. Okay. Have you made any applications since you
15  left the federal prison in Raymondville for a full-time
16  job?
17    A. For full-time, no, sir.
18    Q. Okay. And your answer is, no, you have not?
19    A. Not that I'm aware of, sir.
20    Q. Well, you would be aware of it, would you not,
21  if you'd made an application for a full-time job since
22  September?
23    A. I would be aware, yes, sir.
24    Q. And you did not?
25    A. Not that I remember, sir.

Page 39

1    Q. Are you telling the jury that you don't remember
2  whether or not you've made an application for a job
3  since September of this year?
4    A. For a full-time. You asked for a full-time job.
5    Q. Yes, that's correct.
6    A. I don't remember right now, sir.
7    Q. All right. Explain to -- while you were working
8  for the -- what was your position you were hired for --
9  withdraw the question.
10        I'm going to hand you what's been marked as
11  Mata Exhibit No. 1. It is a document bearing the
12  Defendant's Bates stamped No. 63 through 66, and I'll
13  ask you if you can identify what that is.
14    A. It appears to be my job application to the
15  Cameron County Health Department, sir.
16    Q. Okay. On the last page is that your signature?
17    A. Yes, sir.
18    Q. Okay. And is it completed in your handwriting?
19    A. The job application, yes, sir.
20    Q. Okay. Is that the application you submitted to
21  Cameron County?
22    A. Yes, sir.
23    Q. How well do you know Joel Zamora?
24        MR. JOE: Objection, form.
25    Q. Do you know -- you've listed in your job

Page 40

1  application as a personal reference Joel Zamora; is that
2  correct?
3    A. Yes, sir.
4    Q. How well do you know him?
5    A. What do you mean by "how well"?
6    Q. Well, is he a good friend? Is he a boyfriend?
7  What is he?
8    A. No. He's a friend.
9    Q. Okay. When did you meet him?
10    A. 2002.
11    Q. Okay. Was he instrumental or did he help you in
12  obtaining work over at Cameron County?
13    A. Not at all, sir.
14    Q. Okay. I'm going to hand you what's been marked
15  as Mata Exhibit No. 2. It is the -- it's Bates
16  stamped -- Defendant's Bates Stamp No. 58. And is that
17  your signature at the bottom of that form?
18    A. Signature at the bottom, yes, sir.
19    Q. Okay. And was that given to you -- see, you'll
20  notice the date is 4/5/02. Was that form -- did you
21  sign it on that date?
22    A. I hope so, sir.
23    Q. Okay. You don't know?
24    A. I probably did.
25    Q. Okay. Is that your beginning date of

Page 41

1  employment?
2    A. I'm not -- like I said, sir, I'm not sure if it
3  was that day. It may have been that day.
4    Q. Okay. And did you receive the employee handbook
5  that's checked off there?
6    A. I don't remember if I received that handbook.
7    Q. You signed that you received it; is that
8  correct?
9    A. Yes, sir.
10    Q. Do you still have in your possession a copy of
11  the Cameron County Employee Handbook?
12    A. No, sir.
13    Q. Did you -- when I say "in your possession," have
14  you given it to your attorney?
15    A. No, sir. Do you have a copy of that handbook,
16  sir?
17        MR. JOE: Belinda, don't ask any questions
18  unless it has to do with not understanding what he's
19  asking about.
20        THE WITNESS: Okay.
21    Q. Okay. I'm going to hand you now what's been
22  marked as Mata No. 3. It's Bates stamped Defendant's
23  Bates Stamp No. 83, and I'll ask you, is that your
24  signature at the bottom of that document?
25    A. Yes, sir.

11 (Pages 38 to 41)

Page 42

1   Q. And, again, it's dated April 5th, 2002?
2   A. Yes, sir.
3   Q. Okay. Do you recall signing this document?
4   A. Do I recall signing it?
5   Q. Yes. Do you recall when you signed it?
6   A. Probably on April 5th, 2002, sir.
7   Q. Okay. Do you know where you signed it?
8   A. At the Cameron County Health Department.
9   Q. Okay. You will note again, it's checked --
10  about middle of the list is sign and receipt for
11  handbook. Did you receive handbooks at that time?
12  A. I don't remember if I received a handbook, sir,
13  at that time.
14  Q. Did you read this document when you signed it?
15  A. I probably read it really, really fast.
16  Everything was done really, really fast.
17  Q. Did they give you a stack of material when you
18  signed it?
19  A. Did they give me --
20  Q. Let me rephrase the question. At the time that
21  you signed this acknowledgment you received, did you
22  receive any paperwork from the personnel coordinator?
23  A. I remember signing a lot of paperwork.
24  Q. Did you receive any paperwork?
25  A. I may have. I don't remember.

Page 43

1   Q. Okay. I'm going to hand you what's been marked
2   as Mata Exhibit No. 4. It is Defendant's Bates Stamp
3   87. Okay. Now I'm going to ask you, do you recognize
4   that sheet of paper?
5   A. Yes, sir.
6   Q. What is it?
7   A. I don't know. I recognize the paper. I don't
8   know. It does not have a title to it.
9   Q. Okay. Does that appear to be a job description?
10  A. Part of one.
11  Q. Okay. Is that what you understood your job
12  description to be?
13  MR. JOE: Read the responsibilities section
14  for job description.
15  Q. Do you understand my question?
16  A. Would you repeat the question, please?
17  Q. Is this -- do you recognize this as part of your
18  job description?
19  A. Yes, sir.
20  Q. Okay. When was your -- who was your supervisor
21  when you went to work for the Cameron County Health
22  Department?
23  A. I was told it was Esmeralda Guajardo.
24  Q. Okay. And was she your immediate supervisor
25  throughout the two months you were there?

Page 44

1   A. From what I understand, yes, sir.
2   Q. Okay. Well, did anybody tell you that anyone
3   else was your immediate supervisor?
4   A. No, sir.
5   Q. Okay. And then who would -- do you know who was
6   the head of the department?
7   A. It would be Yvette Salinas.
8   Q. Okay. And was she the head of the department
9   the entire time you were there?
10  A. Yes, sir.
11  Q. Okay. In your own words, what did you
12  understand your primary job duty was?
13  A. From my understanding, I was hired as an LVN, as
14  the communicable disease LVN and immunizations
15  supervisor. I never found out for sure what my position
16  was at the department.
17  Q. All right. You just -- I didn't hear you when
18  you said, "and" that it was -- did you say and
19  medical -- medication provider, or what was that "and"?
20  A. And immunizations supervisor.
21  Q. Oh, okay. As an immunizations supervisor, what
22  would your actual duties be? What would you do?
23  A. From what I was told by my supervisor, it was
24  to -- I had to learn, first of all, about the
25  immunizations and to -- they needed a supervisor for the

Page 45

1   immunization program, so I was supposed to learn about
2   the immunizations and whatever else they told me I
3   needed to -- to do.
4   Q. What was the immunizations program you've just
5   referenced? What is that?
6   A. To the best that I understand, it's the
7   vaccines, the immunizations that are given or used at
8   the health department, the Cameron County Health
9   Department.
10  Q. Okay. Does the Cameron County Health Department
11  receive vaccines from the state?
12  A. Yes, sir.
13  Q. Okay. And do you understand that they have a
14  contract with the state to distribute those vaccines?
15  A. I don't know anything about contracts with
16  anybody else.
17  Q. All right. Was your job to -- as part of your
18  job, were you to oversee the distribution of the -- of
19  vaccine that was received from the state?
20  A. Probably eventually once I learned what my
21  position really was there.
22  Q. So you were still in the learning process during
23  the two months you were there?
24  A. Yes, sir.
25  Q. Okay. And, as you sit here today, you still

12 (Pages 42 to 45)

Page 46

1  don't know exactly what the immunization program is with
2  the county health department?
3      A. For Cameron County Health, not that -- no, sir.
4      Q. Okay. Was part of your job to inventory the
5  vaccines on hand?
6      A. I believe so, sir.
7      Q. Well, did you do that while -- during those two
8  months you were there?
9      A. Yes, sir.
10     Q. Okay. Did you discover anything unusual, as a
11 result of that inventory?
12     A. Yes, sir.
13     Q. And what was that?
14     A. I discovered expired vaccines or immunizations.
15     Q. And where were they located?
16     A. Some were upstairs. Some were downstairs.
17     Q. Okay. What's the significance of upstairs or
18 downstairs? Please explain to the jury.
19     A. I don't know. Some -- some of them were -- they
20 have storage rooms, or they had storage rooms upstairs.
21     Q. Okay.
22     A. Supply rooms.
23     Q. The ones that were downstairs, where were they
24 physically located?
25     A. In a refrigerator and some file cabinet or wall

Page 47

1  cabinet.
2      Q. Did you tell anybody about the expired vaccine?
3      A. Yes, sir.
4      Q. Who did you tell?
5      A. Ms. Guajardo.
6      Q. Okay. Is she the first person you told?
7      A. Probably she was the first person I reported it
8  to.
9      Q. Okay. And then, in turn, did you ever have an
10 opportunity to talk to Yvette Salinas concerning the
11 expired vaccine?
12     A. I don't remember speaking to her. Well, excuse
13 me. Ask the question again, please.
14     Q. Yes. Did you -- did you speak to Yvette Salinas
15 about the expired vaccine?
16     A. I don't remember speaking to her personally
17 about that.
18     Q. And what did your immediate supervisor
19 tell you to do about the expired vaccine?
20     A. To figure it out.
21     Q. Okay, to figure it out. Okay. Did she tell you
22 to contact the -- okay. Do you understand what the
23 Texas Department of Health -- what that agency is?
24     A. Texas Department of Health?
25     Q. Yes.

Page 48

1      A. More or less.
2      Q. All right. Well, did she tell you to contact
3  the TDH, the Texas Department of Health, concerning what
4  to do with the vaccine?
5      A. No, sir.
6      Q. Did anybody at the health department tell you to
7  contact them with regard to that?
8      A. No, sir.
9      Q. Have you ever given a written statement where
10 you said you were told to contact the Texas Department
11 of Health after you found the vaccine?
12     A. Told by who?
13     Q. Have you ever given a written statement that you
14 were told to contact the Texas Department of Health?
15     A. No, sir.
16     Q. Okay.
17         MR. JOE: Can we take a quick rest room
18 break while you read that?
19         MR. BURST: Sure.
20         (Brief recess taken)
21     Q. We're back on the record now. Okay?
22     A. Yes, sir.
23     Q. All right. You've -- as far as -- let me start
24 again and ask you, did Yvette Salinas tell you to get
25 ahold of the Texas Department of Health to find out what

Page 49

1  to do with the expired vaccine?
2      A. I don't remember, sir.
3      Q. Okay. Did your immediate supervisor tell you to
4  get ahold of the Texas Department of Health to see what
5  to do with the expired vaccine?
6      A. Not that I can recall, sir.
7      Q. Okay. Do you -- did either of your immediate
8  supervisors -- were they nurses?
9      A. No, sir.
10     Q. Okay. And so what -- did they tell you to take
11 care of the vaccine -- the expired vaccines, find out
12 what to do? What did they tell you? Give me -- tell me
13 in your own words.
14     A. To the best of my recollection, sir, I remember
15 being told to figure it out, to -- that they weren't --
16 well, I believe it was Ms. Guajardo who told me she was
17 not sure, that the vaccines had been there for years. I
18 asked for a policy or some procedure to follow in order
19 to dispose of them properly. She said that she wasn't a
20 nurse and for me to figure it out.
21     Q. Okay.
22     A. That's basically what I can remember.
23     Q. All right. And, in fact, you told the TDS that
24 you were told to take care of it; is that correct?
25     A. Who is TDS?

13 (Pages 46 to 49)

Page 50

1    Q. I'm sorry. Texas Department of -- I withdraw
2  the question. You told the Texas Department of Health
3  that you were told to take care of the -- of the expired
4  vaccines?
5    A. That I can remember, yes, sir.
6    Q. Okay. Did you contact the Texas Department of
7  Health concerning the expired vaccines?
8    A. Yes, sir.
9    Q. And did they give you instructions on what to do
10 with them?
11   A. We came up with instructions.
12   Q. Well, who's "we"?
13   A. As far as Texas Department of Health, are you
14 talking about Austin?
15   Q. Yes.
16   A. Yes, sir.
17   Q. Okay. They're the ones that told you how to
18 handle the expired vaccines?
19   A. Yes.
20   Q. And did you, in fact, handle them as they told
21 you to handle them?
22   A. To the best of my recollection, yes, sir.
23   Q. Okay. I'm going to hand you what's been marked
24 as Mata 5. It's not Bates stamped, but I want to ask
25 you, is that the form that was provided, or is that the

Page 51

1  kind of form that was provided to you by the Texas
2  Department of Health to complete concerning the drugs
3  that were expired?
4    A. No, sir.
5    Q. Okay. Do you have a form that they gave you to
6  use?
7    A. No, sir.
8    MR. JOE: Just to point out, this form
9  appears to say it was revised in December '02, E.
10 Garcia. It says, "REV. 12-02, E. Garcia," as if
11 perhaps this form has been modified or created six
12 months subsequent to my client's termination.
13   MR. BURST: Yeah, you're correct. I just
14 got this form this morning. I'd asked for a copy of
15 what they used, and this is what I got.
16   MR. JOE: Okay.
17   Q. Can you tell me what information is missing off
18 of that, that you felt would have been on the form they
19 provided you?
20   A. Who is "they"? Well, I don't --
21   Q. The Texas Department of Health. Okay. Let's --
22 to shorten this, let's refer to the Texas Department of
23 Health, if it's okay, as TDH. Is that okay?
24   A. Okay, sir.
25   Q. So right now -- and I'm talking about TDH in

Page 52

1  Austin.
2    Did you contact any other Texas Department
3  of Health office, other than the one in Austin,
4  concerning the vaccine?
5    A. I -- I had mentioned it to -- I asked the
6  regional office or the office that's here on Sesame
7  Drive.
8    Q. It's here in Harlingen?
9    A. Yes, sir.
10   Q. Okay. And did they refer you to Austin?
11   A. No, sir. They did not know what -- what I
12 should do.
13   Q. Okay. So you contacted them, and they didn't
14 know what you should do?
15   A. No, sir.
16   Q. So how did you ultimately end up contacting the
17 Austin office?
18   A. I called by telephone.
19   Q. Were you given their number by someone in the
20 Cameron County Health Department?
21   A. No, sir.
22   Q. How did you know to contact them?
23   A. I didn't know to contact them. I was not
24 getting this type of paperwork or any instructions as to
25 how to dispose of the vaccines properly, so I contacted

Page 53

1  them to get direction or assistance to make sure that
2  this was taken care of properly.
3    Q. When you say "them," do you mean the Austin
4  Texas Department of Health?
5    A. Yes, sir. I assume that's who we were talking
6  about.
7    Q. All right. Now, how did you know to contact the
8  Austin office of the Texas Department of Health?
9    A. I called them because I believe that's where we
10 were receiving the immunizations from.
11   Q. Okay. And so you called the person from whom
12 you were receiving the immunizations from to find out
13 what to do concerning the expired vaccines?
14   A. Right.
15   Q. Who did you talk to there?
16   A. I believe I spoke with this lady named Judi.
17   Q. Is it Judi Chase?
18   A. That's correct.
19   Q. Did she provide you a form; maybe not the form
20 that's marked as Exhibit 5, but one similar to it?
21   A. No, sir.
22   Q. She did not?
23   A. No, sir.
24   Q. She never provided you with a form?
25   A. No, sir.

14 (Pages 50 to 53)

Page 54

1    Q. Okay. Did you come up with a form to list the
2    vaccine that was expired?
3    A. Yes, sir.
4    Q. And how did you do that? Let me rephrase the
5    question. Did you use Excel to do that?
6    A. I didn't use it. I mean, I didn't come up with
7    the form. I don't remember.
8    Q. Okay. Do you know where the form came from that
9    you were using to itemize or inventory the expired
10   vaccine?
11   A. Well, I know I started with legal pads. And,
12   from the legal pads, it just seemed to be messy, so I
13   ended up coming up with some form on the computer.
14   Q. Okay. I'm going to hand you what's been marked
15   as Mata Exhibit No. 6 -- the Pages 1 -- well, they're
16   different pages. They're Bates Stamped Nos. 00107
17   through 00112 -- and ask you if you can tell me what
18   that is.
19   A. This is one of the forms that I came up with.
20   Q. Okay. And this is the form you've provided to
21   your attorney; is that correct?
22   A. I don't know if this is the form. It may be.
23   Q. Okay. And this is your -- how you were listing
24   the various forms and when they were expired; is that
25   correct?

Page 55

1    A. Can you repeat the question, please?
2    Q. Yes. Is this how you were documenting the
3    inventory of expired vaccines?
4    A. Yes, sir.
5    Q. All right. Did you have -- were you working
6    with your supervisors during the time you were
7    completing this form?
8    A. Working with my supervisor --
9    Q. Yes.
10   A. -- physically?
11   Q. Were they -- were you talking with them about
12   it, as you're completing this project?
13   A. Yes, sir.
14   Q. So they were aware you were -- you know, what
15   you were doing and -- were they giving you any guidance?
16   Let me rephrase the question. They were aware that you
17   were completing this form?
18   A. Yes, sir.
19   Q. At some point did you feel you had completed
20   your task of inventorying the vaccine?
21   A. At some point, yes, sir.
22   Q. Okay. And at that time did you have a
23   conference with Yvette Salinas concerning the form?
24   A. I believe we did. I don't remember for sure.
25   Q. Well, did you have a disagreement with her over

Page 56

1    the form?
2    A. I don't remember if it was me and her
3    personally, but I remember there was some trouble with
4    the form.
5    Q. Okay. And what was that trouble?
6    A. From what I understand, my supervisors wanted it
7    revised.
8    Q. Okay. Did you disagree with their revision?
9    A. Yes.
10   Q. Okay. Why did you disagree with the revision?
11   A. Because I was finished, and that was not the --
12   the form that I had completed or was not what Ms. Chase
13   and I had agreed upon.
14   Q. Okay. Did Ms. Salinas ask you, when she
15   reviewed this form, if you had received a format or
16   asked Ms. Chase what information she wanted submitted to
17   her?
18   A. I don't remember if Ms. Salinas asked me that.
19   Q. Do you know whether or not a report was
20   ultimately submitted to Ms. Chase?
21   A. A report as in the vaccine.
22   Q. Any report of the expired vaccine.
23   A. I don't know if they -- if they sent it.
24   Q. Okay.
25   A. I do know it was completed.

Page 57

1    Q. All right. I'm going to hand you what's been
2    marked as Mata exhibit 7, and it is Bates Stamped --
3    Defendant's Bates Stamped 113 through 122.
4        Have you ever seen this letter and the
5    attachments before? Take your time to look at the
6    attachments before you answer.
7    A. Okay. Can you repeat the question, please?
8    Q. Okay. Let me just simplify the question. I'll
9    withdraw the prior question. The exhibits beginning at
10   Page 000115 -- see if you can find 000115.
11   A. Yes, sir.
12   Q. Okay. Is that your signature there on that
13   form?
14   A. Yes, sir.
15   Q. Okay. And then go to 116. Same question. Is
16   that your signature?
17   A. Yes, sir.
18   Q. 117, does that contain your signature?
19   A. Yes, sir.
20   Q. 118, does that contain your signature?
21   A. Yes, sir.
22   Q. And 119, does that contain your signature?
23   A. Yes, sir.
24   Q. And 120, does that contain your signature?
25   A. Yes, sir.

BRYANT & STINGLEY, INC.
www.bryantstingley.com                    (956) 428-0755

Page 58

1    Q. 121, does that contain your signature?
2    A. Yes, sir.
3    Q. And 122, does that contain your signature?
4    A. Yes, sir.
5    Q. Is this, in fact, a completed form that was
6  completed for submission to the Texas Department of
7  Health and specifically Judi Chase?
8    A. Not by me, sir.
9    Q. Okay. Did you sign it?
10   A. Yes, I did.
11   Q. Who was it completed by?
12   A. Whoever Ms. Salinas and Ms. Guajardo had working
13 on this.
14   Q. Okay. Is there some reason you didn't complete
15 this form?
16   A. Yes, sir, because I had already completed mine,
17 and they changed it.
18   Q. Do you understand that if your supervisor tells
19 you that they want a different format, do you feel
20 there's some reason why you should not do the different
21 format?
22       MR. JOE: Objection, form.
23   Q. You can answer the question.
24   A. Can you ask the question, please?
25   Q. Is there some reason if you have -- well, let me

Page 59

1  break it down. If your supervisor tells you that they
2  want a different format, don't you work for that
3  supervisor?
4    A. Yes.
5    Q. Do you have a duty to complete the format or the
6  form -- the work that you're doing for them in the way
7  they want it completed?
8        MR. JOE: Objection, form.
9    Q. You can answer the question.
10   A. Yes, sir.
11   Q. Well, why didn't you complete the form as you
12 were instructed by your supervisors to complete it?
13   A. As I mentioned to my supervisors, I had already
14 completed the inventory, and I also mentioned that I had
15 already agreed with Ms. Chase on how this was going to
16 be done.
17       And they wanted me to delete and change a
18 lot of these things, and I'm not a computer person. I
19 don't work with computers often. So I had mentioned to
20 them, if they want it changed, they can change it. I
21 did not know how to do it.
22       There was another person who was doing all
23 the computer work. So my -- my part was done.
24   Q. So you told your supervisor that you considered
25 your part done?

Page 60

1    A. Yes, sir.
2    Q. And that if they wanted it changed, they could
3  change it?
4    A. If they wanted it changed, that it was up to
5  them. I was not changing it.
6    Q. I see.
7        MR. JOE: When we get to a convenient
8  stopping point, can we take a short break?
9        MR. BURST: Let me finish with this form,
10 if it's all right.
11   Q. Let me hand you what's been marked as Exhibit
12 No. 8, and it's Bates Stamped No. 103 through 106. Can
13 you identify that?
14   A. Yes, sir.
15   Q. Is that the form you completed?
16   A. No, sir.
17   Q. And is that identical to Exhibit No. 6, except
18 that it has some things scratched out?
19   A. No, sir.
20   Q. What's the difference?
21   A. It's completely different. It has --
22   Q. All right. I stand corrected. It is.
23       Did you complete Exhibit No. 7? Is that a
24 form you completed?
25   A. I don't have 7. I have 8, and I have 6.

Page 61

1    Q. What is that?
2    A. 6. I mean, it.
3    Q. Did you complete Form No. 8?
4    A. I worked on it. It doesn't appear as though
5  it's completed.
6    Q. Okay. What work did you do on it?
7    A. Obtaining the information.
8    Q. Okay. Did you scratch out some of the
9  information in front of your supervisors?
10   A. No, sir.
11   Q. Do you see the black marks on there?
12   A. Okay. Yes, sir, I see them.
13   Q. Did you do that?
14   A. I think. I don't remember.
15   Q. You don't remember if you crossed out that
16 information?
17   A. I may have.
18   Q. Okay. Isn't that the information your
19 supervisors told you to take off the form?
20   A. Yes, sir.
21   Q. Okay. But you disagreed with them and told them
22 that, if they wanted to redo it, they could redo it; is
23 that correct?
24   A. Yes, sir.
25       MR. JOE: Objection, form.

16 (Pages 58 to 61)

Page 62

1    MR. BURST: Did you make an objection?
2    MR. JOE: That's not all she said about
3  that. That's not all she said on the question of what
4  they could do with the form or why.
5    MR. BURST: So you're objecting to the form
6  of my question?
7    MR. JOE: Yeah.
8    MR. BURST: Okay.
9    Q. Is there any other reason you disagreed with
10 what your supervisors were instructing you to do?
11   A. Yes, sir.
12   Q. What was that?
13   A. I didn't feel comfortable with them wanting to
14 revise and make these changes after they failed to give
15 me the proper policies or procedures in order to
16 follow -- to dispose of these vaccines. And --
17   Q. Tell -- go ahead. I'm sorry. Finish your
18 answer.
19   A. And they told me to figure it out, to take care
20 of it. So I -- I had to figure it out on my own, and
21 once I did and completed the task, then -- then they
22 were concerned, and they wanted it changed.
23   Q. Do you know whether or not they conferred with
24 someone at the Texas Department of Health to inquire
25 what information the Texas Department of Health wanted

Page 63

1  submitted?
2    A. I don't know what they did.
3    Q. Okay. You don't know whether or not Ms. Salinas
4  or your immediate supervisor contacted the department of
5  health to determine what information to submit?
6    A. I don't know what they did.
7    Q. Okay. Did you feel it was illegal to take this
8  information out of this form?
9    MR. JOE: Objection, form.
10   Q. You can answer the question.
11   A. I felt uncomfortable removing this information.
12   Q. Well, tell me what you mean by "uncomfortable."
13   A. It didn't feel right. I didn't understand why
14 they would want to hide that.
15   Q. Okay. You say you don't understand why they
16 would want to hide it. Let's look at the form. What's
17 crossed out and what's taken off the form that was
18 ultimately submitted is the cost; is that correct?
19   A. Yes, sir.
20   Q. And then the total cost; is that correct?
21   A. Yes, sir.
22   Q. Is there some reason you think that the Texas
23 Department of Health wouldn't know from their own
24 records what the cost of this vaccine is that they
25 provided?

Page 64

1    MR. JOE: Objection.
2    Q. You can answer.
3    MR. BURST: What's the objection? What's
4  the objection?
5    MR. JOE: It's argumentative.
6    Q. You can answer.
7    MR. JOE: It assumes that's the reason she
8  took it off, because she didn't think the Texas
9  Department of Health knew about it. Maybe that's not
10 the reason at all. It's just an argumentative question.
11   Q. You can answer the question.
12   A. I don't know what the Texas Department of Health
13 knows or does not know.
14   Q. Where did you get the cost of the item?
15   A. Some form that I was able to obtain from the
16 health department.
17   Q. It was from the -- it was a Texas Department of
18 Health form, was it not?
19   A. It may have been.
20   Q. Okay.
21   MR. JOE: Is this an okay time for that
22 break?
23   MR. BURST: Sure. You want a break?
24   MR. JOE: Sure.
25   (Brief recess taken)

Page 65

1    MR. BURST: Okay. We're back on record.
2    Q. Have you -- do you have a copy of the form that
3  the Texas Department of Health provided you in which to
4  put the information concerning the expired vaccines?
5    A. No, sir, I don't have a form. I was not
6  provided a form.
7    Q. Is it your testimony you were never given a form
8  by anybody at the Texas Department of Health to fill in
9  concerning these expired vaccines?
10   A. I was not provided a form.
11   Q. Okay. Were you directed by Ms. Salinas to
12 contact the Texas Department of Health to obtain such a
13 form?
14   A. No, sir.
15   Q. All right. Do you know whether or not the
16 Cameron County Health Department through it's
17 supervisors obtained a form from the Texas Department of
18 Health to fill in for the expired -- the return of the
19 expired vaccine?
20   A. I don't know what the supervisors did, sir.
21   Q. Excuse me?
22   A. I don't know what they did.
23   Q. Okay. So you don't know if they did or they did
24 not?
25   A. I don't know what they did.

17 (Pages 62 to 65)

Page 66

1    Q. Okay. Do you remember now -- with regard to
2  Exhibit No. 8, do you remember or recall now whether
3  you're the one that crossed out these blocks on that
4  form?
5    A. Yes, sir.
6    Q. And are you the one that did it?
7    A. Yes, sir.
8    Q. And was that why you were meeting with
9  Ms. Salinas?
10    A. I don't recall if it was her or Ms. Guajardo,
11  but I know one of them wanted this stuff removed from
12  the log.
13    Q. Okay. Did they tell you why?
14    A. No.
15    Q. Okay. Did you feel that it was illegal to
16  remove this information from those logs?
17    A. I don't know if it was illegal. I didn't feel
18  it was right. I just felt uncomfortable. It felt
19  wrong. If we worked for the same people, the
20  immunizations, we're supposed to be working together. I
21  didn't understand why we couldn't share the same
22  information.
23    Q. What information? Okay. Let's -- the same
24  people -- you worked for the same people? Who are you
25  talking about?

Page 67

1    A. Well, the Cameron County Health Department
2  received the immunizations from the state. I didn't
3  understand why we would have to remove that information
4  from the log.
5    Q. Well, you told me just moments ago, though, you
6  didn't know what information the state wanted you to
7  provide; is that correct?
8    A. I did not say that.
9        MR. JOE: Objection, form.
10    Q. You can answer the question.
11    A. I did not say the state.
12    Q. All right. Did you -- do you feel -- did
13  anybody at the Texas -- at the Austin office of the
14  Texas Department of Health tell you to give them the
15  cost?
16    A. Judi Chase and I came up or agreed upon the
17  information that I had obtained from inventorying these
18  vaccines, that this was the information that was going
19  to be sent that I was -- I had already come up with.
20    Q. Are you telling this jury that Judi Chase told
21  you to include the cost of the dose on the form?
22    A. I'm saying Judi Chase knew this information was
23  on its way, and Judi Chase did not tell me not to send
24  it. Judi Chase was in agreement with me. She said it
25  was okay to send this information.

Page 68

1    Q. Did she tell you to include the cost on the
2  form?
3    A. She said it was okay to include the cost.
4    Q. You're not answering my question. Did she tell
5  you --
6        MR. JOE: Objection, form.
7    Q. Did Judi Chase tell you, "Include the cost on
8  the form"?
9    A. I didn't -- no. Judi Chase knew it was on its
10  way. It was on the form. She did not say to take it
11  off. She said -- she agreed that it was okay to send
12  all the information that I had.
13    Q. Did she specifically say, "Send the cost of the
14  dose"?
15    A. No, she did not.
16    Q. Okay. The total cost is the other area that
17  you've lined through; is that correct? There's another
18  area that you lined through, is that correct, on Form
19  No. -- on the Exhibit No. 8?
20    A. Yes, sir.
21    Q. Okay. And I take it that's derived at taking
22  the number of doses times the cost per dose?
23    A. Yes, sir.
24    Q. Okay. And then the last block that's crossed
25  out, as far as titled "Explanation," does that explain

Page 69

1  where the items were found?
2    A. Yes, sir.
3    Q. Okay. Did Judi Chase or anybody tell you that
4  those were legal requirements, that you had to provide
5  that information?
6    A. No, sir, no one -- no one told me what the legal
7  requirements were.
8    Q. Okay.
9    A. Not my supervisors, either.
10    Q. But your supervisors did tell you that they did
11  not want that information on the form that was to be
12  submitted; is that correct?
13    A. Yes, sir. That doesn't mean it was legal or --
14    Q. Okay.
15    A. -- information that needed to be submitted or
16  not.
17    Q. Okay. I understand. Did you have conversations
18  with Judi Chase concerning submission of this form after
19  your termination from the Cameron County Health
20  Department?
21    A. Which form?
22    Q. The submission of the information on the expired
23  vaccines.
24    A. Yes, sir.
25    Q. Okay. And when did that conversation occur?

18 (Pages 66 to 69)

Page 70

1    A. It may have been the following day after I was
2  terminated.
3    Q. Okay. Was there more than one event where you
4  talked to Judi Chase concerning -- let me first ask:
5  After your termination did you talk to Judi Chase more
6  than once?
7    A. I may have.
8    Q. Okay. When would you -- these conversations
9  have taken place?
10    A. Either a day or two after I was terminated.
11    Q. Okay. Were there any -- okay, two days after
12  you were terminated. Did you ever talk to Judi Chase
13  concerning these vaccines again?
14    A. No, sir.
15    Q. Okay.
16    A. Not that I can remember.
17    Q. Did Judi Chase inform you that she had received
18  the report from the Cameron County Health Department
19  when you talked with her?
20    A. I don't remember.
21    Q. While you were employed -- during the two months
22  you were employed with the Cameron County Health
23  Department, did you receive a warning notice concerning
24  being absent, unreported absences?
25    A. Yes, sir.

Page 71

1    Q. Okay. I'm going to hand you what's been marked
2  as Mata Exhibit No. 9.
3        Is that your signature at the bottom of the
4  form?
5    A. Yes, sir.
6    Q. Okay. And do you remember that discussion with
7  your supervisor, Esmeralda?
8    A. With who?
9    Q. With your supervisor. Sorry.
10    A. Yes, sir.
11    Q. Okay. Did you read this form before you signed
12  it?
13    A. Yes, sir.
14    Q. Did you agree with it?
15    A. Yes, sir.
16    Q. Did she -- were you provided the cell phone and
17  personal phones in order to contact your supervisor if
18  you were -- had the need to be late or absent?
19    A. Yes, sir.
20    Q. Subsequently, on April 23rd did you fail to
21  report for work?
22    A. I don't remember, sir.
23    Q. Did you receive a verbal warning for failure to
24  report to work subsequently on -- subsequent to April
25  18th?

Pag[e]

1    A. I don't remember that, sir.
2    Q. I'll hand you what's been marked as Exhibit --
3  Mata Exhibit 10. Please -- are you familiar with the
4  conversation that's related in that exhibit? Let me
5  withdraw that question. When you finish reading it,
6  I'll ask you another question. You finished?
7    A. Yes, sir.
8    Q. Did you have a conversation with Esmeralda
9  Guajardo and with Martha Canas present on April 24th,
10  2002?
11    A. I don't remember.
12    Q. Do you recall having a conversation subsequent
13  to April 18th for being absent?
14    A. After April 18th?
15    Q. Yes.
16    A. Yes, sir.
17    Q. Okay. So there were -- do you recall, then,
18  that there were two occasions where you were counseled
19  about being either tardy or absent?
20    A. No, sir.
21    Q. You only recall one?
22    A. From what I can see, I -- I only remember one
23  right now because the -- because of the dates.
24        The second form, Exhibit No. 10, is dated
25  before I signed Exhibit No. 9.

Page 73

1    Q. I understand that. But were you absent or did
2  you report for work late on April 16th, 2002?
3    A. I don't remember. I would have to look at my
4  time sheets.
5    Q. Did you sign the -- okay. Look at Exhibit
6  No. 9. You signed that. You said you agreed to the
7  content of that, did you not?
8    A. Oh, Exhibit No. 9, yes.
9    Q. Okay. And does it state that on April 16th,
10  2002, you did not appear for work or report your
11  absence?
12    A. That's what it states.
13    Q. Okay. And did you agree with that when you
14  signed it?
15    A. Yes, sir.
16    Q. Then on Exhibit No. 10, I believe it is,
17  the next exhibit --
18    A. Uh-huh.
19    Q. -- states under "Follow-up" -- states on April
20  24th they met with you, and it was about the incident on
21  April 23rd where you did not appear for work.
22        Do you recall a meeting with them at that
23  time?
24    A. No, sir.
25    Q. Do you deny that that happened?

19 (Pages 70 to 73)

**BRYANT & STINGLEY, INC.**

www.bryantstingley.com                    (956) 428-0755

Page 74

1    A. I don't remember about April 23rd. As I stated,
2  Exhibit No. 9 is dated after April 23rd, so I don't -- I
3  didn't sign Exhibit No. 10, so I don't -- I never saw
4  this. I don't remember this.
5        MR. BURST: I'll object as nonresponsive.
6    Q. Do you remember meeting with Esmeralda Guajardo
7  on April 24th concerning an April 23rd absence?
8    A. I don't remember that.
9    Q. Do you deny that it happened?
10   A. No. I said, "I don't remember that."
11   Q. Okay. It could have happened; you just don't
12 remember? Is that your testimony?
13   A. It could have been for April 16th, because it
14 was signed after April 23rd.
15       MR. BURST: Object as not responsive.
16   Q. I'm going to hand you what's been marked as
17 Exhibit No. 11. Do you recognize that note?
18   A. Yes, sir.
19   Q. Did you leave that note on the front door at the
20 Texas -- at the Cameron County Health Department?
21   A. Yes, sir.
22   Q. And is the date correct? Let me strike that and
23 withdraw.
24       On June 4th, 2002, did you leave that note
25 on the front door of the Cameron County --

Page 75

1    A. Yes.
2    Q. Okay. Did you call your supervisor,
3  Ms. Guajardo, in advance to let her know you were going
4  to be late or absent?
5    A. No, sir. I left -- that's why I left this note.
6    Q. And then when she sat down with you, and on the
7  report you signed, Exhibit No. 9, did she provide you
8  with your cell phone and her personal phones so you
9  could call her?
10   A. Yes, sir.
11   Q. Did you try to call her?
12   A. Not that day, no, sir.
13   Q. Okay. You had explicit instruction to do -- to
14 call her if you were going to be late or absent, did you
15 not?
16   A. I had instructions.
17   Q. And you disobeyed those instructions, did you
18 not?
19   A. By leaving this note, yes, I did.
20   Q. Okay. You filed this lawsuit claiming that you
21 made a verbal or written report or complaint of a
22 concern. Do you understand that?
23   A. Yes.
24   Q. Do you understand that?
25   A. Yes.

Page 76

1    Q. Can you tell me when the statement or statements
2  were made that you claim are protected speech?
3    A. When I called Judi Chase at the Texas Department
4  of Health. I don't remember the exact date, but it was
5  prior to my termination.
6    Q. Okay. Was there more than one call to Judi
7  Chase?
8    A. Yes, sir.
9    Q. How many?
10   A. I don't remember exactly how many, but there
11 were several.
12   Q. Well, were each of them a new report?
13   A. No, sir. It was in reference to the same thing,
14 the vaccinations.
15   Q. Okay. So it's your position that you made a
16 report to Judi Chase sometime prior to your termination;
17 is that correct?
18   A. Yes, I did, sir.
19   Q. Did you make a report to anybody else?
20   A. To my supervisors. They knew.
21   Q. Okay.
22   A. And I reported it to Ms. Chase to make sure
23 that, since I wasn't getting the answers on how to
24 dispose of the medications properly, that I was letting
25 the state know what was going on so that they could do

Page 77

1  the right thing and make sure this was taken care of
2  properly, and they could notify who needed to be
3  notified if there was some sort of health risk or some
4  sort of safety risk at hand.
5        MR. BURST: Object as not responsive.
6    Q. Did you make a report to anyone other than your
7  supervisors and Judi Chase?
8    A. I reported it to my supervisors, to the region
9  and to the Texas Department of Health.
10   Q. Okay. Who specifically did you report to that
11 you're calling supervisors?
12   A. Ms. Guajardo.
13   Q. Okay. Did you report it to anyone else as a
14 supervisor?
15   A. I may have mentioned it to the nurse in charge,
16 Ms. San Pedro.
17   Q. Okay. Do you know whether you did or not?
18   A. Yeah, I'm sure I did.
19   Q. Okay. Did you do that before or after you
20 reported it to your supervisor?
21   A. Probably after.
22   Q. Okay. Was Ms. San Pedro in a position over you
23 to supervise you?
24   A. I don't know what her position was for sure.
25   Q. Well, did she direct you or tell you what your

20 (Pages 74 to 77)

Page 78

1  duties were or what to do?
2      A. No, she didn't tell me. She could have guided
3  me, but I was told Ms. Guajardo was my supervisor.
4      Q. Okay. And Ms. San Pedro, she also worked for
5  the Cameron County Health Department; is that correct?
6      A. Yes, sir.
7      Q. Okay. And I believe your earlier testimony was
8  that when you reported this to Ms. Guajardo she told you
9  to take care of it, is what you said?
10     A. Yes, she said to take care of it, to figure it
11 out.
12     Q. Okay. Do you feel that you figured it out?
13        MR. JOE: Objection, form.
14     Q. You can answer the question.
15     A. Finally, yes, sir. To the best of my ability at
16 that time, yes, I did.
17     Q. Okay. Did you make any -- when you first
18 reported this to your supervisor, did you make a report
19 orally or in writing?
20     A. Orally, verbally.
21     Q. Okay. And what did you -- specifically what did
22 you tell Ms. Guajardo?
23     A. I don't remember specifically, but I remember
24 mentioning to her that we had an overwhelming amount of
25 vaccines. They -- well, she already knew about the ones

Page 79

1  that were upstairs, but the ones that were downstairs
2  that were refrigerated -- in the refrigerator that could
3  have been used or taken by mistake and used I mentioned
4  to her.
5      Q. First, let me ask you a question: Were you
6  aware that there was a safeguard that prevented expired
7  vaccine from being used, a safeguard in place?
8      A. No, sir.
9      Q. Okay. You didn't work with that, with the
10 actual administering the vaccine?
11     A. I don't know. I don't know what safeguard
12 you're talking about.
13     Q. Well, my question is, you didn't work with the
14 actual -- actually administering the vaccine to
15 patients; is that correct?
16     A. No, I didn't.
17     Q. Okay. So you're not aware of whether or not
18 there was a safeguard in place to prevent expired
19 vaccine from being used?
20     A. No, sir.
21     Q. Okay. Were you making that report to Ms. San
22 Pedro as an employee?
23        MR. JOE: Objection, form.
24     Q. You can answer the question.
25     A. Yes, sir.

Page 80

1      Q. Now, the -- subsequently, you say you made a
2  report to Judi Chase; is that correct?
3      A. Yes, sir.
4      Q. All right. When you made that report, did you
5  make it orally or in writing?
6      A. It was by telephone at first.
7      Q. Was the call made in order to get information on
8  how to handle the expired vaccine?
9      A. I placed the call in order to -- to report this
10 and to find out how to take care of this and for them to
11 also notify or make known -- let this be known to
12 whoever they needed to notify. If it needed to be made
13 public, then they would know what avenues to take and
14 who to let know.
15     Q. Was the inventory of this expired vaccine one of
16 your duties for the Cameron County Health Department?
17     A. It wasn't a -- I don't remember it being a
18 written duty, but it was a -- I was told to do it. I
19 was instructed to do it.
20     Q. Okay. And who instructed you to do it?
21     A. Ms. Guajardo.
22     Q. Okay. Was the return of the -- or the -- the
23 return of the vaccine -- the expired vaccine to the
24 Texas Department of Health one of your duties?
25     A. Well, yes, if she told me to do it.

Page 81

1      Q. And who told you to do it?
2      A. Ms. Guajardo. I was following what she told me
3  to do.
4      Q. Okay. What was the, if you recall -- was the --
5  your initial statement to Judi Chase when you contacted
6  her concerning the expired vaccine?
7      A. I don't remember specifically, but I do remember
8  reporting to her or notifying her of the enormous amount
9  of meds, vaccines, that we had in the building.
10     Q. And, when you called her, were you an employee
11 of the Cameron County Health Department?
12     A. Yes, sir.
13     Q. Okay. Did you make any other reports that you
14 considered a report on a matter of public concern?
15        MR. JOE: Objection, form.
16     Q. You can answer the question.
17     A. Can you repeat the question or rephrase?
18        MR. JOE: You mean any other than what she
19 testified to already or any other than calling Judi
20 Chase?
21     Q. Other than what you've testified to here right
22 now -- you've told me -- did you make any other reports
23 concerning what you believe was protected speech for
24 which you believe you were terminated?
25     A. I made the report to Judi Chase in reference to

21 (Pages 78 to 81)

Page 82

1   the vaccine, expired meds, and I also made one report to
2   some gentleman at the regional office about some
3   employees' concerns about possible asbestos in the
4   building.
5       Q. Okay. The regional office, where is that?
6       A. Some office that's here in Harlingen.
7       Q. Okay. And when did you make that report?
8       A. I don't remember. I think it was in April or
9   May.
10      Q. Well, you were only there part of April and May
11  and the first part of June, right?
12      A. So it was probably in April.
13      Q. And so, what, some employees had told you that
14  there was asbestos?
15      A. They were concerned about asbestos in the
16  building.
17      Q. So who did you contact?
18      A. I don't remember his name. He's in charge of
19  asbestos concerns.
20      Q. Did you advise your supervisor that you were
21  concerned about asbestos?
22      A. Yes, sir.
23      Q. Who did you tell?
24      A. Ms. Guajardo.
25      Q. Okay. When did you tell her?

Page 83

1       A. Probably as soon as it was mentioned to me by
2   the employees.
3       Q. And what did you tell Ms. Guajardo?
4       A. I asked her if there was some sort of a way to
5   find out if their concerns were valid, because they were
6   concerned on how to properly handle supplies that were
7   in the rooms that may have been contaminated or may have
8   contained asbestos.
9       Q. What did Ms. Guajardo tell you?
10      A. That they -- she had already heard of those
11  concerns several times and to ignore it.
12      Q. She told you to ignore it?
13      A. Yes.
14      Q. So what did you do?
15      A. I looked up information. I asked for pamphlets
16  on the effects of asbestos.
17      Q. Do you know who you talked to in the regional
18  office?
19      A. I don't remember his name.
20      Q. Did you make any -- was that in writing, or was
21  it oral?
22      A. It was a telephone call.
23      Q. How did you know who to contact?
24      A. I didn't. I just inquired, because they were
25  the regional office.

Page 84

1       Q. Did you advise your supervisor that you were
2   contacting the regional office concerning asbestos?
3       A. I don't remember -- I do remember mentioning I
4   needed to find out for the employees' concerns.
5       Q. Okay. You mentioned that to Ms. Guajardo?
6       A. Yes.
7       Q. When did -- was that a second conversation with
8   Ms. Guajardo?
9       A. Perhaps it may have been.
10      Q. Well, you made the conversation. Do you know
11  whether you made more than one -- you had more than one
12  conversation with Ms. Guajardo with regard to asbestos?
13      A. I may have mentioned it to her more than one
14  time.
15      Q. How many times?
16      A. A few times. I don't know how many for sure.
17  It was an ongoing problem there.
18      Q. So you discussed it with her several times?
19      A. Yes, sir. I don't remember exactly how many
20  times.
21      Q. Did it turn out that there was a problem at all?
22      A. I don't know for sure.
23      Q. So you never received any information back
24  concerning this report that you made concerning
25  asbestos?

Page 85

1       A. I got a copy of it from the Internet.
2       Q. Okay. Well, what does it say?
3       A. I don't have it in front of me. I don't know
4   exactly what it says.
5       Q. Well, does it say that there was no asbestos
6   found? Was it a negative report?
7       A. I don't understand what it says. I don't know
8   if it was negative or positive.
9           I do know that I was told that that's why
10  they were looking for a new building. The county wanted
11  to move the health department to a new building, because
12  it was old and --
13      Q. Who told you that?
14      A. Ms. Guajardo.
15      Q. Okay. Are there any other reports that you
16  consider that you made while you were at the Cameron
17  County Health Department that you consider a report of
18  public concern?
19      A. No, sir. Just the asbestos and the
20  immunizations.
21      Q. Okay. At the time you were the -- let me ask
22  you this question: You went to -- you were there
23  essentially April and May, correct?
24      A. Yes, sir.
25      Q. Do you know about what time during that period

22 (Pages 82 to 85)

Page 86

1   that you first discovered the expired vaccines?
2       A. I don't remember exactly, but I believe it was
3   sometime in May.
4       Q. Okay. Early May, late May?
5       A. I don't remember for sure.
6       Q. And then after that you worked with your
7   supervisors in the State Department of Health to try to
8   fill in this information and get them the report; is
9   that correct?
10      A. Yes, sir.
11      Q. Okay. Have you read the petition that's been
12  filed in your behalf in this case?
13      A. Yes, sir.
14      Q. Did you review it for its content and accuracy?
15      A. Yes, sir, I'm sure I did.
16      Q. Okay. In Paragraph 8 of the petition it states
17  in part that the subject matter of reports initiated by
18  Plaintiff -- and you understand that you're the
19  plaintiff, correct --
20      A. Yes, sir.
21      Q. -- was within the scope of her assigned duties
22  at the time made. Is that correct?
23      A. Yes, sir.
24      Q. Okay. So making these reports was part of your
25  assigned duties?

Page 87

1       A. Yes, sir.
2           MR. JOE: Objection, form.
3       Q. At the time you were handed your termination
4   paper it was late in the work day; is that correct?
5       A. Yes, sir.
6       Q. And did you return to your office and start
7   putting together papers to take with you?
8       A. Not putting -- I wasn't putting together papers.
9   I was just getting my belongings as quickly as possible.
10      Q. Well, correct me if I'm wrong, but earlier in
11  this deposition didn't you say that you removed some
12  copies of documents, these forms that you had completed?
13      A. Yes, sir. But it wasn't just the papers only.
14  It was also my belongings.
15      Q. I'm not asking you about your belongings. I'm
16  asking you about the county health department documents
17  or copies of them. You did remove some at that time?
18      A. Right.
19      Q. Did they ask you not to remove them at that
20  time?
21      A. Yes.
22      Q. But you did it anyway; is that correct?
23      A. I told them that they could get them later when
24  I came for my paycheck.
25      Q. You told them that they could get them what --

Page 88

1   get what later?
2       A. When I -- once I got home, that I could go
3   over -- through my personal bag and see what I had in
4   there, and I would return what was theirs, what they
5   considered theirs.
6       Q. So you made the decision that you would take
7   whatever documents you had and return them when you were
8   ready?
9       A. No. According to the policy and procedure, it
10  states that if they needed anything back from me, that
11  they could withhold my paycheck. So I told them, "If
12  there's anything that needs to be returned, you can give
13  it to me when I come for my paycheck."
14      Q. Excuse me. According to what policy?
15      A. The policy and procedures.
16      Q. You're saying that there's a Cameron County
17  policy that says they can withhold your paycheck?
18      A. If they needed some property returned, yes.
19      Q. Do you have a copy of that policy?
20      A. I don't have it in front of me right now.
21      Q. Where did you see that policy?
22      A. Probably at work at the health department.
23      Q. Do you understand the workings of making an open
24  records request?
25      A. Not really. Not specifically.

Page 89

1       Q. But you have testified that you understand now
2   that you didn't have the right to remove county
3   documents when you left, after you'd been terminated; is
4   that correct?
5       A. I didn't say that.
6       Q. You didn't say that earlier?
7       A. Not about it not being my right.
8           MR. JOE: Objection, form. I think she
9   testified specifically. I'm only going to say this,
10  because I do remember it; that she understands now that
11  the county considered that to be their property then.
12          MR. BURST: The testimony is what it is,
13  and I don't remember it that way.
14          MR. JOE: I don't either.
15      Q. When you worked for the county, on three
16  occasions at least, you made determinations that it
17  didn't make any difference what your supervisors told
18  you; you were going to do it the way you wanted to do
19  it; is that correct?
20          MR. JOE: Objection, form.
21      Q. You can answer the question.
22          MR. BURST: I'm not asking for further
23  explanation.
24      Q. You can answer the question.
25          MR. JOE: That's not what she testified to.

23 (Pages 86 to 89)

Page 90

1     MR. BURST: You know, I object to sidebar
2  comment. You let your witness -- you can object, but
3  you need to let your witness answer the question.
4     Q. Can you answer the question?
5     A. Can you ask the question, please?
6     Q. All right. You testified you knew that when you
7  signed that verbal reprimand and were given the phone
8  numbers of your Supervisor Guajardo that you were
9  instructed to call her if you were going to be tardy or
10  absent; is that correct?
11    A. Yes, sir.
12    Q. And did you testify that when you left that note
13  on the door on June 4th, that that was -- that you had
14  disobeyed that directive?
15    A. Yes.
16    Q. Okay. Did you testify that your supervisors
17  told you to revise the form -- the format on which you
18  were reporting the expired vaccine?
19    A. Can you repeat the question?
20    Q. Did you testify that your supervisors told you
21  to revise the format or the form that you were -- on
22  which you were recording the expired vaccine?
23    A. Yes. They said they wanted it altered, changed.
24    Q. And did you testify that, if they wanted to do
25  it, that they could do it?

Page 91

1     A. If they were going to -- if they wanted it done,
2  then they could do it themselves.
3     Q. Okay. And did you just testify that they told
4  you not to take the documents with you when you left
5  after your termination?
6     A. They told me not to take property that belonged
7  to Cameron County.
8     Q. Okay. And then did you testify that you told
9  them that they could get it back after you -- when you
10  picked up your paycheck?
11    A. Yes.
12    Q. Okay.
13    A. If there was anything that needed to be
14  returned.
15    Q. So, during your two months of employment with
16  the county, on at least three occasions you advised your
17  supervisors that you weren't going to do what they
18  wanted to do; is that correct?
19    MR. JOE: Objection, form. Mr. Burst, that
20  third example occurred after she was already terminated.
21    MR. BURST: She can answer the question.
22    MR. JOE: She was already fired.
23    MR. BURST: Do you have an objection?
24    MR. JOE: I object that you're including a
25  third example of what you're calling disregarding

Page 92

1  instructions as happening during her employment. It
2  actually happened after her employment.
3     MR. BURST: I object to your sidebar.
4  There's formal objections you can make to my questions.
5     MR. JOE: Well, I don't want you to trick
6  my client into answering the question.
7     MR. BURST: I'm not tricking -- let's -- we
8  can go before the judge, and you can argue this. Now,
9  I'm not tricking your client.
10    MR. JOE: You said, during her employment
11  on three occasions, and your third occasion is
12  disobeying instruction after she --
13    MR. BURST: Well, let's just -- she got
14  paid for that full day.
15    MR. JOE: She'd already been terminated.
16    MR. BURST: She got paid for that full day.
17    MR. JOE: I don't know what --
18    MR. BURST: And I'm not going to sit here
19  and argue with you. I'm going to ask the question.
20  You can make a proper objection, and she can answer the
21  question.
22    Q. Now, the question -- you heard my question. Do
23  you want me to repeat it?
24    A. Yes.
25    Q. On three occasions, while you were -- where you

Page 93

1  were immediately employed with Cameron County, did you
2  tell your supervisors that you were going to do -- you
3  were disobeying their directions and going to do it the
4  way you wanted to do it?
5     MR. JOE: Objection, form.
6     Q. You can answer the question.
7     A. Which three occasions are you talking about?
8     Q. The three that I just asked you about. Do you
9  want me to enumerate them for you?
10    A. Yes, please.
11    Q. No. 1, when you were told to call in and given
12  the phone number of your supervisor and told to call in
13  if you are tardy; No. 2, when you were told to revise
14  this form, and you told them they could do it; and,
15  No. 3, when you were told not to remove the property
16  from the -- the documents or property of the county, and
17  you told them they could get it later.
18    A. No. 1, with the tardiness and the absences, I
19  didn't do it intentionally, or I didn't do it to
20  directly disobey them. There was a lot of flexibility,
21  I was told by them there. What they wrote and what they
22  say are two different things.
23    No. 2, with the vaccination report, like
24  I've already said before, I reported this to Ms. Chase
25  at the Texas Department of Health, because I was not

24 (Pages 90 to 93)

Page 94

1  receiving proper or appropriate policy and procedures on
2  how to dispose of the vaccines, so I reported it to the
3  Texas Department of Health. And I did not make the
4  changes, because the job was completed.
5      And the third one, I was fired. I was
6  already terminated.
7      Q. Is that your answer?
8      A. I was already terminated.
9          MR. BURST: I object as not responsive.
10      Q. Now, you say that you didn't understand that you
11  were to call if you were going to be tardy or absent?
12      A. No, sir. I'm saying that I was told that there
13  was a lot of flexibility there. They -- if you're over
14  in hours, you just let them know you're coming in later
15  to make sure you did not go into overtime; if you're
16  going to come in, just to let them know.
17      Q. On April 16th you had been employed for
18  approximately two weeks. April 16th, 2002, you had been
19  employed approximately two weeks; is that correct?
20      A. Yes, sir.
21      Q. And on -- and you were given a warning notice
22  that was put in your file that you were to contact your
23  supervisor if you were late -- going to be late or
24  tardy; is that correct?
25      A. On April 25th.

Page 95

1      Q. All right. Were you late or tardy on April 16th
2  or not? Exhibit No. 9.
3      A. Yes. According to this, on April 16th, I was
4  tardy.
5      Q. Okay. So you had been with the county two
6  weeks. And, because of being tardy, you were called in
7  and given a verbal reprimand; is that correct?
8      A. This is a written reprimand.
9      Q. All right. I stand corrected. You were given a
10  written reprimand; is that correct?
11      A. Yes, sir.
12      Q. And in -- at that time you were given phone
13  numbers, not only cell phones but personal phone
14  numbers, of your supervisor to call if you were going to
15  be tardy or late; is that correct?
16      A. Yes, sir; I was given cell phone numbers.
17      Q. What in that made you think that you didn't have
18  to let them know if you were going to be tardy or
19  absent?
20      A. Her -- Ms. Guajardo and other employees saying
21  that it was a flexible place, that we could let them
22  know if we were going to be late. This was not done
23  intentionally.
24      Q. You didn't intentionally -- you weren't
25  intentionally late?

Page 96

1      A. No, sir.
2      Q. When you left that note on the door, couldn't
3  you as easily just called Ms. Guajardo like she
4  instructed you to do in writing?
5      A. I don't -- I don't remember why I didn't call
6  her, but I was right by the building at that hour, so I
7  left her the note.
8      Q. Okay. Pretty much, you felt you could do what
9  you wanted to do with regard to tardiness and absences;
10  is that correct?
11      A. No, sir, I didn't say that.
12      Q. What is it you feel you could do?
13      A. I did the best that I could do, sir, at the
14  time.
15      Q. While you were employed with the Cameron County
16  Health Department were you assigned a cell phone?
17      A. Yes, sir.
18      Q. Did you have that the entire two months you were
19  there?
20      A. I don't remember, sir.
21      Q. Do you remember when you got it?
22      A. No, sir.
23      Q. You don't?
24      A. No.
25      Q. So was there any reason you could not use that

Page 97

1  cell phone to call when you were going to be tardy or
2  late?
3      A. I don't know. No, sir.
4      Q. Okay. On the letter that you received advising
5  that you were employed, it told you on that letter that
6  you would be working 8:00 to 5:00; is that correct?
7      A. I believe so, sir.
8      Q. Okay. You've identified what you consider two
9  reports which were of public concern. Are there any
10  other reports you made while at the Cameron County
11  Health Department that you consider were of public
12  concern?
13      A. Not that I can remember.
14          MR. BURST: Let me -- if we can, let's go
15  off the record briefly and let me talk to my clients,
16  and I'll probably pass the witness after that.
17          MR. JOE: All right.
18          (Brief recess taken)
19          MR. BURST: At this time I'll pass the
20  witness.
21          MR. JOE: I do have some questions. These
22  subject areas I'm going into are for purposes of this
23  deposition and not in lieu of or in substitution of the
24  right to ask my client witnesses in the same -- I mean,
25  questions on the same subjects at the time of trial.

25 (Pages 94 to 97)

Page 98

1                    EXAMINATION
2   BY MR. JOE:
3        Q.  Ms. Mata, the first subject area I'd like to
4   talk to you about is the report -- actually, the
5   response of the county and your supervisors to the
6   report that you made to the state.
7            Can you tell the Court whether you
8   perceived any difference in your supervisor's treatment
9   towards you after you made the report to the state of
10  the expired immunizations?
11           MR. BURST:  Objection to form.
12       A.  You're asking me if I felt what differences
13  or --
14       Q.  I'm asking you if you perceived any differences
15  in how you were treated as an employee from how you were
16  treated before the report to how you were treated as an
17  employee after the report.
18       A.  I felt like I was being treated differently.  I
19  wasn't getting -- I was getting the cold shoulder,
20  maybe.  I felt as if I was being avoided and that I was
21  being watched more, as far as looking for reasons to
22  terminate me.
23       Q.  Do you believe that your supervisors appreciated
24  the fact that you reported the immunizations to the
25  state?

Page 99

1            MR. BURST:  Object to form of the question.
2   You're leading your witness.
3            MR. JOE:  Maybe I can rephrase that.
4   Strike that question.  I'll rephrase it.
5        Q.  If you have any opinion, what do you think your
6   supervisor's response was to the fact that you had
7   reported the expired immunizations to the state?
8        A.  It seems that they were --
9            MR. BURST:  Object to the form.
10           You can answer.
11           MR. JOE:  On the basis of what?
12           MR. BURST:  Calling for speculation.
13           MR. JOE:  I said, "If you have any
14  opinion."
15       Q.  Go ahead and answer.
16       A.  It's as though they were nervous.  They seemed
17  upset because of -- especially with that part that they
18  wanted me to black out or delete, as far as the cost.
19  It seemed as though they may have been embarrassed by
20  that amount -- the amount and the actual amount of years
21  that some of the medications had been expired, which I
22  believe went all the way up to about six to eight years
23  having been expired.
24       Q.  Did you feel that, even though calling the state
25  might bring some embarrassment upon the county, it was

Page 100

1   the right thing to do, anyway?
2            MR. BURST:  Objection to form of question.
3        A.  Yes, I felt like it was the right thing to do.
4        Q.  And can you tell the Court some of your
5   considerations in deciding to go ahead and report to the
6   state, even though it might bring some embarrassment to
7   the county?
8        A.  Well, I wanted to make sure that I did the --
9   that the -- I did the right thing, and especially in
10  disposing of these vaccines, disposing of them properly,
11  to let someone know what was going on, to -- by
12  reporting to the state so that they could also let the
13  people know who needed to be notified, as to what was
14  happening.  If there was some sort of concern or health
15  concern, they would notify whoever needed to know.
16       Q.  Would that be such as the public or the county
17  commissioners or county officials that need to know?
18       A.  I guess, yeah, whoever needed to know.
19       Q.  Were you a resident of Cameron County at the
20  time?
21       A.  Yes, sir.
22       Q.  So this facility you worked for actually had
23  jurisdiction to some degree over you as a citizen with
24  regard to health?
25       A.  Yes, sir.

Page 101

1        Q.  You were both an employee of Cameron County and
2   a citizen of Cameron County and a beneficiary of Cameron
3   County's Department of Health; would you agree with
4   that?
5            MR. BURST:  Object to form.
6        A.  Yes, sir.
7        Q.  Now, some number of questions have been asked
8   about Deposition Exhibit No. 11.  Looking at Deposition
9   Exhibit No. 11, this is a note, I believe you testified
10  to, in which you left with your employer to let them
11  know you would be in at 10:00; is that right?
12       A.  Yes, sir.
13       Q.  All right.  And at the time that you had left
14  this note with your employer, had you already worked a
15  number of hours in that work week that was going to
16  cause you to stop working or else incur overtime if you
17  worked as per your 8:00 to 5:00 schedule?
18           MR. BURST:  Objection, form.
19       A.  Yes, sir.
20       Q.  And can you tell the Court what your opinion was
21  of your employer's expectations that you not work
22  overtime without their specific approval?
23       A.  I was told that we were not to work overtime if
24  at all possible without prior approval; and, if we did,
25  that we had the flexibility to either come in late, take

Page 102

1  longer lunches or leave earlier.
2      Q. So you're saying that the notion that you work
3  strictly 8:00 to 5:00 is a false notion?
4      MR. BURST: Objection, form.
5      A. It's not set in stone.
6      Q. In other words, you could work more hours than
7  8:00 to 5:00 on some days and less hours than 8:00 to
8  5:00 on other days?
9      A. Yes, sir.
10     MR. BURST: Objection, form.
11     Q. Is that right?
12     A. Yes, sir.
13     Q. Within your employer's directives, you could
14  work more than 8:00 to 5:00 certain days and less than
15  other days?
16     MR. BURST: Objection, form, and not
17  supported by the evidence.
18     Q. Is that your understanding?
19     A. That's what happened, sir.
20     Q. Okay. And do you remember approximately what
21  time of day it was that you left this note on your
22  employer's door?
23     A. Yes. It was about 5:30 or 6:00 in the morning;
24  about 5:30 or 6:00.
25     Q. A.M.?

Page 103

1      A. A.M.
2      Q. Do you have any reason to believe that your
3  supervisors would be awake at that time of day?
4      A. No, sir.
5      Q. Did you reasonably assume they would have been
6  asleep, and you would have woken them up if you had
7  called them at that time of day?
8      A. Yeah. I felt that Ms. Guajardo might be asleep.
9  That was the number that I was given, so I figured if I
10  called at that hour I'd wake her. I didn't see any
11  sense in waking her if I was right there next to the
12  building.
13     Q. In fact, they did get this note; is that right?
14  Your understanding is that on June 4th they received
15  this note, because they had it and they showed it to you
16  that day; is that right?
17     A. Yes, sir.
18     Q. And did they ever contend that they didn't get
19  this note in a timely manner?
20     A. No.
21     Q. To this day, do you understand why they're being
22  so particular as to suggest that leaving this note was a
23  direct disobedient act and abrogation of your
24  instructions, when calling and waking them up at 5:30
25  would have been a better idea, ostensibly, following

Page 104

1  their directions?
2      MR. BURST: Objection, form of the
3  question.
4      A. It seems that they're trying to use that as the
5  reason that they terminated me, as opposed to my
6  reporting the expired vaccines to the state.
7      MR. BURST: Objection, nonresponsive.
8      Q. I realize you worked there for a short time, but
9  in that two-month period of time, have you ever seen
10  these supervisors be so particular with respect to
11  directions to an employee, as they were to you, if they
12  suggested they fired you because you left a note at 5:30
13  in the morning, as opposed to calling?
14     MR. BURST: Object to the form of the
15  question.
16     A. No, sir.
17     Q. Have you ever seen them treat another employee
18  that way?
19     A. No, I didn't.
20     Q. Have you ever seen them treat other employees
21  much more loosely and understandably and flexibly?
22     MR. BURST: Objection to the form of the
23  question.
24     A. Well, for sure, I know themselves, they came in
25  late. I saw them several times come in late.

Page 105

1      Q. Okay. And was this a workplace where getting
2  the point across was more important than the form that
3  the point was made in? In other words, if you got the
4  point across in this letter, based on your understanding
5  of the kind of employer they were over the two-month
6  period of time, wasn't that sufficient that you got the
7  point communicated to them?
8      MR. BURST: Objection to the form of the
9  question.
10     A. Yes, that makes sense. I was told at least on
11  two occasions by Ms. Guajardo that that place of
12  employment was like -- was not like a normal place of
13  employment. And, actually, I asked her why, and she
14  said, "Because this is the county. The county works
15  very different," implying that it was political in some
16  sense.
17     Q. Okay. You testified that at the beginning of
18  the questions I asked that you felt like one of the ways
19  you were treated differently was they were watching you
20  very closely.
21     Would firing you because you wrote a note
22  saying you'd be in late, as opposed to calling them on
23  the telephone and telling them at 5:30 in the morning
24  that you'd be in late an example of how they were
25  watching you closely to nitpick your conduct?

BRYANT & STINGLEY, INC.
www.bryantstingley.com                    (956) 428-0755

Page 106

1        MR. BURST: Objection, form of the
2    question.
3        A. I believe so.
4        MR. JOE: Pass the witness.
5               EXAMINATION
6    BY MR. BURST:
7        Q. So you believe they were trying to find a reason
8    to fire you?
9        A. Yes, sir.
10       Q. Your testimony was that you made the reports
11   that you made in May of 2002; is that correct?
12       A. The one about the vaccines, yes, sir.
13       Q. And what about the one about the asbestos?
14       A. It may have been April or May.
15       Q. When was it?
16       A. It may have been April or May.
17       Q. Did you make it in writing?
18       A. No, sir. I told you I made it by telephone
19   call.
20       Q. And you made it in a time just before you were
21   terminated; is that correct?
22       A. Which one?
23       Q. The asbestos.
24       A. No, sir.
25       Q. And you feel that's why they terminated you,

Page 107

1    because you reported the asbestos?
2        A. No, sir. Because of the expired vaccines.
3        Q. And, as to the expired vaccines, those -- you
4    had been twice reprimanded for being tardy in April
5    prior to making the report of the vaccine; is that
6    correct?
7        A. At least one. I don't know about twice.
8        Q. Well, let me put it this way: The documents
9    that were laid before you were both dated in April,
10   those two documents that are --
11       A. Yes, sir.
12       Q. Do you want me to identify them, or do you
13   want -- okay. The two documents concerning the
14   reprimand, which are Exhibits No. 9 and 10, were both
15   dated in April; is that correct?
16       A. Yes, they're both dated in April. Like I said,
17   I only signed one. I didn't see the other one.
18       Q. I understand that. Well, the other one was a
19   recordation of a verbal reprimand. It wasn't presented
20   to you; is that correct?
21       A. I don't remember seeing it.
22       Q. Okay. But both documents are dated prior to
23   your report of vaccine expiration; is that correct?
24       A. Yes, prior to the report of the vaccines and
25   after the report of the asbestos.

Page 108

1        Q. I understand. And so you made the vaccine --
2    the asbestos report within two weeks of your employment
3    there?
4        A. It was somewhere around April to -- April to
5    May.
6        Q. April or May? You don't know?
7        A. Not for sure.
8        Q. We can find out by going through the records; is
9    that correct?
10       A. Yes, sir.
11       Q. Okay. And so tell me how they were out to get
12   you if they reprimanded you prior to making the reported
13   violations of the -- or the reported -- the expiration
14   of vaccine?
15       A. Like I said, it seemed like they were avoiding
16   me, that they were being colder. It looked like I was
17   under a microscope. It felt like I was working under a
18   microscope. They were just nitpicking and -- I don't
19   know.
20       Q. So you felt, in spite of being told in writing
21   that you had to be there or to report, that you didn't
22   have to be there that way; is that correct?
23       MR. JOE: Objection, form.
24       Q. Is that correct?
25       A. I'm not saying that I felt that way, no.

Page 109

1        Q. Well, did you feel you needed to be there 8:00
2    to 5:00?
3        A. I -- I was told we had the flexibility, sir,
4    to -- if we were working overtime, that we could come in
5    later or leave earlier.
6        Q. Were you told if you worked overtime you were to
7    get permission in advance to work overtime?
8        A. Yes.
9        Q. Did you get permission in advance to work
10   overtime on the week that you left the note June 4th?
11       A. Yes. I was told to complete the immunizations.
12       Q. You were told to work overtime?
13       A. Right.
14       Q. Specifically told to work overtime?
15       A. I was told to do what we needed to do in order
16   to get that done.
17       Q. Did you go to your supervisor and say, "I'm
18   going to need to work overtime to complete that report"?
19       A. No.
20       Q. You never discussed with her that you were going
21   to work overtime; is that correct?
22       A. I didn't discuss overtime.
23       Q. Okay. And you understand county policy required
24   you to discuss with her if you were going to work
25   overtime before you worked overtime; did you understand

BRYANT & STINGLEY, INC.

www.bryantstingley.com                    (956) 428-0755

Page 110

1  that?
2      A. I don't remember that policy.
3      Q. Okay. Did you go to your supervisor and say the
4  day before, June -- on June 3rd, did you go to your
5  supervisor and say, "I've been working overtime. I'm
6  going to come in late tomorrow"?
7      A. No, sir. I believe I had already worked late
8  that day, so they were probably already gone for the
9  day.
10     Q. Do you understand that even if you work
11  overtime, whether it's with pre-authorization or not,
12  you're entitled to be given comp time for that overtime?
13     A. I understand that.
14     Q. Okay.
15     A. They told us --
16     Q. All right. Now --
17     A. -- to cut it down.
18     Q. But you understand that you don't determine when
19  you take that time off for overtime; do you understand
20  that?
21     A. Not with them, no, sir.
22     Q. Do you have any document, either a county policy
23  from your supervisors, that tell you that you have the
24  flexibility to work when you want to work?
25     A. I was told verbally.

Page 111

1      Q. In the face of a written document given to you
2  two weeks after you were employed there that told you
3  that you had to let them know if you weren't going to be
4  there?
5      A. Can you repeat or rephrase?
6      Q. You got a written document within two -- or
7  within -- within three weeks you went to work there, you
8  got a written document because you were tardy within two
9  weeks, and that document specifically told you that you
10  needed to report if you were going to take time off,
11  didn't it? Read it.
12     A. Yes. But --
13         MR. JOE: Well, it says what it says.
14     A. Yes.
15     Q. Does it say that?
16     A. But they were very flexible. They said that,
17  that they were very flexible.
18     Q. But you don't have anything in writing that they
19  said that, do you?
20     A. No. It was verbal just like this was verbal.
21  Exhibit No. 10 was verbal. I didn't sign it. I didn't
22  see it.
23     Q. But it was written down and put in your file,
24  wasn't it?
25     A. By them, but I didn't see it.

Page 112

1      Q. Okay.
2      A. Just like the verbal -- them verbally telling me
3  that we were flexible --
4         MR. JOE: That raises a good question,
5  though --
6         MR. BURST: I object to your sidebar
7  comments, and if you continue it one more time, I'm
8  going to adjourn this objection, and we're going to go
9  to the judge, and then you can tell him why you can make
10  a mockery of me taking her deposition.
11         MR. JOE: I'm not --
12         MR. BURST: You got a chance to ask her
13  questions if you want to.
14         MR. JOE: I'm not making a mockery of it.
15         MR. BURST: I believe you are. You're
16  sitting over there laughing, and you're making sidebar
17  comments. You're interfering with my questions. I gave
18  you all the opportunity to question your witness, and
19  you can do it again, and you can make objections.
20         MR. JOE: Well, I will do so.
21         MR. BURST: All right.
22     Q. So you don't feel that you needed to discuss
23  with your supervisors that you were going to take time
24  off?
25         MR. JOE: Objection, form.

Page 113

1      Q. You can answer the question.
2      A. I notified somebody, and I didn't -- I'm not
3  saying I didn't feel the need to do it. But, like I
4  said, I was told they were very flexible.
5      Q. Who told you they were very flexible?
6      A. Ms. Guajardo.
7      Q. Okay. And so on June 4th at 5:30 in the morning
8  you left a note on the door?
9      A. Approximately 5:30 to 6:00.
10     Q. And you were in the vicinity of their office?
11     A. Yes, sir.
12     Q. What were you doing in the vicinity of their
13  office at 5:30 in the morning?
14     A. I was dropping off my brother at a school.
15     Q. What school does he go to that starts at 5:30?
16     A. It was a truck driving school.
17     Q. Okay. And did you have the county's cell phone
18  at that time?
19     A. I don't remember, sir.
20     Q. Well, do you have a telephone?
21     A. Do I have one?
22     Q. Yes.
23     A. Yes.
24     Q. Were you going to be someplace where there was
25  not going to be a phone?

29 (Pages 110 to 113)

BRYANT & STINGLEY, INC.

Page 114

1    A. I don't recall. I just knew it was very early
2 in the morning, and I figured that it was easier and it
3 was probably -- I would have a document showing that I
4 did let somebody know.
5    Q. Why were you -- why were you late on June 4th?
6    A. I believe I had worked late the day before, and
7 I was up very early that day, and I had already put in
8 several hours of overtime, so I didn't see any problem
9 with it.
10    Q. You didn't see any problem with it, but you
11 didn't ask your supervisors if they had a problem with
12 it, did you?
13    A. Not for that day. They had already told me they
14 were flexible.
15        MR. BURST: I object to the response.
16    Q. Did you tell your supervisors -- did you give
17 them a chance to see if they had a problem with you
18 being late that day?
19    A. For that day, no, because they told me they were
20 flexible. We were supposed to --
21        MR. BURST: Object as nonresponsive.
22    A. We were supposed to watch our own schedules, our
23 own hours, is what they told us or told me to watch my
24 hours.
25        MR. BURST: I object as nonresponsive.

Page 115

1    Q. Where were you at 8:00 on June 4th of 2002?
2    A. I may have been home that morning.
3    Q. Do you have a phone at your home?
4    A. Yes, sir.
5    Q. Could you have called your supervisor and said,
6 "Did you get my note? I need to be late"?
7    A. I could have.
8    Q. Did you?
9    A. No, I did not. That's what the note was for.
10        MR. BURST: I'm going to object to the last
11 part of that as nonresponsive.
12    Q. Okay. You've testified that you thought that
13 after you made the report of the vaccine they were
14 looking for ways to terminate you.
15        Precisely what gave you -- why did you make
16 this statement, they were looking for ways to terminate
17 you?
18    A. For example, this note. I didn't understand. I
19 still don't understand what the big deal was that I was
20 going to be late. They were late often. We left early.
21 They left early often.
22    Q. Oh, so you're saying because your supervisors
23 were late you could be late?
24    A. I didn't say that. I'm just saying I don't
25 understand what the big deal was.

Page 116

1    Q. Well, you compared them to me. You said they're
2 late. Does that mean you can be late? If your
3 supervisors are late, that means you can be late?
4        MR. BURST: Objection, form.
5    Q. You can answer the question.
6    A. I was told, sir, again, that we were flexible.
7 We were supposed to watch our hours.
8        MR. BURST: Object as nonresponsive.
9    Q. You just stated to me that the supervisors were
10 late; is that correct?
11    A. Yes.
12    Q. Do you feel that because they were late to work
13 you could be late to work?
14    A. Not just for that reason, but we were -- we were
15 all county employees.
16    Q. Okay. Then what difference does it make if they
17 were late, if you don't feel that that gave you a reason
18 to be late?
19    A. Rephrase the question, please.
20    Q. You told me that they were late. Why did you
21 tell me they were late if it doesn't make any
22 difference?
23        MR. JOE: Objection, form.
24    Q. You can answer the question.
25    A. Because you're making it seem as though because

Page 117

1 we're scheduled 8:00 to 5:00 that it's set in stone.
2    Q. But you're not a supervisor, are you?
3    A. I was. At that place of employment I was.
4    Q. You were a supervisor over who?
5    A. Not of them, but I was told that I was the
6 supervisor for the immunizations program.
7    Q. But you didn't supervise any people, did you?
8    A. I was told I was.
9    Q. Who were you supervising?
10    A. The immunizations program.
11    Q. Well, give me a name. Who were you supervising?
12    A. Whoever their employees are in the immunization
13 department.
14    Q. Well, who did you supervise on a daily basis?
15 Who did you give orders to?
16    A. I know I worked with a girl named Irene, and
17 they -- I was told that I was to oversee the
18 immunizations program which would have been other nurses
19 that were in the other clinics.
20    Q. Well, did you ever do anything -- did you ever
21 have a meeting with the other nurses and tell them what
22 to do?
23    A. I met them, I wrote notes, and I went to go look
24 at the other buildings, the health clinics. And I never
25 had a chance to have a meeting with them, but I saw

30 (Pages 114 to 117)

Page 118

1  things that --
2     Q. Go ahead and finish.
3     A. I saw things that shouldn't have been done that
4  were being done.
5     Q. Did you when either of the -- either Yvette
6  Salinas or Esmeralda Guajardo were late, did you ever
7  ask them why they were late?
8     A. No, sir.
9     Q. Did you ever feel that they may have things to
10 do like go to the commissioners court or go to other
11 areas where the health department has work? Did you
12 ever ask them?
13    A. No, sir. They said that we were flexible there,
14 so I don't know what their reasons were.
15       MR. BURST: Objection, nonresponsive.
16    Q. So back to my question to you, is the fact that
17 they were sometimes late, in your view, did that give
18 you any authority to be late?
19       MR. JOE: Objection, form.
20    A. I was verbally told that I could be late or
21 leave early, sir.
22       MR. BURST: Object as nonresponsive.
23       MR. JOE: I really think this question has
24 been asked enough times.
25       MR. BURST: She hasn't answered it yet.

Page 119

1        MR. JOE: She said that not for that reason
2  alone -- not for that reason alone was she entitled to
3  be late.
4        MR. BURST: Okay. I'll rephrase the
5  question.
6     Q. Do you feel that the reason -- that because
7  Yvette Salinas and Esmeralda Guajardo were late, in your
8  view, that that was a reason for you to be late?
9     A. No.
10    Q. Do you believe that if an employer advises an
11 employee within two weeks or three weeks of their hire
12 date that they're not to be late or tardy, and if they
13 are to call and the person does that again, that the
14 employer has the right to fire the employee?
15    A. I don't know what they have the right to do.
16    Q. Do you think they can fire the employee -- the
17 employer can fire the employee for those reasons?
18    A. I don't know what they can or cannot do.
19    Q. So to turn that around, do you have an opinion
20 that if you're -- if an employee is late after being
21 advised not to be late, that the employer can't
22 terminate them?
23    A. I don't know what they can do, sir. Apparently,
24 they can do what they want.
25    Q. How did they avoid you after you made this

Page 120

1  report in May; "they" being your supervisors?
2     A. By not saying very much to me when they saw me;
3  by not stopping in my office. They weren't as friendly.
4     Q. They what?
5     A. They weren't as friendly.
6     Q. They weren't as friendly as before you made the
7  reported violations; is that what you're saying?
8     A. Yes, sir.
9     Q. Okay. What specific -- you testified to your
10 attorney that they were looking for reasons to terminate
11 you. What specific facts did you see that you gave your
12 attorney an opinion they were looking for reasons to
13 terminate you?
14    A. Oh, they were -- let me see. I don't know
15 exactly how to say it. I just -- it felt -- I could
16 feel the change in our relationship, our work
17 relationship, the way they treated me, the way they -- I
18 could hear -- I knew that there were rumors around that
19 they were talking about me. It seemed as though they
20 were nervous or upset. They felt something, as a result
21 of this report. They knew something was up. They felt
22 uncomfortable. They were -- I don't know -- upset. I
23 just -- I could feel the -- the distance. I don't know
24 how else to explain it.
25    Q. Okay. I want you to look at the first paragraph

Page 121

1  of Exhibit No. 10. Do you remember calling Danny Cruz
2  about -- on that date that's reflected there?
3     A. Repeat the question, please.
4     Q. Do you remember talking to Danny Cruz on that
5  date?
6     A. Vaguely.
7     Q. Vaguely?
8     A. (Moving head up and down).
9     Q. Okay. Do you remember talking to Esmeralda
10 Guajardo, your supervisor, on that date?
11    A. I may have. I don't remember, sir.
12    Q. Did you tell her you would be in at 10:00?
13    A. I don't know who I told I would be in at 10:00.
14    Q. It could have been her?
15    A. According to this, it says it was her.
16    Q. Well, I'm asking you. Do you know -- you said
17 you don't know, but could it have been her that you
18 talked to?
19    A. It could have been her. She signed this form.
20 She signed this document.
21    Q. But you don't know who you talked to is your
22 response; is that correct?
23    A. I don't really remember. It may have been her.
24    Q. Okay. Do you recall her telling you that if you
25 did -- if you were late or absent again without talking

31 (Pages 118 to 121)

Page 122

1  to them that that would be grounds for termination?
2     A.  Without notifying them, yes.
3        MR. BURST:  Okay.  I have no further
4  questions.  I'll pass the witness.
5        MR. JOE:  All right.  I have a couple of
6  follow-up questions.  I would like to just say to make
7  the record complete that I have not laughed for much of
8  this deposition.  In fact, I only laughed at one time
9  during this deposition, which I will gladly admit to,
10  and it was at the point in time that opposing counsel
11  suggested that a verbal understanding was without
12  effect, when one of these exhibits that was written but
13  never shown to my client and simply inserted into her
14  file has great importance.  I did laugh briefly at that
15  remark but not to make a mockery of the deposition but
16  only because I couldn't help myself.
17        EXAMINATION
18  BY MR. JOE:
19     Q.  All right.  Ms. Mata, at the time of your
20  termination you were working on the report of expired
21  immunizations, right?
22     A.  Yes, sir.
23     Q.  Had you been given any work assignment to begin
24  after this was done?
25     A.  No, sir, not at all.

Page 123

1     Q.  Had they ever -- had your supervisors ever
2  mentioned to you what you would be working on after you
3  finished this project?
4     A.  No, sir.
5     Q.  With respect to the note that was left on the
6  door, Deposition Exhibit No. 11, you did testify that
7  they received it.  You also testified you didn't call to
8  confirm that they received it.  But wouldn't you agree
9  that in your experience, as a person -- well, first let
10  me back up and lay a foundation.  Have you in your life
11  had numerous occasions to call people by telephone?
12     A.  Yes.
13     Q.  And is it true that sometimes when you call for
14  someone you get no answer?
15        MR. BURST:  Object to form.
16     A.  Yes.
17     Q.  And is it also true that some of the times you
18  get no answer the person you called doubts that you
19  actually did make a call to them?
20        MR. BURST:  Object to form.
21     A.  Yes.
22     Q.  Has that happened before in your experience?
23        MR. BURST:  Object to form and calls for
24  speculation.  How is she going to know?
25        MR. JOE:  In her experience -- what my

Page 124

1  question is -- in her experience, as a person that uses
2  the telephone, my question is, has she ever called
3  someone who didn't answer the phone, who then doubted
4  that she actually did make the call?
5        MR. BURST:  Objection, form.
6     A.  Yes.
7     Q.  That's happened to you before?
8     A.  Yes, sir.
9     Q.  And you also had testified that you thought that
10  subsequent to making the report to the state that your
11  employer was treating you with scrutiny and looking for
12  reasons to get rid of you, correct?
13     A.  Yes.
14        MR. BURST:  Objection, form.
15     Q.  So, by having submitted a note, you actually did
16  something that was safer from the standpoint of
17  eliminating any confusion over whether you gave your
18  employer notice or not?
19        MR. BURST:  Objection to form.
20     Q.  Would you agree with that?
21     A.  Yes.
22        MR. JOE:  Pass the witness.
23        EXAMINATION
24  BY MR. BURST:
25     Q.  Had you called and talked to your supervisor on

Page 125

1  June 4th, your supervisor would have had the opportunity
2  to tell you, "No, you have to come on in," wouldn't she?
3     A.  She could have.
4     Q.  But by leaving a note she had no opportunity to
5  discuss it with you at all, did she?
6     A.  No, sir.
7        MR. BURST:  I have no other questions.
8        MR. JOE:  I've got one more question.
9        EXAMINATION
10  BY MR. JOE:
11     Q.  During the two-month period that you worked for
12  the county, were your supervisors ever aware that you
13  did work at home?
14     A.  Yes.
15     Q.  And what sort of work did you do at home for
16  them?  Was it this project that you had been working on
17  for a long period of time?
18     A.  This was part of it.
19     Q.  Okay.
20     A.  And also ordering office supplies.  They said I
21  could do that on my own time or after hours.
22     Q.  Ordering office supplies for the office?
23     A.  For the office.
24     Q.  All right.  And working on compiling information
25  for them they told you you could do at home?

32 (Pages 122 to 125)

Page 126

```
1    A. Yes, sir.
2    Q. Was that work at home -- we're talking about
3  compiling information -- was that done on the clock or
4  off the clock?
5    A. On the clock.
6    Q. Okay. So you were -- you were allowed to keep
7  track of your own hours, worked outside the office; is
8  that right?
9    A. Yes, sir.
10   Q. And was it these two supervisors that knew of
11 that?
12   A. I know for sure Ms. Guajardo did.
13   Q. All right. So they didn't presume that if you
14 weren't at the office you weren't working; is that
15 correct?
16       MR. BURST: Object to the form.
17   A. True.
18   Q. And just so that this is not an objectionable
19 question on that, I will rephrase it and say, another
20 way to draw a conclusion from this is that they knew
21 some of the time that you were outside of the office you
22 were working for the county?
23       MR. BURST: Objection, form.
24   A. Yes, sir.
25   Q. Okay. And was it both of these supervisors that
```

Page 127

```
1  knew of this policy where you could work at home and
2  keep track of your own hours?
3    A. I know for sure Ms. Guajardo did.
4    Q. Anyone else besides her?
5    A. The human resource lady.
6    Q. Anyone else besides those two?
7    A. A girl that worked with me, Irene, knew I did
8  that.
9    Q. Okay.
10   A. Danny knew I did that.
11   Q. All right. They told you you could do it?
12   A. They knew -- they knew it was --
13   Q. And that you were keeping track of your hours at
14 home?
15   A. Yes, sir.
16   Q. They never told you you could not do that?
17   A. They never told me that.
18   Q. All right. Did they know that in order to do
19 work at home, for example, on these lists, you had to
20 take things with you, such as these lists?
21   A. Yes, sir.
22   Q. And they didn't have a problem with that?
23       MR. BURST: I object to form.
24   Q. Is that right?
25   A. Not at all. They had no problem with it.
```

Page 128

```
1    Q. That they knew it, and they had no problem with
2  it, to be perfectly clear?
3        MR. BURST: Object to form.
4    A. Yes, sir.
5    Q. All right. And that with respect to some of
6  these drafts of lists that are exhibits here, there were
7  multiple copies of these drafts; is that right?
8    A. Yes, sir, there are a lot more of those.
9    Q. So you didn't deprive the county of any
10 exclusive information; is that right?
11   A. No, I did not.
12   Q. If you happened to have any of this work that
13 you shuttled back and forth from your house to work with
14 you when you left, you did not deprive the county of
15 anything they didn't already have; is that right?
16   A. That's correct.
17   Q. In fact, some of these drafts would have been
18 completely outdated at the time you were terminated,
19 correct?
20   A. That's correct.
21       MR. JOE: All right. Pass the witness.
22           EXAMINATION
23 BY MR. BURST:
24   Q. Is it your statement that you were permitted to
25 work at home during business hours?
```

Page 129

```
1    A. I know I worked at home after business hours.
2    Q. That's what I understand you to say, that you
3  worked -- that you say -- your testimony is that
4  Ms. Guajardo knew you were working at home after hours?
5    A. After hours, yes.
6        MR. BURST: No further questions. I pass
7  the witness.
8           EXAMINATION
9  BY MR. JOE:
10   Q. On the day that you did report late to work at
11 10:00, did you have any reason to believe that you would
12 not have been excused to take that time off when you
13 left the note on the door?
14       MR. BURST: Object to form.
15   A. No, sir.
16       MR. JOE: All right. No further questions.
17           EXAMINATION
18 BY MR. BURST:
19   Q. Do I understand you to say that you didn't have
20 any reason to believe you would not have been excused by
21 leaving a note on the door? Is that what you said?
22       MR. JOE: That's not what I asked, so I
23 don't see how that could be what she said, because
24 that's not the question I asked.
25       MR. BURST: I hate to ask you to read back
```

33 (Pages 126 to 129)

**Page 130**

```
1   the question he asked, but I'm going to need to.
2        MR. JOE: Can I cut this short from you
3   going through that exercise? I asked her if she knew of
4   any reason why she would not be excused had she asked
5   for that time off that day that she left the note there.
6        MR. BURST: I object to the form then, and
7   I object to form now.
8    Q. If you had called and talked to her -- you've
9   already testified. If you'd called and talked to them,
10  then you would have given them an opportunity to tell
11  you whether or not you could take off; is that correct?
12   A. Yes.
13   Q. And you did not do that; is that correct?
14   A. No, sir. I left the note.
15       MR. BURST: Okay. I'm beating a dead
16  horse. I have no -- I pass the witness.
17       MR. JOE: No further questions at this time
18  and reserve all questions till the time of trial.
19       (Deposition concluded)
20
21
22
23
24
25
```

**Page 131**

BELINDA MATA - ERRATA SHEET

Reasons for changes:(1) Clarify the record
(2) Conform to the facts
(3) Correct transcription errors.

PAGE LINE  CHANGE FROM/CHANGE TO          REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Page 132**

SIGNATURE OF BELINDA MATA

I have read the foregoing transcript of my deposition
and it is a true and accurate record of my testimony
given on DECEMBER 8, 2004, except as to any corrections
I have listed on Page 131 herein.

_____
BELINDA MATA

THE STATE OF TEXAS
COUNTY OF HIDALGO

SUBSCRIBED AND SWORN TO BEFORE ME, the

undersigned authority on this the _____ day of

_____, 2004.

_____
Notary Public in and for
The State of Texas

My commission expires:

_____

**Page 133**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
BELINDA MATA          X
    Plaintiff         X
                      X
VS.          X  CASE NO. B-04-092
                      X
CAMERON COUNTY HEALTH  X
DEPARTMENT, THE COUNTY OF X
CAMERON               X
    Defendants        X

REPORTER'S CERTIFICATE
I, LINDA LOCKLEAR, Certified Court Reporter,
certify that the witness, BELINDA MATA, was duly sworn
by me, and that the deposition is a true and correct
record of the testimony given by the witness on
DECEMBER 8, 2004; that the deposition was reported by me
in stenograph and was subsequently transcribed under my
supervision.
I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of the parties, nor a
relative or employee of such attorney or counsel, nor am
I financially interested in the action.

WITNESS MY HAND on this _____ day of
_____, 2004.

_____
LINDA LOCKLEAR, Texas CSR 6326
Expiration Date: 12-31-04
Bryant & Stingley, Inc.
4900 North 10th, Building A, Suite 3
McAllen, Texas 78504
Firm Registration No. 41
(956) 618-2366

34 (Pages 130 to 133)

**BRYANT & STINGLEY, INC.**
www.bryantstingley.com          (956) 428-0755